# EXHIBIT A



  

**Family Assessment Clinic** | 4925 Packard Road, Ann Arbor, MI 48108 | Direct: 734.926.4650 | Main: 734.971.9781 | F: 734.971.2730 | www.csswashtenaw.org

**Date**:  July 8, 2015

**Case name**: P▆▆▆▆-M▆▆▆▆ **family**

Contractual arrangement: The Family Assessment Clinic through Co-Director, Kathleen Coulborn Faller, Ph.D., was contacted by James R. Marsh of the Marsh Law Firm on February 3, 2015 to undertake a document review and family member assessments related to the exploitation of the P▆▆▆▆-M▆▆▆▆ children in pornography. The contract specifies a fee of $295 an hour for work on this case (document review, interviews, testing, report writing, deposition, and court testimony) paid to Catholic Social Services of Washtenaw County. No personal compensation is received for this review. The Clinic's administrative support and internal consultation are not billed.

Brief biographical sketch: KATHLEEN COULBORN FALLER, Ph.D., A.C.S.W., D.C.S.W., is Marion Elizabeth Blue Professor Emerita at the University of Michigan. She is also Co-Director of the Family Assessment Clinic at Catholic Social Services of Washtenaw County.

Dr. Faller is involved in research, clinical work, teaching, training, and writing in the area of child welfare, child sexual abuse, and the child welfare workforce. She conducts case record reviews where the issues related to child sexual abuse, other types of child maltreatment, and child welfare and social work best practice. She has conducted over 300 juried conference presentations at state, national, and international conferences and over 250 workshops.

She is the author, editor or co-editor of 10 books, including *Social Work with Abused and Neglected Children* (The Free Press, 1981), *Child Sexual Abuse: An Interdisciplinary Manual for Diagnosis, Case Management, and Treatment* (Columbia, 1988), *Understanding Child Sexual Maltreatment* (Sage, 1990), *Child Sexual Abuse: Intervention and Treatment* (Department of Health and Human Services, 1993), the American Professional Society on the Abuse of Children Study Guide: *Interviewing Children Suspected of Having Been Sexually Abused* (Sage, 1996), *Maltreatment in Early Childhood: Tools for Research-based Intervention* (Haworth Press, 2000), *Understanding and Assessing Child Sexual Maltreatment, Second Edition* (Sage, 2003), *Interviewing Children about Sexual Abuse: Controversies and Best*

*Practice* (Oxford, 2007), *Seeking Justice in Child Sexual Abuse: Shifting Burdens and Sharing Responsibilities* (Columbia, 2010) and *Contested Issues in Child Sexual Abuse Evaluation* (2014), as well as approximately 100 research and clinical articles.

<u>Reason for referral</u>: The P██████-M██████ family was referred by James R. Marsh of the Marsh Law Firm for evaluation based on the M██████ children's victimization through child pornography. The producers of the pornography were R███████████ M██████, the children's biological father, and J████ B█████, a General Motors executive. Both men are currently incarcerated, but they distributed the pornography on the internet. Thus, the images are still available and involve scores of additional offenders who have accessed, traded, shared, and utilized the M██████ children's sexual abuse images.

The questions the Family Assessment Clinic was asked to address are as follows:

1.      The psychological harm that the children, and their mother, have suffered and are likely to suffer because of the child pornography which is widely available online and is still being collected, viewed, and traded.
2.      The impact that the existence and wide distribution, trading, collecting, and viewing of Erin and Fiona's child sexual abuse images had and will have on their ability to form and maintain relationships.
3.      How it will likely impact Erin and Fiona's ability to one day have a family.
4.      How it impacts the family on a daily basis.
5.      What medical services will Erin and Fiona likely need over their lifetimes including physical, psychiatric and psychological care?
6.      Overall impact on Erin and Fiona's potential for "enjoyment of life."
7.      How the existence and wide distribution, trading, collecting, and viewing of Erin and Fiona's child sexual abuse images caused and will cause additional and long-lasting harm beyond the original abuse.

<u>Process of evaluation</u>: Background materials related to the criminal cases against R██████ M██████ and J████ B█████ and other documents furnished by the Marsh Law Firm were reviewed. The list of these documents can be found in Appendix 3.

On Feb. 24, 2015, Dr. Faller, assisted by Nicole Hall, M.S.W. graduate student at the University of Michigan School of Social Work, interviewed A██████ P██████, mother of the victims, and "Erin" and "Fiona[1]," . Mrs. P██████ was interviewed for two hours in the morning and then for about 15 minutes after lunch. Then Erin was interviewed for a little less than an hour and Fiona for a little more than a half hour. Dr. Faller's curriculum vitae is attached (Appendix 4).

On the Feb. 24 date, family members also completed standardized measures, which were subsequently scored (See Appendix 2). Scoring was supervised by Mary Ortega, L.M.S.W., A.C.S.W. Her resume is attached (Appendix 4).

---

[1] The victims' names have been changed to protect them.

In addition, Elizabeth Toplyn, Ph.D., L.P., interviewed and conducted projective testing on A⬛⬛⬛ P⬛⬛⬛ (April 22, 2015), Fiona (April 25, 2015), and Erin May 9, 2015) (See Appendix 1 for Dr. Toplyn's reports). Dr. Toplyn's curriculum vitae is attached (Appendix 4).

A meeting was held with James Marsh on June 4, 2015 to discuss the findings and next steps.

### Interviews with A⬛⬛⬛ P⬛⬛⬛, mother of the victims

Ms. P⬛⬛ was asked to relate more or less chronologically what happened from the discovery of the pornography onward and its impact upon her and her family. She presented as articulate and relatively composed, crying only once during the course of the interviews.

Initial investigation: She stated the family was returning from a trip to Frankenmuth over the 4th of July 2010 weekend when two phone calls came in on her cellphone, one from a former neighbor who was observing the police arresting her ex-husband, and a second from a detective.

Once she returned home, Ms. P⬛⬛ called the detective, who was on his way to her house. She stated that initially he apparently suspected that she was complicit in the production of the child sexual abuse images depicting her daughters because her ex-husband, R⬛⬛ M⬛⬛, had put this information on the internet where he also indicated that she was a drug addict. Ms. P⬛⬛ was very afraid she would lose custody of her children. At the time, she had a one year old daughter by her current husband, A⬛⬛⬛ P⬛⬛⬛, as well as four older children by Mr. M⬛⬛. She had twins, who were 15, Erin was 12, and Fiona was 8.

Ms. P⬛⬛ contacted her mother, who was able to care for her youngest child, C⬛⬛⬛, and she, Fiona, and Erin were instructed to proceed to Care House, a Children's Advocacy Center. At that point, Ms. P⬛⬛ was questioned in a board room by many professionals, including someone from the Department of Homeland Security (ICE), the United States Attorney's Office, and local law enforcement. She did not know, initially, what her ex-husband was charged with. Ms. P⬛⬛ explained that she was intent on being cooperative because she feared the loss of custody of her children. She was required to view the child sexual abuse images of her daughters in order to assist law enforcement in dating the material and identifying the children. The images included her daughter, Fiona, being sexually abused by her ex-husband and J⬛⬛ B⬛⬛. Ms. Pulicini asked for a garbage can because she feared she would vomit. Fiona appeared to be drugged. She recognized some of the other children in the images as her children's friends, but others she did not recognize. She reported that some of the children were in bathing suits--and some the photographs appeared innocent--but she learned that there was a sexual narrative that accompanied the photos. She said it was by then 8:30 at night.

Her daughters, Fiona and Erin, were then sequentially forensically interviewed at Care House. Fiona did not remember very much, but Erin was able to assist in identifying J⬛⬛

B▊▊ because she had met him, although under an assumed name. Because Fiona had been drugged, she provided less information, but described a time that she vomited in the night, and her father did not get mad at her, which would have been his customary response to her sickness. It is believed this occurred at a time when Fiona was drugged. Fiona also revealed that her dad bought her lots of presents.

Ms. P▊▊ said her ex-husband explained the frequent presence of Mr. B▊▊ at his house by telling her that he was gay (and presumably B▊▊ was his partner). She believed him based on some of the difficulties in their marriage and was supportive of his coming out. When she discovered that he was dishonest in this claim, this was yet another assault on her.

Because of the possibility there might be physical evidence, because she wanted to be cooperative so that Child Protective Services would not remove her children, and because she wanted the perpetrators to get the maximum sentence, she allowed a forensic medical examination of all four of her daughters from her first marriage at a rape center in Macomb County. She described the experience as "terrible" for the girls. She believes the exams occurred a couple of days after their forensic interviews, but they occurred late at night. The procedure was not completed until 3AM. She sincerely regrets allowing these medical exams.

<u>Child Protective Services Investigation and Involvement:</u> In addition to the trauma of discovering that her ex-husband had sexually exploited her children, Ms. P▊▊ also had to endure an investigation by Child Protective Services (CPS). A CPS case was opened on her presumably because she had been neglectful for failing to protect her children from her ex-husband. She described the CPS investigation as "awful" and their involvement as unhelpful and an additional source of trauma. Several workers were involved, and she was required to be home whenever they chose to conduct a home visit, which was weekly. Moreover, she was in constant fear that "some zealot" would remove her children from her care. The case was open for approximately three months. She said that R▊▊ M▊▊ relinquished his parental rights which avoided a protracted trial to terminate his rights to the children. Even five years later, the fact that she had a substantiated CPS case worries Ms. P▊▊ because she knows that the history will be reviewed if there is another report on her or the children. Presently, she is worried because Erin is engaging in a lot of risk-taking behaviors—skipping school, smoking, using marijuana, and engaging in risky sexual activity. She fears Erin's behavior could result in a CPS report.

<u>Initial Impact upon Ms. P▊▊'s Functioning:</u> In describing the initial impact of the discovery that her children had been sexually abused and exploited to produce child pornography, Ms. P▊▊ said she was "torn apart." She cried all the time. She could not sleep, but then would ultimately fall asleep out of exhaustion. She described herself as "in such a fog." She was physically sickened. She said that she lost a lot of weight. Physically, she was so debilitated that she was not recognizable. She said that if she had not had her children, she would "never have gotten out of bed again." That said, she declared she was a

"damaged version of me." She recognizes that she will never be the person she was before she discovered that her children were violated through child pornography. She knows that this has impacted all her children. She said that C⬛⬛⬛⬛⬛, who was a year old when this all occurred has never known her as she was before. C⬛⬛⬛⬛ is now 6.

<u>The Federal Case:</u> The Federal case concerned the production, possession, and distribution of child pornography. Ms. P⬛⬛⬛'s ex-husband was arrested on July 10, 2010. His arraignment occurred in August 2010. He pleaded guilty in August 2011 and was sentenced in September 2011. He received a 45 year sentence in the Federal case. His was the first case to be resolved and it took over a year.

In order to avoid the potential impact of the arraignment on the children, the family went to Chicago. They were in a hotel when their phones started ringing (Ms. P⬛⬛⬛ said "blowing up"). She describes having a panic attack, bolting from the hotel room, leaving the hotel, crossing the street to a bus stop and considering stepping in front of the bus and ending her life. The event that snapped her out of this response was a text from Erin saying, "Mom where are you? I'm really worried about you." When asked if that was the only time she was suicidal, she said she had thought about suicide many times. She has also wanted to run away, to leave the state with her family to get away from their environment and start over.

Mrs. P⬛⬛⬛ describes the professionals involved in the Federal case as being very supportive of her family throughout the legal process. She described a social worker named Amy who became their advocate. The Federal officials protected the family from the media even though the cases against both perpetrators, Mr. B⬛⬛ and her ex-husband, were featured prominently in the media. The Federal officials were quite concerned about the family's safety because her ex-husband had provided information on the internet that could identify who they were and where they lived. The FBI even advised Ms. P⬛⬛⬛ to change the children's names although she ultimately decided not to do so. The children had to change schools in order to be in a safe school environment, which resulted in them losing all their friends and their support systems. The transition was especially difficult for her twins, who were 15 and involved in theater. The school they left was in their father's district, and the one they transferred to was in Mrs. P⬛⬛⬛'s district. The former school district was superior, which is why the children were attending school there.

At the sentencing in the Federal case against her father in September, 2011, Erin read her victim impact statement as did Ms. P⬛⬛⬛. The other children were apparently present, but did not read their statements in court. Ms. P⬛⬛⬛ said that Erin's knees were shaking. She also reported that her ex-husband was pretending to cry which, according to one Federal agents' impression, was to drown out what Erin was saying. Ms. P⬛⬛⬛ described speaking to the judge as the "most important and scariest thing I have done in my life." She added, "There aren't words to describe the pain" of what she experienced then and continues to experience now.

<u>The State Cases:</u> The State cases concerned the violation of Michigan law which included digital vaginal penetration and cunnilingus on Fiona. These cases were against her ex-husband and Mr. B███. These cases were important to Mrs. P███ because they involved the physical sexual acts against her children. However, she felt that the local prosecutors did not handle the case in the manner she anticipated. She explained that there was a reduction in the charges based on a technicality and an apparent wish on the prosecutors' part to "get the case over with." Even though the Federal case had already concluded and her ex-husband and Mr. B███ had been sentenced to 45 and 35 years respectively, the failure of the local district attorney to vigorously prosecute the State cases was another source of distress for Mrs. P███.

Mrs. P███ went to the sentencing of both her ex-husband and Mr. B███, and read her victim impact statements. She would not let her children go to their father's sentencing, which was fortunate since. he used the occasion to rail against her for her inadequacies as a wife, as if attempting to blame her for his sexual exploitation of their children and the other children.

<u>Impact upon Employment:</u> Ms. P███'s career suffered as a consequence of the victimization of her children through child pornography. She described herself as having a reputation of being highly dependable and excelling in the work environment. After she discovered what happened to Erin and Fiona, she began missing meetings and double booking appointments. Ms. P███ was grateful for having a boss who was most supportive. Her boss moved her to a position where she was more isolated--and where her errors did not have such an impact--but definitely the sexual exploitation of Erin and Fiona negatively impacted her ability to seek promotions and her earning capacity. Indeed, she was often fearful that she would be fired. She also said she "missed a ton of time from work." She felt compelled to attend court hearings and she had to take care of her children. She said that even though she had sufficient vacation time to cover lost days, this meant that she did not have vacation time to do things with her family.

<u>Impact on the Marriage:</u> Ms. P███ described the serious impact that the child pornography had on her marriage. She explained that when she and her husband, A███, married, they agreed that he would be a stepfather to Erin and Fiona and not attempt to replace their father. The situation that he is in now is not what he ever anticipated or bargained for. Ms. P███ described the entire nightmare as "not fair" to him. There is now a great deal of tension in their marriage especially as it relates to parenting. She tells him that he should just leave and that they should separate, while he responds that he wouldn't do that because then she would be left to cope alone.

<u>Impact of the Response of Mr. M███'s Family:</u> Erin and Fiona's paternal grandparents, who live on the next street over from the P███'s residence, have exacerbated the impact of what happened. Ms. P███ reported that instead of being supportive of their grandchildren, they are supportive of her ex-husband. She said this troubling behavior started right after Mr. M███ was arrested. They were apparently unaware of what

happened and repeatedly demanded the key to Mr. M⬛⬛⬛'s residence from Ms. P⬛⬛⬛ so they could go into the house and clean it. They called repeatedly. At one point, Ms. P⬛⬛ confronted her ex-mother-in-law, saying, "Your son raped my daughters." Ms. P⬛ thinks that Mr. M⬛⬛⬛'s mother did not know that his own children were his victims.

Ms. P⬛⬛ finally gave her ex-in-laws the key to Mr. M⬛⬛⬛'s house. When she and Mr. M⬛⬛ divorced, she left most of the children's possessions in the house so it would seem like home when Erin and Fiona visited their father. Although the children were able to enter the house one time after Mr. M⬛⬛⬛'s arrest to retrieve their possessions, most of the children's things were still there. Mrs. P⬛⬛ reported that her ex-in-laws had garage sales where they sold off Erin and Fiona's belongings. Moreover, they would often leave notes in the P⬛⬛ mailbox demanding, for example, that Ms. P⬛⬛ to pay Mr. M⬛⬛⬛'s outstanding bills. Because these various notes were so disturbing, she asked her husband to retrieve the mail and deal with the demands. The paternal relatives also stalked P⬛⬛ family members. She described a time when Erin was home alone and a paternal sister-in-law came to the door. Erin hid in the house and called her mother. Mr. M⬛⬛⬛'s family members would also show up at places the P⬛⬛ family frequented such as their gym.

Impact on the Children: Mrs. P⬛⬛ stated that her children now have a mother who is crying all the time. She also revealed that her parents did not know how to help. Her children went to each other for support, which Mrs. P⬛⬛ said "may not have been the best." One of the twins tried to commit suicide. The other has an eating disorder. Erin is the most affected. Her acting out and risk-taking behaviors are not only dangerous to herself but are also very distressing to Mrs. P⬛⬛ and a source of conflict with her husband.

Impact upon Ms. P⬛⬛⬛'s Functioning: In addition to the immediate impact on her parenting, Ms. P⬛⬛ described some longer term impacts from the production, distribution, and possession of her daughters' child sexual abuse images. She reported that she overindulges her daughters, spending excessively on them. She also revealed that she is very fearful now. Because Mr. M⬛⬛⬛ put Erin and Fiona's identifying information on the internet, Ms. P⬛⬛ is afraid that someone will kidnap her daughters. She said, "How do I let them spend the night" with friends? She stated that only after two years of counseling did she finally conclude that she could not have known about her ex-husband's deviance and his production of child pornography. .

She added that the impact from child pornography is not limited to her parenting and marriage, but affects every relationship she has. When asked if the impact was less today, Ms. P⬛⬛ reported that it was not; although the impact was different, it was not less. She used the analogy of being repeatedly hit by a truck. She gets up, and then the truck hits her again and again and yet again. She is aware that the effect from child pornography will never end, in part because it will affect her children at different developmental stages, but mostly because Erin and Fiona's child sexual images are available online to everyone everywhere constantly forever.

<u>Ongoing Effect from the Existence of Child Pornography:</u> Ms. P▓▓ was asked about the impact of the existence of Erin and Fiona's child sexual abuse images on the internet. She said that the Department of Justice regularly updates her when more offenders are found and keeps her abreast of the progress of pornography cases involving images of her children. Initially, these notices came via the regular mail. Now most come via email. When they were coming in the mail, she had to stop her children from retrieving the mail from the mailbox. The volume is very high, in the hundreds. For example, she said in the last two weeks (in February, 2015), she received 35 emails. However, she says she thinks they represent approximately 150 cases. Some cases have more than a single offender. Each notification represents a new assault on her children and on her family. She was asked about her daughters' awareness of the new cases. There is an attempt to shield them, but this is not always possible.

## Interview with Erin M▓▓▓, age 16

Erin was interviewed for a little less than an hour on February 24, 2015 as part of a family assessment to evaluate the impact on her and her sister from the production, distribution, and collection of their child sexual abuse images starting with her father and his collaborator, J▓ B▓▓. This impact includes the effect of the original criminal acts and the ongoing impact of the wide availability of her child sexual abuse images on the internet.

Erin was forthcoming, frank, and cooperative during the interview. She does not enunciate clearly, so some of her answers were unclear. She also became quite upset during the session, and so we did not probe beyond what she volunteered about the child pornography.

When we asked Erin if she understood why she was here, she replied "To talk about how what dad did affects our lives." We then asked some rapport-building questions before asking questions about how child pornography had impacted her life.

Erin said she is in the 11th grade and that school was OK. She goes to ▓▓▓▓▓▓, and it is a nice school. Her subjects are government and economics, algebra 2, English, art, and chemistry. Her favorites are art and chemistry. She acknowledged that her grades are uneven. She said in the 9th grade she had all As. Presently her grades vary from As to Fs. She intends to finish high school and wants to pursue art or go to college, perhaps go to college and then pursue art. Although she is at the age that most adolescents who intend to go to college have selected schools, she has not considered where she might go. As to art, she draws and likes pastels. She brings her art home from school and has it in her room.

We asked her about her siblings. She first spoke of the twins, who are S▓▓ and K▓▓. Erin said that she does not talk very much to K▓▓. She did not know where K▓▓ was attending school, but knew that she was currently doing an internship in Florida. S▓▓ (Dan), who appears to be transgendered, attends ▓▓▓▓▓▓▓ University. Erin described S▓▓ as cool and said she talks to him a lot. S▓▓ wants to be a boy. Erin wishes he spent more time at home. She is closest to Fiona, whom she described as wild and funny.

They do lots of things together, such as watching TV. She described C_____ not as a sister, but as a half-sister, and said she was spoiled.

When asked about her mom, Erin said that they fight a lot. They butt heads. Her mother is upset about her grades. Also they fight about the fact that Erin smokes and skips school. When she skips school, she hangs out with friends. Sometimes she will just go and sit in a friend's car instead of going to class. She wants to be alone. She also sometimes leaves the school grounds. When she is caught for these behaviors, she is grounded, which means she is not supposed to be able to see her friends. She sneaks out anyway.

Erin has considerable insight into her risk-taking behavior. She is aware that it derives from her father exploiting her and her sister to produce child pornography. She also knows that these behaviors are self-destructive, but she said that sometimes she just doesn't care. What happens is even though she knows she is harming herself, she acts out anyway to change the day. She also admitted that she is sad a lot of the time, and the acting out disrupts her feelings of sadness.

When asked about her stepdad, whom she calls A_____, she described a recent incident. Fiona's dog peed in the house, and her stepdad threw the dog out of the house. Fiona became very upset and was crying and Erin was crying.

Erin also revealed that her mom and stepdad fight a lot. In her view, her mom is mad at her stepdad and takes it out on her. When asked, Erin said sometimes her mom takes it out on Fiona. She added that Fiona can be rude sometimes, but she doesn't mean to be. Erin said the mood of the family is mostly not good.

We asked Erin to describe a recent incident when her mom took her anger out on Erin. Erin said that she was going on a cruise from Miami. Erin was going with a friend and the friend's family to Miami and then on the cruise. Her mother and stepdad had been fighting the whole day. Erin was supposed to be packing. She said her mother came into her room and started yelling at her. Evidently her mother was afraid Erin wouldn't be packed in time and would make the friend's family miss the plane. Her stepfather came into the room and also started yelling at Erin. He said, "Fuck You" to Erin, and she called him an "asshole." A_____ then "called her the C word (cunt)."

Erin said her mother and stepdad fight about three times a week. She added, "I really hate listening to them." She said, "It has gotten physical a couple of times." These fights lead to her mother crying and leaving the house. Sometimes her mother just sits in the car. When asked if the parents make up, she said, "They never make up." She then said that everyone in her family is stubborn. She said, "This is not fun for me."

She has some insight into the arguments. She said, "My mom has bad anxiety." She said that this got much worse when her dad was arrested.

We then asked Erin about how she found out her dad was arrested. She said a detective came to the house. The kids had to go outside, and mom was inside talking for a long time.

She knew her dad had done something illegal. Then they had to go to ▮▮▮▮ House. She knew that the detective was suspicious about her mother because her dad said she was a drug addict. She said the kids were interviewed at ▮▮▮▮ House. They were asked if their dad ever gave them medicine.

A friend had seen her dad get arrested. Friends would "call me and bother me." Parents of her friends were instructing them to ask her what was going on. Erin just told them that her dad was in Florida.

She also said that they had to change schools, and the middle school she had to go to was not a good school. She said she got into drugs and she was suspended from that school twice.

Erin admitted, "My dad and me were really close." "I looked up to him." She described him as easy to talk to, but did say that he had a really bad temper. Her friends had seen him lose his temper, and they were scared of him. Erin then began crying and cried for quite a long time.

Erin also revealed that "There was no food in the house (father's house)." She would have to call her mom to find out what she could make from what there was in the house. The house was also really dirty and messy. She said Fiona's room "was so trashed" that Fiona slept in their dad's room. She said that she and her brother (S▮▮▮▮) had their own rooms. She then explained that her dad would only want Fiona with him and would get really mad when the other kids were there. She said the day before her dad was arrested Fiona was supposed to go for a visit with K▮▮▮▮ because K▮▮▮▮ was going to visit a friend in a nearby town. Her dad got really mad and cancelled the visit.

We also asked her about dad's friend and co-conspirator, J▮▮, whom she said was really weird. She also revealed that her dad had another friend, Ace, who would call and that she would answer the phone. Her dad refused to talk to Ace so Ace would talk to her. He sounded nice on the phone and she felt bad that her dad didn't want to talk to him.

Erin described reading her victim impact statement at her dad's sentencing (she called it his arraignment). She again was crying. She was very scared and felt bad for her dad, but she told him that he had ruined her life. She said she hated switching schools, moving out of her house, and having to leave all her stuff. She added, "He really messed up my life." She said she felt bad that she made him cry when she read her statement.

Erin also spoke about the longer term effects of her father's exploitation of her to produce child pornography. She said that she has issues with boys. She can't have a stable relationship; yet she feels compelled to have relationships with boys, often several at a time. She said she had an abusive boyfriend, but she "just put up with it." She still has a relationship with him but also with other boys. She said, "I feel bad about myself." "I just want to feel loved." She started being sexual at 13 and had intercourse at 14. She does not use a condom, even though she does not want to get pregnant. She added, "I feel sad a lot. I hate feeling sad. I don't care about myself." She described herself as reckless and not caring

about what happens to her. It is "impossible to be happy." She said, "My family is so different" since her father's child pornography crimes were discovered. "I don't want to trust." "He (her dad) was supposed to care. He's your parent. How are you supposed to live with this?"

Erin is currently seeing a therapist. She likes her and has seen her twice. She couldn't remember her therapist's name, however.

Impressions:

Erin has been markedly affected by her father's betrayal and the production of child pornography by her father and his accomplice, J�ââ B�ââ. Moreover, she is old enough to understand that other pedophiles and child molesters are distributing and collecting her and her sister's child sexual abuse images, and the implications of having her images on the internet. Of her siblings, she appears to have been the closest to her father. Nevertheless, she was the child who was so moved by the impact of her sexual exploitation (which impacted not just her but her entire family) that she read her victim impact statement in court.

Of grave concern is her depression and her method of coping with it. Essentially she is engaging in risk-taking behaviors, promiscuity, unsafe sex, using drugs, smoking, and skipping school to alleviate her depression. At the same time, she is aware that her sexual behavior is an attempt to find love that she lost in her relationship with her father. What her father did serves as a model for exploitive close relationships, which she reports compulsively repeating.

Her description of how her stepfather treats her is concerning because what he is doing is reinforcing her sense of herself as damaged goods. Moreover the regular fights between her mother and stepfather exacerbate her depression and present yet another model for toxic adult behavior.

## **Interview with Fiona M�ââ, age 13**

Fiona was interviewed for a little over a half hour on February 24, 2015 as part of a family assessment to evaluate the impact on her and her sister from the production, distribution, and collection of their child sexual abuse images starting with her father and his collaborator, J�ââ B▢▢. This impact includes the effect of the original criminal acts and the ongoing impact of the wide availability of her child sexual abuse images on the internet.

Fiona was asked what she knew about coming to the Family Assessment Clinic and she said to talk about her dad. She presented as quiet and cooperative, although she did not volunteer information and her answers were short. To build rapport, we talked about school and a typical day.

Fiona is in the 7th grade and named her school as Middle School. She said she does not like school; it is boring, but she gets really good grades. Her subjects are math, Spanish, social

studies, science, and English. She also is in a support class where she does her homework. Her grades are As and Bs. She does not do any afterschool activities. She used to do dance.

A typical day begins with her mom waking her up. She then goes back to sleep and her mom wakes her up again. She gets up, puts on her make-up, gets the bus, goes to school, attends all her classes, comes home, and eats dinner. Her mom usually cooks, but her stepdad can make tortellini alfredo. Chores are to clean her room, and she and Erin do the dishes.

We asked her who was in her family and she named her stepdad, Erin, C_____, me, and mom. She was asked about each family member. With regard to C_____, she said she is 5, they get along, but C_____ whines. She plays games with C_____ and they watch wrestling. About Erin, she said they are really close and lately they have gotten closer. Erin is often sad, but she can rely on Fiona. They are talking more.

She described her mom as really nice, but also she yells a lot. Her mom and stepdad fight. When they have a fight, she goes to her room. She said her stepdad is nice and said he had bought tickets for them to go to a wrestling match on March 10.

She then related an incident when her stepdad was really angry and screaming because her dog peed inside the house. Her dad threw the dog out of the house. The dog is named Champ, he is a bulldog, and he does lots of things he is not supposed to do. He jumps on the couch, chews stuff up, and pees in the house. He is 7 years old. She cried when her stepdad got angry at Champ and Erin gave her a hug.

With regard to K_____, Fiona just said, "She's rude to me." She is very fond of her brother who goes to _____ University. She called him Dan instead of S_____. Fiona said he is helpful and he is a "good sibling to me." She asks him to come home for the weekend and she is really glad he will have a Spring Break next week and will be home.

When asked about her dad, she said he would buy her things and "was really nice to me, but not to my brother." She added that his house was messy and he never cleaned. She would visit him two times a week, Wednesdays and the weekend. When she would go there, she would hang out with her friend, Teresa, and talk to Erin. Her dad would cook when she visited, noodles or beef stroganoff, which Fiona said was "really good."

When asked about her father's arrest, Fiona said they had come back from Frankenmuth, and didn't know about the child pornography. She was scared. The detective came over, then a lot of stuff happened for about two weeks, and then it was over. She knew that her "sister (Erin) did a speech" and then her sister "came over and tried to cheer me up." She added that she wished she had said hi to her dad in court.

Because Fiona's response was so muted, we asked her what she thought about what happened to her dad, and she explained, "He's in prison for a reason." She claimed not to remember that much and not to know details about what he did.

When asked how what her dad did affected them, she said that it really affected Erin, who is making bad choices. She also added that it "affected my mom a lot." She said it made her closer to her siblings. She hasn't talked about her dad in a long time and thinks about him sometimes.

She said she went to counseling after her dad was arrested and thinks she wants to go back to counseling now. She believes the sexual exploitation affects her, but she doesn't think about it much.

Fiona was asked what she would wish for if she had three wishes. She said:

1. "That this would never have happened (the sexual exploitation)."
2. "My mom and stepdad wouldn't fight."
3. "My brother still lived with us."

<u>Impressions</u>

Fiona has erected a protective wall around herself with regard to having been sexually exploited by her father, J▇ B▇, and the scores of other offenders who have access to the images of her being sexually abused. The fact that she was drugged at the time helps make this possible. At the same time, she knows that the abuse is affecting her. She is also acutely aware of how the sexual exploitation has devastated her family, especially Erin, the sibling to whom she is the closest. It has also wreaked havoc in her world because of the exploitation's impact on her mother, who cannot function as a consistent nurturing parent, and because it has led to chronic strife between her mother and her stepfather.

It is very likely as Fiona becomes older, her protective wall will crumble. She will come to appreciate the reality of her exploitation. She is just entering puberty. As she becomes more aware of herself sexually, the trauma of her abuse and exploitation will have additional negative impact.

**Summary of the Projective Testing results on A▇ P▇, Erin M▇, and Fiona M▇**

Dr. Toplyn's test findings and interview results augment and corroborate other information related to the impact from child pornography and its wide and unending availability on the internet on these family members. This section of our report highlights additional findings by Dr. Toplyn. See Appendix 1 for the Dr. Toplyn's reports.

Projective tests provide the respondent with ambiguous stimuli, with the intent of allowing emotions and internal conflicts to be revealed in their responses to the stimuli. The responses to projective tests are then content analyzed for meaning.

<u>A▇ P▇</u>

Projective measures employed with Mrs. P▇ were the Thematic Apperception Test and the Rorschach.

With regard to Mrs. P▓▓▓, her responses were significant for trauma, anxiety, and depression. She feels that she has been stuck in negativity too long and yearns for less chaos, peace, and time for herself. She also feels resentful that her feelings don't count. Her experience with the sexual exploitation of her daughters and her experience with the aftermath have undermined her ability to trust others.

Erin M▓▓▓

Projective measures employed with Erin were the Thematic Apperception Test, the Rorschach, and the House, Tree, Person.

With regard to Erin M▓▓▓, Dr. Toplyn's findings reinforce grave concerns about the impact of the child pornography and its availability on the internet on her. First, Erin believes, like her sister, Fiona, she was also drugged, sexually abused, and had pictures taken. Second, Erin described to Dr. Toplyn additional instances of sexual exploitation. When in the eighth grade, she would provide sex to any boy who asked her because it was easier than saying "no." Often this was oral sex, although she had and continues to have unprotected sexual intercourse, even though she does not want to get pregnant. She also described giving sex to boys as a way to feel wanted. Third, she has a serious substance abuse problem. This includes stealing Oxycontin and Xanax from her mother and smoking marijuana daily, which she said she does to make her calmer and happy. She resorts to other drugs when marijuana is not producing the calming effect.

With regard to the projective testing, although Erin does have some strengths, specifically that she is very attuned to her world and is interested in support and human contact, she has significant vulnerabilities. She feels badly about herself and experiences "damaged goods syndrome." She is depressed; she is both angry at her father for messing up her life and sad at the loss of him in her life. She also feels unheard by her mother. Much of her sadness and anxiety center on issues of her sexuality.

Fiona M▓▓▓

Projective measures employed with Fiona were the Thematic Apperception Test, the Rorschach, the Sentence Completion, and the House, Tree, Person.

Fiona's strengths are in relationships with others and her ability to integrate thoughts and feelings.

Although Fiona denies thinking about her father, her projective test findings indicate he is very much on her mind. She thinks what her father did was a terrible thing, and it has resulted in fears of being around older men. She has a fair amount of unconscious anxiety, especially about the lower half of her body. She spends a lot of time in her head with little awareness of her physical body. There was a sense in her stories that something has been stolen from her (probably her innocence or past life), and she is very angry about this loss.

In addition, she experiences herself as small and helpless. She has a sense of herself as not as important as other people.

Her projective measures indicate she sees quiet defiance as the only strategy to gain independence; at the same time she feels guilty about being defiant.

## Results of Standardized Measures

To gather additional information about the impact of sexual exploitation and the availability of the sexual abuse images of Erin and Fiona M█████, the girls and their mother completed standardized instruments that yield data about various aspects of functioning. Mrs. P█████ completed the **Achenbach System of Empirically Based Assessment (ASEBA) Child Behavior Checklist (CBCL)** and the **Trauma Symptom Checklist for Young Children (TSCYC)** on Erin and Fiona. The girls completed the **Youth Self Report (YSR)** and the **Trauma Symptom Checklist for Children (TSCC)** on themselves. See Appendix 2 for tables displaying complete findings.

The CBCL and the YSR gather data about comparable domains, the CBCL from a caretaker and the YSR from the youth. Similarly, the TSCYC gathers data from a caretaker and the TSCC from the young person. The CBCL has 9 subscales, an internalizing (self-traumatizing) sub-score, an externalizing (acting out) sub-score, and a total problems score. The YSR has 6 subscales and a total problems score. The TSCYC has 9 subscales and the TSCC has 10 subscales.

There is a convergence of findings between mother and each daughter, with some differences (Rescorla et al., 2013). The findings indicate that at the time the data were collected both girls have marked and worrisome symptoms related to their sexual exploitation. These data are consistent with interview and projective testing findings.

With regard to Erin, both mother and Erin rate Erin in the clinically significant range on the total scores of the CBCL and the YSR. Mother rates Erin as in the clinical range on 7 of the 8 subscales and both internalizing and externalizing behavior sub-scores. Erin rates herself as in the clinical range on 4 of the 6 subscales of the YSR and in the borderline clinical range on 1. On the TSCYC, mother rates Erin in the clinically significant range on 6 of the 9 subscales. On the TSCC, Erin rates herself in the clinical range on 7 of 10 subscales. Mother does not rate Erin as having clinically significant sexual concerns, but Erin rates herself as having clinically significant sexual concerns.

With regard to Fiona, mother rates her as in the clinical range on 3 of the 8 subscales of the CBCL and in the borderline range on 5. She scores Fiona in the clinical range on the internalizing, externalizing and total scores of the CBCL. Fiona rates herself in the clinical range on one subscale of the YSR and in the borderline range on 3 subscales. Consistent with her mother's total score for her on the CBCL, Fiona's total score on the YSR is in the clinical range. Mother's rating of Fiona on the TSCYC indicates clinically significant scores 7 of the 9 subscales and 1 as potentially problematic. Fiona rates herself as having clinically significant symptoms on three of the 10 subscales and potentially problematic on 1. Neither Fiona nor her mother rate her as having sexual concerns at this time.

Overall the standardized measures indicate both Fiona and Erin suffer from depression, use dissociation to cope with their trauma, and have symptoms of post-traumatic stress disorder.

**Questions**

Responses to the questions posed by the Marsh Law Firm are based upon the data available at the point the impact statement was prepared. These opinions may supplemented based upon additional information and materials.

**1.      The psychological harm that the children and their mother have suffered and are likely to suffer because of their exploitation through Child Pornography, which is widely available online and is still being collected.**

Although the child pornography features images of the both Fiona and Erin, the pornography negatively impacts upon the whole M_____-P_____ family. The fact that the child sexual abuse images were posted on the internet and are being repeatedly downloaded by individuals who use them to satisfy their pedophilic interests are sources of ongoing trauma to the family and will continue to negatively impact Fiona and Erin as they enter adolescence and adulthood.

Mrs. P_____ was asked about the impact of having child pornography featuring her daughters on the internet. She said that the Department of Justice regularly updates her when more offenders are found and keeps her abreast of the progress of cases involving images of her children. Initially, these notices came via the regular mail. Now most come via email. When they were coming in the mail, she had to stop her children from retrieving the mail from the mailbox. The volume is very high, in the hundreds. For example, she said in two weeks in Feb. 2015, she received 35 emails. However, she says she thinks the total number of cases is approximately 150. Some cases have more than a single offender. These new cases represent ongoing assaults on the M_____-P_____ family and the family's privacy. Mrs. P_____ was asked about her daughters' awareness of these new cases, and she said that depended upon where they were when she received a notification. There is an attempt to shield them, but this is not always possible.

The stress associated with the sexual exploitation of her daughters has also gravely compromised Mrs. P_____'s functioning as a mother and a wife. See the response to question 2.

**2.      How the Child Pornography which is available online and is still being downloaded, viewed, and traded has impacted the ability to form and maintain relationships.**

Mrs. P_____ stated that the experience of having her children victimized by child pornography has affected all of her relationships. That is, this trauma impacts not only her relationships with her children and her husband but every single relationship she has. She cannot trust people she encounters. Moreover, the response of her children's paternal grandparents of siding with their son, who sexually exploited his children and their grandchildren, has effectively ended the children's relationships with their paternal

grandparents. Mrs. P████ is also fearful that more abuse will happen to her children and does not allow them much freedom.

Erin spoke specifically about the effect of having a father who was "supposed to care. He's your parent. How are you supposed to live with this?" She also said that she does not want to trust other people. Erin's awareness that people are constantly viewing her child sexual abuse images has led her to experience herself as "damaged goods," which, in turn, has led to promiscuity. She has multiple unprotected sexual relationships with boys.

One of Fiona's strengths is that she is able to form friendships. However, her family relationships are compromised because of the impact of her exploitation. Her relationship with her mother is affected in that her mother restricts Fiona's independence for fear of her being additionally victimized. Her mother and stepfather fight often, the fighting precipitated in part by her mother's heightened anxiety associated with the sexual exploitation of her children and consequent inability to trust her parenting instincts. Fiona also feels that her mother is more punitive toward her than toward Erin.

**3.     How it will impact the children's ability to one day have a positive personal relationships.**

There is scant research on the long-term impact of sexual exploitation and particularly on the effect of the long-term availability of a victim's childhood sexual abuse images on the internet (e.g., Rogers, 2008), in contrast to the numerous studies of and articles about the offenders themselves (e.g., ATSA, 2010; Temporini, 2012). Unfortunately being a victim of child pornography is likely to have a negative effect on victims throughout the lifespan, not just on their ability to form positive personal relationships.

First, as victims gain a more sophisticated understanding of the violation of the taboo represented by the sexual abuse and the child pornography, they face renewed challenges in coping. Fiona, at this time, seems to have little comprehension of what her father did and the impact of the availability of the images of herself being sexually abused and exploited not just by her father but by a stranger. This comprehension will change as she grows older and likely will cause her significant ongoing trauma. In contrast, Erin is much more aware, and the knowledge is having a dramatic impact on her behavior—promiscuity, depression, and self-medication by using drugs and alcohol.

Second, victims of sexual abuse and child pornography essentially have fewer psychological resources for dealing with other adversities in life, such as the death of a caretaker, a car accident, loss of employment, or a divorce. Sexual abuse and being a victim of child pornography also literally compromises the immune system (Adverse Childhood Experiences, 2014; Kendall-Tackett, 2013).

Third, sexual abuse and being a victim of child pornography generates special problems as victims reach developmental milestones related to sexuality, intimacy, and close personal relationships. Typical milestones that create crises for victims are puberty, dating

relationships, sexual encounters, marriage, decisions to have children, and when the victim's child or children reach the age when he or she was victimized.

Known specific longer term impacts from being victimized by child pornography include:

1. Distorted and unhealthy sexuality.
2. Difficulty establishing healthy relationships in general.
3. Difficulty trusting others, especially individuals who remind the victim(s) of the offender(s).
4. Risky behaviors, including substance abuse, promiscuity, self-mutilation, suicidal ideation, and suicide attempts.
5. Greater risk for getting ensnared in commercial sexual exploitation.
6. Ongoing humiliation and lack of privacy. Victims are unable to escape the reach of the images and constantly live with the knowledge that anyone they meet may have viewed the images.

Moreover, the availability of the images online can impact educational opportunities, educational success, employment possibilities and potential, day-to-day activities, and other aspects of life. (Foothills Child Advocacy Center, n.d.; Rogers, 2008; Wortley & Smallbone, 2006).

Finally, there will likely come a time when both Fiona and Erin become concerned that the images of themselves are not only being used to satisfy the perversions of those who view them, but precipitate the assault of other victims and are being used for grooming other victims. (Babchishin, Hanson, & VanZuylen, 2015)

**4.      How it impacts the family on a day-to-day basis.**

The availability of the M⬛⬛ children's child sexual abuse images on the internet and the dynamics of having it repeatedly circulated and downloaded are sources of day-to-day trauma. They have damaged the P⬛⬛ parents, their marriage, each of the children, Erin and Fiona, in separate ways, the family as a whole, their relationships with extended family members, and their relationships with the community. See responses to questions 1, 2, 6, and 7 for further details.

**5.      What additional or increased medical services will family members likely need over their lifetimes (including physical, psychiatric and psychological care)?**

Unfortunately, there is no research on effective treatments for victims of child pornography and their families. Evidence-based treatments for child sexual abuse are insufficient for treatment of victims whose child sexual abuse images are still available on the internet. That is because safety is a prerequisite for successful treatment. Erin and Fiona are not truly safe, nor can they ever be truly safe, because their images are still widely available on the internet.

Recognizing this limitation, the following interventions are recommended:

The most immediate need is for marital counseling for Mr. and Mrs. P█████ so that the family does not fall apart. Moreover, the family needs family therapy so they can deal with the impact of the sexual exploitation on their functioning as a family. Initially, these two modes of treatment will need to be weekly. It should be expected that this therapy will need to continue for at least two years.

Mrs. P█████ requires individual counseling to address her past sexual abuse, the sexual exploitation of her children, her anxiety, her depression, and her panic attacks. It is to be expected that this therapy will need to be intermittent until Erin and Fiona are adults.

Erin is at grave risk. She needs ongoing treatment hopefully to help her safely navigate adolescence. Fortunately, she is currently involved in treatment and finds it beneficial. Erin has an immediate need for birth control, and she may need services to deal with unwanted pregnancy(ies) and sexually transmitted infections (STIs).

Erin will likely require hospitalization for substance abuse and depression. She is likely to need four episodes of in-patient treatment for substance abuse and four for depression and suicidal ideation over the course of her life.

Presently she is engaging in self-destructive behavior that may well lead to involvement in the juvenile or adult justice system—truancy, substance abuse, and promiscuity. These behaviors are likely to lead to the need for legal services.

Moreover, these behaviors are compromising Erin's education. Unlike most middle class 17 year olds, she does not have a specific plan for post-secondary education. That is, she thinks she wants to go to college, but has not thought about where she wants to go, despite the fact she has two older siblings who are in college and she has parents who are educated.

Longer term implications of Erin's self-destructive behaviors are very troubling. They narrow her options in life, in terms of health, mental health, education, and vocation. If she continues on her current path, she is highly likely to end up becoming a burden on society—unemployed, with unplanned children, and with crippling mental health problems. Moreover, she is at high risk for early death, from suicide, accident, or drug overdose.

It is critical that Erin receive multi-modal intervention to address her bleak prospects. Yet, at this point, her parents cannot afford the help she needs.

Fiona voiced a desire to receive psychological treatment. She was in treatment in the past and found it beneficial. The family finds it difficult to cover the cost of her treatment. She has not only the sexual exploitation and internet images to deal with in treatment, but she is entering puberty. Her projective testing indicates that she has nascent sexual problems. Moreover, she is close to and emulates her older sister, Erin, who represents a very worrisome role model. The extent of her future treatment needs will become clearer as she

transitions puberty, but it would be imprudent to assume that all will be well for her because her symptoms are less marked than Erin's.

**6.    Overall impact on the family members' potential for "enjoyment of life."**

Interviews with Mrs. P▮▮▮▮, Erin, and Fiona yielded information that the family is not enjoying life. Mrs. P▮▮▮▮ acknowledged that she is a damaged version of herself, that her youngest daughter, C▮▮▮▮, has never had the opportunity to know her as a mother before the child pornography was discovered, and that every new case of someone committing a child pornography crime against her daughters re-traumatizes her. She and her husband fight frequently and she has said to him repeatedly that he should just leave. This contentious atmosphere colors the way Mr. and Mrs. P▮▮▮▮ parent. It is quite clear that this family has only intermittent happy moments. Most of the time there is strife and tension in the household.

**7.    How the widespread distribution and viewing of Erin and Fiona's child sex abuse images has caused additional and long-lasting harm**

This family will never completely recover and heal from the impact of the child pornography featuring Erin and Fiona. Recovery and healing require safety. Because these images remain available and continue to be shared among sexual deviants, the children and the family will never be able to completely move beyond what happened.

It has been five years since Erin and Fiona's child sexual abuse images were traced to Mr. M▮▮▮▮ and Mr. B▮▮▮▮. The first year was consumed by the Federal and State litigation. Although both men were sentenced to long prison sentences (45 and 35 years respectively), new cases, cases of additional individuals sharing and collecting images of the M▮▮▮▮ children's sexual abuse occur regularly and will continue years into the future.

Presently both Erin and Fiona are at a very vulnerable time in their lives. Erin is an adolescent and is displaying extremely worrisome risk-taking behaviors, which are directly attributable to the online availability images of her and her sister's sexual abuse. Fiona is just entering puberty. She had Erin are very close, and Fiona is already emulating some of Erin's behaviors, using drugs and defiant behaviors. Adolescence will be very rocky for both of them.

<u>**References**</u>

Adverse Childhood Experiences Study (ACES) (2015). Accessed at
     http://www.cdc.gov/ace/index.htm).

Association of Therapists for Sexual Abusers (ATSA) (2010). *Internet facilitated sexual offending*. Accessed at http://www.atsa.com/internet-facilitated-sexual-offending

Babchishin, K. M., Hanson, R. K., & VanZuylen, H. (2015). Online child pornography offenders are different: A meta-analysis of the characteristics of online and offline

sex offenders against children. *Archives Of Sexual Behavior*, *44*(1), 45-66. doi:10.1007/s10508-014-0270-x

Foothills Child Advocacy Center. (n.d.) *The impact of child pornography on victims*. Accessed at www.foothillscac.org.

Kendall-Tackett, K. (2013). Treating the Lifetime Health Effects of Childhood Victimization, 2nd Edition, Middlesex, NJ: Civic Research Institute.

Rescorla, L.A., et al. (2013). Cross-informant agreement between parent-reported and adolescent self-reported problems in 25 societies. *Journal of Clinical Child & Adolescent Psychology, 42*, 262-273.

Temporini, Humberto. (2012). Child pornography and the internet. *The Psychiatric Clinics of North America*, 35 (10), 821 – 835.

Wortley, R. & Smallbone, S. (2006). Child pornography on the internet (Guide No. 41). Albany, NY: University at Albany Center for Problem-Oriented Policing.

Respectfully submitted,

Kathleen Coulborn Faller, Ph.D., A.C.S.W.
Marion Elizabeth Blue Professor Emerita of Children and Families
School of Social Work, University of Michigan
Co-Director, Family Assessment Clinic
Catholic Social Services of Washtenaw County

**Appendix 1: Test reports on A_____ P_____, Erin M_____, and Fiona M_____ from Elizabeth Toplyn Ph.D., L.P.**

## PSYCHOLOGICAL ASSESSMENT

NAME: A_____ P_____

DOE: 4-22-15

DOB: 9-17-71

**REASON FOR REFERRAL**

A_____ P_____ was referred for psychological evaluation by the Family Assessment Clinic. She is the mother of two girls who were drugged, sexually abused, and had the images of that abuse posted on the internet. The perpetrators were the girls' father, R_____ M_____, and a General Motors executive named J____ B____. Both men were criminally prosecuted and are incarcerated. The psychological evaluation of Mrs. P____ was requested in order to assess emotional damage as a consequence of her daughters' sexual exploitation.

**ASSESSMENT INSTRUMENTS**

CLINICAL INTERVIEW
RORSCHACH
THEMATIC APPERCEPTION TEST

**FAMILY HISTORY AND BACKGROUND**

Ms. P_____ stated that she was born and raised in _____ Michigan. She is the oldest of three girls. She said that she gets along well with her siblings but one is substantially younger than she is and she does not feel they necessarily had much of a relationship while growing up. She said that her parents were married throughout her upbringing and remain so. She reported that she had minor struggles with her mother as a young girl. She added that her mother took the lead as the disciplinarian and she thought that had something to do with their conflicts. She denied a history of mental illness or substance abuse in her extended family. She has 5 children. The oldest are twins, two girls, although one girl is transgendered. Ms. P_____ has a 17-year-old daughter, a 13-year-old daughter and a 6-year-old-daughter. The oldest, the twins, are in their early twenties. The 4 oldest girls are daughters of her ex-husband, Mr. M_____. The youngest daughter is 6 and a product of her union with her current husband.

**EDUCATIONAL HISTORY**

Ms. P_____ reported that she graduated from high school and that she was a very good student. She had no behavioral problems and was involved in sports, student council, broadcasting and the National Honor Society. She said that she earned a B.S degree in Human Resources from Oakland University. She started at University of Michigan-

Dearborn but felt that she didn't belong and had difficulty feeling confident while there. She took a short break but returned to school and finished her degree while the girls were young. She said that in retrospect she thought the Michigan/Dearborn campus had been too large for her. She described a solid work history starting in high school. She worked briefly as a bank teller. She said that after she graduated and her twins were born, she began working at ▊▊▊▊▊▊▊▊ Hospital's corporate headquarters where she is still employed. She said that she likes her job but that it is stressful and involves a lot of responsibility.

**ABUSE HISTORY**

Ms. P▊▊▊ reported that she was sexually abused at age seven by an older second cousin. The cousin was about 12. She said that he put her into a closet with him and had intercourse with her. She says that she remembered someone knocking on the closet door trying to get in, so he let her out. She did not say anything until many years later when she told her parents. She reported that she saw this cousin years later in her twenties and had a panic attack. She reported that the relationship she had just prior to meeting Mr. M▊▊ had also been abusive. She stated that it was verbally abusive.

**RELATIONSHIP HISTORY**

Ms. P▊▊▊ stated that she met Mr. M▊▊ when they worked together at the bank where she was a teller. She had just turned twenty and he was eight years older. She said their relationship moved quickly and they were engaged within one year. She thought that their relationship was good but said looking back that her criterion for a good relationship at that time was minimal. All she wanted was that someone "was nice to her." She said that in retrospect she also sees that there were concerns before their marriage. He lied to her and didn't share that he had been previously married until they had been dating for five months. His other family members said negative things about him to her but she thought they were just being malicious. She said that she was taught to work on and fix a relationship rather than give up on it. She and Mr. M▊▊ were married for ten years. She said that trust was always an issue in the marriage. He worked long hours and made up stories about where he was and which job he was at. She said he would even make up stories or lies over issues that were insignificant. She said that outside of their marriage he "was charming and the life of the party." After Erin was born, though, he changed. Erin was premature by several months. Ms. P▊▊ went into premature labor. She was hospitalized for the last 3 weeks of her pregnancy in an attempt to hold off the delivery. She was depressed and on bed rest.

Erin was a more difficult infant than either of the twins had been. She was colicky at first. As she became a toddler she was advanced and met all of her milestones early. She was a "daredevil and had "nonstop energy." She could be challenging and difficult to manage. Ms. P▊▊ believed that Erin's personality did not fit with Mr. M▊▊▊'s sense of what an infant

and toddler should be like. She said that he became more involved in work and outside sports that added extra expenses to the family.

She said that other difficulties from the beginning of her relationship with Mr. M████ were that they had no commonalties. She conveyed that it was difficult to have an intellectual conversation with him. She reported that she made a decision to stay in the marriage and became depressed for many years, but did not seek treatment. She said that the depression lifted when she finished college and was exposed to the work world. She then sought treatment for her depression. She said that she didn't want to be in the marriage and felt trapped. They agreed that the marriage was over but continued to live in the same home with the girls. They "just passed the kids back and forth." She moved out when she began dating Mr. P████. As she separated from Mr. M████ she was beginning to feel more confident, accomplished and more comfortable and able to interact with the world and with work. Her divorce from Mr. M████ was finalized in 2007.

When they began living in separate homes, the girls spent every other week at their father's. Ms. P████ had concerns that there may have been some neglect. He reportedly wouldn't keep food in the house but she would buy it to ensure the girls had food while there. He started to leave the girls alone at night and one night one of the twins called her to say she was scared.

She said that her relationship with Mr. P████ started as a friendship. They worked together but tended to gravitate towards each other at work functions. They were married in 2007. Ms. P████ said that the marriage was "good at first." He had never had kids or been married so there were some understandable adjustment issues but they were able to work through them. She said that he never tried to play Dad and usually left the discipline up to her.

**CHANGES TO THE FAMILY AS A RESULT OF Erin and Fiona's Sexual Exploitation**

Ms. P████ stated that initially after Erin and Fiona's sexual exploitation surfaced she felt like she was living in a fog. She said that she was thrown into a legal system with complex terminology and processes and found it difficult to navigate. She had a desire to protect her kids and wanted to protect them from some of the legal aspects of the situation. She said that prior to the abuse her relationship with the girls had been pretty good. She felt like she knew how to parent them and wasn't afraid to take the role of parent. Ms. P████ said that the abuse affected her perceptions of herself as a parent. She doubts herself and lacks confidence in her parenting. She hesitates to set appropriate limits and is inconsistent. She gave the example of going to Chicago. She stated that they went as a means to relax and escape the child pornography and legal situation. While there she had a panic attack and ran from the hotel. When she returned she calmed down and took the girls shopping. She told them they could buy whatever they wanted regardless of expense. She realizes that she is not setting good limits and that it allows the girls to manipulate her. However, she finds it hard to return to her old style of parenting. She added that she continues to blame herself for not knowing that the abuse was occurring. She is more anxious than in the past and has

panic attacks on a regular basis. She takes Xanax for these panic attacks. However, she hesitates to use enough of the medication even at the doctor's recommendation. She feels that she should be able to able to fix everything for the girls.

Ms. P▒▒▒ has been suicidal at times, but only had thoughts of it, never to the point of actually making a specific plan. She adds that she thinks she screwed the girls up. She denies being angry at her ex-husband except for feeling angry when she watches Erin struggle and feels mad that she has to clean up the mess that he made. She feels sad because she feels that he "took my kids away." She feels a loss for who they might have been had the sexual exploitation not happened.

The sexual exploitation, the prosecution and the aftermath initially affected her work. She had just been placed in a new position and was having difficulty focusing on the work of supervising others. Her superiors moved her to a less busy area. Ms. P▒▒▒ at the time was trying to deal with Erin's difficulties at school and her oldest daughter's suicidality.

She said that it wasn't until about two years after discovering about the child pornography that she "fell apart." She feels that different parts of the family are always falling apart at different times and that she is trying to keep the family members all in one piece.

Her marriage has also been affected. She conveyed that the abuse and legal situation put a lot of tension into her relationship with her husband. She felt bad for her husband. She said that they began having parenting conflicts. He would express that she was not parenting the girls in an appropriate manner. She said that she thinks that she presented to her husband as needy and emotionally weak. She thought that her anxiety drained her husband and that he found it difficult to deal with her. She said that she was often crying and feeling helpless and that he did not know what to do to help her. Dealing with Erin's issues also takes away from time that they can spend together.

Ms. P▒▒▒ added that she had noticed changes in all of her daughters since the sexual exploitation surfaced. After the allegations, her two oldest children changed. S▒▒▒ clung to her and C▒▒▒ became even more emotionally detached. She said that C▒▒▒ has become less detached since going away to college. S▒▒▒ was suicidal and was placed in a psychiatric day hospital for a period of time.

Ms. P▒▒▒ reported that she has seen the biggest change in 17-year-old Erin. Erin is struggling with substance abuse and promiscuity. She is defiant and has been caught stealing. The substance abuse started four years ago with marijuana. Erin also started stealing around the same time.

Ms. P▒▒▒ recognized that Erin's having to change schools in middle school was particularly difficult. During her second year at the new school she began associating with a group of friends who were a bad influence. Ms. P▒▒▒ says that at the time she thought that Erin was looking for a way to connect in a new situation.

She said that her relationship with Erin has also changed. Erin was always close to her father. Ms. P____ thinks that Erin finds it hard to believe that her father would have done something like this to her and takes her anger at the changes in her life out on her mother.

Ms. P____ said that Fiona has also been adversely affected. She had always been a "super easygoing child." She became very forgetful and would have extremely angry outbursts over minor things. Her grades also suffered briefly. She fell behind in her schoolwork and didn't catch up until the 3rd grade.

She said that her youngest child, C_____, was also affected. For the first two years of her life while the prosecution was going on, C_____ was often farmed out to different relatives. She felt that this transfer among different parenting styles undermined her own parenting consistency with C_____.

**EMOTIONAL FUNCTIONING**

Ms. P____ was asked to complete the Personality Assessment Inventory. This is a standardized assessment tool that measures an individual's response style and the presence of possible psychopathology. Ms. P____ responded in a consistent fashion and appeared to be sincere and forthright in her responses. There were no attempts to portray herself as free of shortcomings or as more impaired than she was. Her clinical scores were significant for trauma, depression and anxiety. Her anxiety scores were very high and people with such scores generally show generalized impairment. Their lives tend to be seriously constricted and they may not be able to meet even minimal role expectations without feeling overwhelmed. In particular, her anxiety score related to traumatic stress was high. Her anxiety affects her thinking, her emotions and may lead to somatic concerns. Usually, the individual has experienced a trauma that is the overriding focus of their life and she views herself as being severely damaged perhaps irreparably by having experienced that trauma. Ms. P____'s scores also suggest that she is experiencing a significant amount of depression. She is likely to feel hopeless, discouraged and useless. Interpersonally, she may be withdrawn and may feel misunderstood or insignificant to other people. Typically, such individuals have little energy to pursue social role responsibilities let alone outside interests.

Ms. P____'s projective themes focus heavily on feeling that she has been stuck in "darkness" and negativity for too long. A large part of her wants to leave it behind but she finds it difficult to trust that the future is better. She very much wants to trust that there is something better. There is also a sense in her stories of feeling that she is defeated at times and frustrated by her failure to adequately "impose her will" or find any other solution to fix problems. She seems to try to remind herself that she is powerful. Ms. P____ also seems to yearn for a place with less chaos and wish for the ability to take comfort in other people. She seems to yearn for peace and time for herself but struggles with allowing herself to meet her own needs. She believes that obligations come before her own needs but it also leaves her feeling resentful and as if her needs don't count.

In terms of the ability to integrate her thoughts and her feelings in an organized manner, Ms. P          does fairly well. She may do so by constricting the amount of emotions she allows herself to feel. She can appear to be very cut off from affect regarding people who have done horrible things. She may also limit the amount of emotion in her life because currently she is easily overwhelmed by it and her anxiety takes over. When very anxious, she doesn't always think in the most logical way.

The themes in these stories probably reflect her experience with her ex-husband, her daughters and her experience with the court system. The entire experience has left Ms. P          with damaged trust and difficulty in finding hope for her future. She finds it difficult to move past what has occurred. In part, this may be because some of her anger at her ex-husband is cut off, but there is a reality to always having to deal with the abuse as the years go on, given that the pictures are online, most likely forever.

Her frustration and sense of feeling defeated may relate to her difficulties with Erin. The two of them appear to often be in conflict and the stories suggest that Ms P          is worried about her and wants her to learn to care for herself. At the same time, I think she is very angry at her daughter and resentful of her needs right now. She perceives her behavior at times as one more demand she can't handle right now. I think that the exploitation of her children, her anxiety, and resentment related to the effects of the child pornography on her life impact her ability to parent Erin effectively through her difficult teenage years.

**SUMMARY**

Ms. P          describes dramatic effects on her family as a consequence of her daughters' sexual exploitation at the hands of their father and his accomplice. The exploitation occurred at a time when she was just recovering from a depression and beginning to approach work and the world in a more competent and confident manner. She has lost much of her confidence especially in regards to her parenting. She no longer trusts her parenting instincts. She hesitates to set limits and this examiner believes that she feels responsible for the girls having been abused. She admits to blaming herself. Issues regarding her ability to parent appropriately or set limits are likely due in part to feeling guilty that she did not know what was occurring. It is also likely that the abuse has made her question how good a parent she is and to doubt her own ability. Her anxiety has increased dramatically and she now has panic attacks. Her marriage has suffered under the strain as well. When the abuse surfaced she had just remarried and both she and her new husband were trying to adjust to their marriage and his becoming a stepparent. He also had to deal with changes in his new wife's behavior. From her description he often may have felt that he needed to step in and parent which was never their plan. Ms. P          seems to be overwhelmed by the past few years and possibly even resentful of having to take care of everyone all the time. She stated that she feels that it's her responsibility to somehow fix the girls. I suspect that some of her difficulties with Erin are related to resentment of having to continue to do for others when no one is doing for her. Ms. P          has been so traumatized by her ex-husband's betrayal of their daughters and of her that she sees

herself as irreparably damaged and unable to function. She is also significantly depressed which makes it difficult for her to find the energy to meet basic role responsibilities such as parenting effectively.

_____

Elizabeth Toplyn, PhD

Licensed Psychologist

## PSYCHOLOGICAL ASSESSMENT

NAME: Erin M████

DOB: 5-1-98

DOE: 5-9-15

**REASON FOR REFERRAL:**

Erin M███ is a seventeen-year-old girl who was referred for a psychological assessment by the Family Assessment Clinic. Erin was depicted in child sexual abuse images created by her father and an accomplice and was possibly drugged and sexually exploited. Her father is currently incarcerated in a federal prison, but the images continue to be widely distributed on the internet. An assessment was requested in order to assess the emotional damage to Erin from Her exploitation by child pornography.

**ASSESSMENT INSTRUMENTS**

CLINICAL INTERVIEW
RORSCHACH
HOUSE, TREE, PERSON
THEMATIC APPERCEPTION TEST

**BEHAVIORAL OBSERVATIONS**

Erin was a pleasant and cooperative teenager. She answered questions directly and with little guardedness. She did not seem overly concerned that the examiner might share some of the information with her mother (i.e., ongoing violation of house rules.) She looked sad frequently and was able to talk about her emotions.

**FAMILY HISTORY**

Erin reported that she grew up in ████ Michigan. Her parents separated when she was about seven but she said it was difficult to tell if they were actually separated. She said that her parents continued to live in the same home despite the dissolution of the marriage. She said that she and her siblings were not told of the divorce until a year or so after it occurred. She said that her mother had begun to date the man who is currently her stepfather. Erin reported that she is one of four girls. Her older sisters are twins, although one identifies as male. She said that she thought for a long time that her older sister C███ did not like her and that at times she still thinks that is true. She described herself as very close to S██████ and finds it easy to accept his transgendered status. She has two younger sisters, Fiona and C████. She reported that she gets along really well with Fiona. She said at times they fight but they are quick to forgive each other. She described

her youngest sister as "kind of a brat" but doesn't have much of a connection to her given the large age difference. C       is only six.

Erin was asked about her relationships growing up with her parents. She said that she and her father were "pretty close." She added that "I used to get in trouble a lot in 6th grade. My dad was like that too so he understood." She said that she got along well with her mother when she was younger but that there is significant conflict now. She was asked what she thought the problem was between them and she said "me and my behavior. It upsets her and we fight a lot." She added that "we fight because of her extreme worry. I understand that she has anxiety but it is not my fault. She is nervous regarding anything I do, so she questions me and asks me 900 questions." She was asked to give an example and she said that, sometimes, if she asked permission to go shopping with a friend, her mother would insist on knowing what store they were going to before allowing her to go. Erin said that she found this difficult because she didn't necessarily know what store they were going to go to. She said that they used to be pretty close and she reluctantly admitted to missing the mother she used to know. She said that "now I can't talk to her." She said that part of her difficulty was that her mother changed immediately after the sexual exploitation surfaced. She said her mother would not allow the girls to do anything and thought that people would try to kill them.

She was asked about her relationship with her stepfather. She said that initially they got along well and that she liked him. She thinks now that he doesn't like her. She says that he is rude to her and she thinks that he behaves inappropriately with her. She says that he will say odd things to her. She added that "he creeps me and freaks me out. If I'm wearing a shirt that shows my belly he will touch my belly and say he sees it. When I wear leggings he slaps your butt." She said that she has not told her mother about these behaviors.

**SCHOOL FUNCTIONING**

Erin reported that she is currently attending      high School in the    Public School system. She is an 11th grader. She said that she did better academically this past term than she had in the one previous to it. This term she received two A's and a B, although she had dropped a class that she was failing. She said that the term previous to this one, she failed all of her classes because she never went to class. When asked why she didn't go, she said that she "was really depressed for a while. I wanted to cry all the time." She explained that she didn't want to cry in front of her peers so she would just leave the classroom. Erin reported that she continues to skip school currently. She said she had done so three times the week of this interview. She also added that in some ways her school situation had made it easier for her to do this. She had dropped a class which her mother was aware of but it has not yet shown up formally on her record. Therefore the school continues to call and say she missed class (automated) so the mother can't tell if it is the dropped class or another class. She tried to minimize her skipping behavior and said that she only did it if someone else wanted to do it. She said that really no one does. She added

that most of the time she just wants to be alone and not let people see her cry. She added that she often just goes outside and sits by herself in Richard's car.

Erin was asked about what it was like to have to move schools when her father was arrested and incarcerated. She said that it was difficult. She moved in the beginning of seventh grade and began attending a middle school that was 6-8 grades. Her previous school had been a K-6 elementary school. Erin said that she felt that it was hard to make friends because most of the kids had known each other for a year and groups had already been formed. She said that the first year she only had 2 friends and that she was lonely and sad. She said most of her sadness was about her father but also "mainly my whole life." Erin reported that initially she had done well in school until 8th grade when she began receiving detention frequently. She added that she was mouthy with teachers.

Erin was asked how she saw her future and what she wanted to do after graduation. She said that when she turned seventeen she had decided she needed to buckle down and stop her problematic behaviors. She added that she had no idea about her future and was frustrated because everyone expected her to know what she wanted. She said that she didn't and was irritated that her mother expected her to know as well. She said that she thought she might like to go into something in engineering because she is good at math and science. She is also a good artist and particularly likes to paint.

**PEER RELATIONSHIPS**

Erin was also asked if she had friends. She said that she had a best friend, a girl named A____. She and A____ have known each other for 13 years and she was the reason that Erin chose to switch back to her current district. When her father was arrested, there were concerns for the family's safety and the girls moved and attended a different school district. She said that she could talk to A____ about anything and that A____ was aware of what had happened with her father.

Erin stated that she also has a boyfriend of sorts. She said that she and Richard had known each other since the 9th grade but that they frequently ended their relationship and then resumed it. She referred to him as her ex-boyfriend and said that even when they were apart he was her friend and one of the few people to whom she felt she could talk openly. She said they had officially been broken up for most of the past year but their relationship had been the best it had ever been over that same time period. She said that Richard was the second of two relationships and that she and Richard have had sexual relations. She said that her mother was aware of this because at the time they were parked in the school parking lot and were caught by the police. She said that Richard was allowed to go home and she was brought to the police station for her mother to pick up. At the time, Richard was 17 and Erin was not. I brought up these issues with Erin as a possibility for why she was brought to the police station and Richard was not, but she didn't think it "was a big deal" and that the police overreacted. Erin was asked about her knowledge and ability to protect herself while having intercourse. She said that she did not want to become pregnant and that she didn't use birth control. She said that fairly strongly. When I

questioned Erin regarding the need to use birth control she said that she couldn't get her mother to follow through. She added too that Richard objected to the use of condoms. She said that her mother had said that they would get her birth control when she found out that Erin was having intercourse but never made an appointment. I asked Erin why she couldn't make her own appointments. She said she could but had not had driver's training and that if she made an appointment her mother would get upset and say, "How do you expect me to get you there?" She added that she hasn't seen her general practitioner in one year. She said that her mother had registered her for driver's education but then decided she didn't want her to drive.

Near the end of the interview Erin volunteered that she had done "whorish things". She said that in 8th grade she provided oral sex willingly to anyone. She said that she did so because it was easier than saying no. Peers then made fun of her for this behavior and it affected her reputation at school. She said that she has engaged in this behavior even when she and Richard were officially together. She said that she didn't know if she really liked providing oral sex but that she did like the thrill of doing it. She said that she feels badly about herself afterwards. She was asked if she had ever felt forced to do anything sexually. She said that Richard's older brother used to "crush on her" and that he once got her into his room and placed her hands on his genitals. She left the room. She said that she had not told anyone about that incident. She said that two months later he text messaged her asking her to come to his room. This time she did and provided oral sex. She said that she felt pressured to do it because it was easier than trying to argue and say no. She said that it took too much time to argue with the boys. She added that giving the boys what they wanted sexually was also a way to feel wanted. I asked her about this statement. She said that sometimes she thinks that no one will want her because she is damaged somehow.

## PSYCHIATRIC HISTORY

Erin was asked about her current mood. She said that she is depressed and that it feels like the depression has lasted for years. She said that she probably first experienced it when the allegations of sexual exploitation surfaced. She denied being on any psychiatric medications besides Adderal. (She was recently diagnosed with ADHD). She added that her therapist has suggested an antidepressant but that she didn't want to go and talk to the doctor. Thus when her mother arrived to take her to the appointment she made sure she wasn't home. I asked Erin what frightened her about taking medication. She said that people told her it could make her suicidal. We discussed the real likelihood of that and I gave her some unbiased information on benefits and side effects. I asked Erin about her sleep and appetite. She said that she stays up very late at night because she has difficulty sleeping. She is often tired the next day. Her appetite is good. She said that "I eat extremely well." She was asked if she had ever been suicidal. She said probably but explained that it had been passive suicidal ideation in which she wished a car would hit her but that she didn't really want to die. She said, though, for a while she refused to wear a seat belt in the hopes that the family would get in a car accident and she would be killed. She now wears a seatbelt. She has thought about jumping off a bridge but can't think of where to go to do

that. She also said that she wasn't sure she would like being dead. She has also thought about overdosing. She said that what stopped her was the thought that she didn't want to do that to her family or her friend A___. She then added that she and three of her siblings had a suicide pact. She laughed at this and it was difficult to get an explanation. She said that she didn't think that anyone really wanted to do it because they knew it would destroy their mother but that they all said to each other well if you do it, then I will have to. That is apparently part of what stops them because losing all three of them would be too much for their mother. She stated that at this point she does "want to see the future." She denied any counseling other than her current therapist and she denied psychiatric hospitalizations.

## SUBSTANCE ABUSE

Erin was asked about her substance use. She said that she smokes marijuana and that her mother "thinks I'm really reckless, but it's casual smoking. She thinks weed is like heroin." Erin said that how often she smoked depended on how much money she had but that when she had money she spent approximately 40 dollars on it. She added that she started smoking at age 13 in the 8th grade. She said that initially her friends offered and she was not interested. However, she indicated that her mother questioned her about the possibility of her using drugs all the time and she decided she may as well use if her mother was going to assume that she did. Erin said that she tried to tell her mom once that she had been turning down the marijuana in 7th grade but she and her mother began to argue instead. When asked about other drugs she said that she used to take bottles of Oxycontin and Xanax from her mother's medicine cabinet. She said that she used some of it and sold some. She added that she used it every day last summer because the marijuana was not helping her relax the way it had in the past. Although, Erin said this behavior was in the past, she added that she had taken some of these pills from her mother in December 2014 and then again about one month before this assessment. She said that she uses marijuana because it makes her "calmer, makes me happy." Erin was asked what appealed to her about using the painkillers. She said that initially she had been prescribed Vicodin at 14 after spinal surgery for severe scoliosis. She said that her prescription lasted for 6 months and that she still wanted it afterwards even though she was not in pain. She said that it helped her relax She said that she tended to use these medications when she really didn't want to think about something and the marijuana was not helping in that regard.

She was asked what these things were that she found so intolerable to think about. She listed, "dad, school, future and death." When asked what she thought about when she thought about death she said that it disturbed her because there was no answer to what happened to someone after they died. She didn't know what it meant to be dead. It should be noted that the night before this interview there was a well-publicized car accident in which several teenagers were killed or injured. Substance abuse was suspected to be partially to blame. Erin was good friends with one of the teens who had been killed and knew some of the others as well. She added that she was irritated at her mother on the way to this assessment because her mother kept saying that the accident was the fault of the

teens because they were speeding and intoxicated. Erin's response was that they didn't mean to do it.

## EXPERIENCE OF HER FATHER'S ARREST AND INCARCERATION

Erin was asked what she remembered about the arrest of her father. She said that "we were on our way home from Frankenmuth and a detective came over. We had to sit in the car while they were talking. I thought it was about me and that I was going to be arrested. We had to go to ▨▨▨ House with the detective and we all talked to the ▨▨▨ House person. Then we had an idea of what happened." She said that the next day she was supposed to see her dad and asked if they were going. Her mother's response was that their father was in jail. She said that her mother told them what happened about a week after the detective had originally talked to everyone. I asked what her thoughts were at that time. She said that she started crying and that it hadn't seemed real, "like he just disappeared." She says that she has seen him only once since this occurred. She added that she has no memory of the abuse. She is aware that Fiona was abused and drugged and that it is believed that she was drugged and abused as well. She said that she knew that there were images of both herself and Fiona being sexually abused.

She said that that summer was a rough one. Initially all of her friends wanted to talk to her to find out what happened. She did not want to talk about it with people and her mother told her not to do so. She was embarrassed that people knew. She said first people began keeping things from her and then stopped talking to her because she wouldn't give them information on what had occurred. Only three of her friends remained friends.

I asked her what her thoughts were now about her father. She said that she thinks he did sexually abuse the two of them. She said that prior to this she had seen inappropriate images on his computer (close-ups of female genitalia). She said that this occurred when she was around 8. She explained that she had surprised her father one day when she came to talk to him and he was on the computer. He slammed the computer shut and got angry at her. She added that after that incident that she made a rule for herself to make as much noise as possible when approaching her father when he was on the computer so that he would know she was coming and could turn the computer off before she got there.

She denied that he ever hit them physically but said that he "screamed a lot." We talked about the fact that her child sexual abuse images were still on the internet. She said that it scares her because she could just walk past someone who recognizes her from those pictures. She said that once a man in a van kept smiling at her and that she had wondered if he was doing so because he had recognized her from one of the pictures. She said that she knew that probably he was just inappropriate and "a pervert." She said that at times she misses her father but that she does not feel anger toward him. Instead, she gets angry that her life has been messed up and that it isn't fair. I asked about her experience of reading her victim's statement in court. She said that it was hard to do and that it made her father cry. She added that it was hard to see him chained up and that she had been a little afraid for him because he has a bad temper.

## EMOTIONAL FUNCTIONING

Erin's projective responses do suggest strengths in that she is very attuned to her world and interested in support and human contact. There were indications that she feels badly about herself. She sees herself as having both a good side and evil side and believes that she has no choice but to listen to the evil side. Given what she said in the interview about feeling that she may be damaged goods I suspect she thinks that she has to be evil. There are indications that she feels alone and unheard by her mother. She tends to look to men for comfort but may be too quick to accept any man because "she needs someone." She sees herself as "needy." I think some her promiscuous behaviors with boys may in part be related to her need to be wanted and to have some support from someone. There were indications that Erin is very sad about what she has lost and what her father has taken from her. She sees him as having gotten away with stealing from her. I think that she is angry because he "destroyed my life." At the same time, she seems to feel bad about feeling angry at him. It is hard for her to see her father as "bad" and she has trouble accepting that he was responsible for what he did. She also seems to feel abandoned by him. She said in the interview that she was close to her father and the projective responses suggested that she greatly misses his support. At the same time, she understands why she can no longer have it.

I think it is very difficult for her to tolerate all of her conflicting feelings. Rorschach responses suggested that she doesn't wish to look too closely at her emotions and tries to keep them at arm's length. She is able to think in an organized fashion in the presence of her depression but is easily overwhelmed by the emotions when there is more than sadness present. Erin is able to think rationally and with fairly good judgment despite her depression although she has a tendency to see and act on only one detail of a situation. She does so because allowing large amounts of emotions into her world tends to overwhelm her and she becomes impulsive. It is likely that with the difficulties with her mother, the end of high school closing in on her and her conflicting feelings about her father that she is easily overwhelmed emotionally at this time. This examiner suspects that given these factors, Erin is having increasing difficulty managing her emotions and utilizing her better judgment. There were also indications that much of her anxiety and sadness centers on sexuality issues and issues with relationships with other women.

Erin may have always protected her father from his own behaviors and she relied on him for support. Part of her loss and abandonment at the moment is the loss of their relationship. She turns to boys for attention and a sense of being wanted. She conveyed that she thinks that she is damaged goods and her projective responses suggested that she thinks that she has no choice but to allow her damaged side to overpower her good. She is willing to give boys what they want sexually to ensure feeling wanted but her level of depression may also leave her without the energy to stand up to their requests.

**SUMMARY**

Erin is a seventeen-year-old girl who presents as being significantly depressed and at risk for promiscuity and substance abuse. She has been acting out in numerous ways and can present as angry and oppositional. Depressed teenagers, however, often present with anger and irritability as opposed to sadness. Erin tends to minimize both her own feelings and her own behavior.  She can speak insightfully about her actions but also tends to see them as "not a big deal." Her level of depression is concerning. She said that she is not suicidal at this time but she has thought about ways to die at least in the past. Erin has had significant and ongoing impact from her sexual exploitation and the continued circulation of her child sexual abuse images on the internet. Additionally, because she and her father were close and she and her mother are struggling, she may continue to struggle with relationships in the future. The loss of her father as a support system is hard for Erin, much less to have to accept and deal with the sexual exploitation at his hands.

_____

Elizabeth Toplyn, Ph.D

Licensed Psychologist

## PSYCHOLOGICAL ASSESSMENT

**NAME: Fiona M**⬚⬚⬚

**DOE: 4-25-15**

**DOB: 2-21-02**

**REASON FOR REFERRAL**

Fiona M⬚⬚⬚ is a 13-year-old girl who was referred for a psychological evaluation by the Family Assessment Clinic. Fiona was depicted in child sexual abuse images created by her father and an accomplice and was drugged and sexually exploited. Her father is currently incarcerated in federal prison, but the images continue to be widely distributed on the internet. An assessment was requested in order to assess the emotional damage to Fiona from her exploitation by child pornography.

**ASSESSMENT INSTRUMENTS**

CLINICAL INTERVIEW

HOUSE TREE PERSON

SENTENCE COMPLETION

RORSCHACH

THEMATIC APPERCEPTION TEST

**BEHAVIORAL OBSERVATIONS**

Fiona was brought to the appointment by her mother. She was dressed neatly but casually. Fiona was friendly and pleasant and cooperated with everything the examiner asked her to do. She appeared to be honest and forthright in responding to questions and was able to speak about her experiences with her father and her family. Her affect was positive throughout the interview and she smiled easily. There was a full range to her affect and it changed appropriately with the topic of her conversation. She frequently laughed in a self-conscious manner.

**RESULTS OF CLINICAL INTERVIEW**

Fiona was asked about herself as a way to establish a rapport prior to testing. She stated that she was a seventh grader at Middle School South which is part of the ⬚⬚⬚ public school system. She said that she found school boring, particularly the subject of social studies. Her favorite subject is science. Her grades are currently all A's. She reported that she has friends both at home and at school. Her best friend is Maddie. Maddie lives in the neighborhood. She added that last year she had been best friends with Maddie's sister but this year she was best friends with Maddie. She explained that the two sisters were in the same grade although one was less than a full year older than the other. She said that currently the three of them all "get along." She conveyed that she had a group of friends at school that she laughingly called the "cool group." She said that she was involved in sports at school. Last year she had run track and this year she is trying softball.

Fiona said that she has four sisters, one of whom is transgendered. She said that C⬚⬚⬚ and S⬚⬚⬚ were twins and in their twenties. Erin is seventeen and her youngest sister, C⬚⬚⬚, is six. She

said that "Me and Erin are best friends. Me and C░░░░ don't get along. She's always mean. Now she is in Florida. It was better when she visited. We got along better." She added that she was good friends with S░░░. She thinks of S░░░ as a sister but does not have a problem with him identifying as a male. She added that she sometimes fights with C░░░░.

She described more feelings about Erin in relation to their mother. She said that Erin can "be snappy and have an attitude." She says that she thinks that Erin is allowed to get away with too much. For example, she said that her mother will threaten to take away Erin's phone for her disrespect but doesn't always follow through. Fiona says that she has told her mother that Erin should lose her phone and privileges more often. Fiona added that she thought that her mother was harder on her than she was on Erin. She said that if she gets an attitude with her mother, she will take away her phone or her laptop for a while. She says that her mother says she can be disrespectful.

When asked about her relationship with her mother, she agreed that she can be disrespectful but feels that her mother doesn't allow her to do anything she wanted to do. She said her mother doesn't trust the neighborhood because there "is a lot of crime." She expressed frustration that her mother doesn't let her hang out with her friends outside. She explained that she is only allowed to go a couple of streets past her own, and just recently her mother agreed to allow her to walk home from school. She conveyed that her mother will ask the girls to do something, such as unload the dishwasher, and Fiona will say she didn't want to do it. Her mother will then start to yell that "she does everything." Fiona says once her mom yells, she will sometimes do as she is asked and that her stepfather will help her. No one wants to make her mother angrier.

She was asked what she remembers about growing up. She said that she remembered living in ░░░░ and at that time she was the youngest in the family since C░░░░ had not yet been born. She said that she was a good student without behavioral problems. She does not remember if she was ever held back a grade in early elementary school. She said that her parents separated when she was "three or four." She added that initially the visitation schedule was that they visited their father every Wednesday and every other weekend. She said that she remembered the visits as being "good." She explained that she would hang out with a good friend from school named Theresa or she and friends would talk through the computer and various apps. She said her sisters were there as well and that she would "sometimes hang out with Erin and her boyfriend." She added that she got along with her Dad growing up.

She thinks her mother remarried when she was around six or seven but was uncertain of the timeline. She said that she likes her stepdad and that they talk about music. They have a common interest in classic hard rock bands such as Led Zeppelin and AC-DC. When pressed, she said that she liked some of today's music but not much of it.

Fiona was asked if she currently has a boyfriend. She said no, but that she had one until a month or so ago. His name was Ben. They go to school together and she liked him because he is "attractive, nice and funny." She described him as being a good friend to her. She explained that she ended the relationship because she didn't want to be with him anymore. She thought he had been a little upset, but she had decided that she didn't like him all that much. She conveyed that there were other boys that she found interesting or attractive at school and that she has been talking to one named Alex.

39

Fiona denied using drugs or alcohol currently. She said that she had smoked marijuana regularly last summer with Erin. She said that Erin didn't pressure her but just asked her one day if she wanted to try it. She also drank vodka over the summer. She added that she has stopped using these things because her mother caught her. She said that she liked marijuana and how it made her feel. She lost her phone and was grounded as a consequence of this behavior. She said though that her mother gave the phone back earlier than planned because she was upset one day and told her she needed to talk to her friends to feel better. Fiona said that she wanted to focus on school, so she stopped using these substances, but that she might use them again over the summer when there is no school.

Regarding how her mother disciplines the girls, she said that she often takes away phones or laptops or grounds them.  She said that "Erin freaks out if you take her phone and starts having a screaming fit." She said that her mother is afraid to set limits on Erin because she doesn't want to upset her. She said that her stepfather generally lets her mother handle the discipline, although he will sometimes yell at Erin.

Fiona remembered her father's arrest and said that was the last time that she saw him. She added that she hadn't really known why her father was arrested or jailed until she was about eleven. She said that she remembered waking up one night and remembered that her father had a friend over while they were there during their weekly visitation. She asked S⬛⬛⬛ and Erin about this memory, and they explained that their father had drugged and sexually abused her. She said she was a little surprised when they told her. She has no memories of the abuse. This examiner asked how Fiona felt about her father after talking with her sisters. She responded that she "doesn't like him anymore. But now I don't think about it. I see my stepdad as my dad." She said that she did not have to testify at her father's trial but had gone to court the day Erin read her victim statement. She wanted to support Erin. She was asked what her thoughts are now about her father. She said that "like it's in the past, like it's not the present. Makes me feel more happy. I don't have to worry about what happened." She was asked if she had any concerns about the images of her sexual abuse that remain on the internet. She said that she didn't really worry about them. She thought that if someone close to her knew she might be embarrassed. She said in that case that she would tell her mom who would probably make her switch schools.

Fiona was asked about depression and if she had ever felt suicidal. She responded that she had thought about suicide because her parents used to yell a lot. She made a point of saying that they seemed to be having a good, happy day on the day of the evaluation, and there had been no yelling. She says that she hasn't felt suicidal lately but if she does, she talks to her brother and sister, and "they talk me out of it. Erin makes me laugh." She also had a good friend who she knew for many years die about a year ago. She said that after the friend's death, she often thought about suicide.

She said that she does get sad sometimes because her mother yells at her more than she does at Erin. She said that she told her mother she felt this way and her mother started to cry and hugged her.

**RESULTS OF PROJECTIVE TESTING**

Projective testing suggests that Fiona sees herself as someone who can manage stress well. She is able to seek out relationships and support from those relationships. However there were indications that she also sees herself as small and helpless with a fair amount of unconscious anxiety regarding her body, particularly the lower half of it. She connects easily to others and relies

heavily on her friendships. There are age appropriate wishes for more independence from family and a belief that her mother is too strict and possibly overprotective. Fiona's stories suggest that she sees quiet defiance as the only way to gain more freedom, but also feels bad about that defiance. She recognizes and appreciates how much her mother has done for the family. There is also a sense that she may see herself as not as important as the others. One of her stories talks about a daughter dying and the mother being sad but "just going on with her regular life." She sees her mother as someone who works really hard and is very anxious and exhausted. She also feels that her mom is resentful and takes it out on her on her children at times. Fiona wants to do well but is confused by the inconsistent parenting and her mother's emotional volatility at times. In terms of her relationship with her father, Fiona stated that she doesn't think about the abuse or him much because it's easier. However, her projective responses suggest that he is very much on her mind. She sees him as bad, both because of the sexual exploitation and for having left them by being incarcerated. She thinks that he did a terrible thing to her and she is afraid around older men. Fiona's stories also suggest that she believes that something (probably her innocence or past life) has been stolen from her and she is angry at these things. She wants to listen to the adults in her world but isn't sure she can trust them.

Fiona does well in terms of integrating her thoughts and emotions. She is able to remain logical and think deliberately in the face of strong feelings and is not easily overwhelmed by emotions. She spends a lot of time in her head with little awareness of her physical body.

## SUMMARY

In summary, Fiona is a 13-year-old girl who was sexually exploited by her father and a co-conspirator. Fiona is currently doing well at school and seems to have good relationships with her sisters, stepfather and friends. She makes friends easily and relies on them for support. She is entering adolescence which is accompanied by wishes for more independence and freedom and more time with friends as opposed to parents. She perceives her mother as too strict and overly anxious. While this is an understandable reaction from her mother given the abuse by her father, I think it is negatively impacting Fiona's relationship with her mother. It may put Fiona more at risk for acting out behaviors in the future. Fiona seems to already think that the only way to gain independence is to take it anyway. Currently she is not yet sophisticated enough to not get caught, but that is likely to change as she gets older. She is also very close to her older sister, Erin, who is having a difficult time and may well begin to use Erin's methods to try to gain independence for herself. She also sees people still in fairly dichotomous terms, i.e., dad is either bad or good. She may begin to struggle more as she gets older and realizes that frequently people are more nuanced and complex.

There has been damage from the sexual exploitation. Fiona has difficulty trusting that adults have her best interest although she struggles against that feeling. She has anger towards her dad but currently seems to have cut off a lot of feelings about her body, her sexuality and her anger. As she goes further into adolescence this may be much harder for her to do and she may act out more.

_____

Elizabeth Toplyn, Ph.D

**Appendix 2: Scores on Standardized Measures**

**Erin_____ M_____**

| Erin    M____ , 16 year old, female, Birth date:    98 |

**Achenbach System of Empirically Based Assessment (ASEBA); the Child Behavior Checklist (CBCL)** The ASEBA is a comprehensive evidence-based assessment system developed through decades of research and practical experience. The ASEBA assesses competencies, strengths, adaptive functioning, and behavioral, emotional, and social problems from age 1½ to 18 years

Completed by Mother, A_____ P_____, 2/24/15:

| SCALE | SCORE | CLINICAL SIGNIFICANCE |
|---|---|---|
| Anxious / Depressed | 8 | Borderline Clinical Range |
| Withdrawn / Depressed | 11 | Clinical Range |
| Somatic Complaints | 12 | Clinical Range |
| Social Problems | 5 | |
| Thought Problems | 9 | Clinical Range |
| Attention Problems | 15 | Clinical Range |
| Rule-Breaking Behavior | 22 | Clinical Range |
| Aggressive Behavior | 23 | Clinical Range |
| Other Problems | 9 | |
| | | |
| INTERNAL | 31 | Clinical Range |
| EXTERNAL | 45 | Clinical Range |
| SUM | 114 | Clinical Range |
| | | |
| ACTIVITIES | 4.3 | Clinical Range |
| SOCIAL | 4.67 | Borderline Clinical Range |
| SCHOOL | 3 | |
| TOTAL T | 20T | Clinical Range |

**Youth Self Report (YSR)**

Completed by Erin _____ M_____, 2/24/15:

| SCALE | SCORE | CLINICAL SIGNIFICANCE |
|---|---|---|
| Depressive Problems | 20 | Clinical Range |
| Anxiety Problems | 8 | |
| Somatic Problems | 6 | Borderline Clinical Range |
| Attention Deficit/ Hyperactivity Problems | 11 | Clinical Range |
| Oppositional Defiant Problems | 10 | Clinical Range |

| Conduct Problems | 19 | Clinical Range |
|---|---|---|
|  |  |  |
| ACTIVITIES | 9 |  |
| SOCIAL | 7 |  |
| SCHOOL | 2.83 | Borderline Clinical Range |
| TOTAL T | 25T | Clinically Significant |

**Trauma Symptom Checklist for Young Children (**TSCYC): For all the clinical scales except PTS-TOT, T-scores less than or equal to 64 are considered normal, T-scores between 65 and 69 are deemed potentially problematic, and T-scores greater than or equal to 70 are interpreted as clinically significant.

RL T-score of 70 or higher considered invalid. Scores from T=65-T=69 suggest significant parental under-endorsement, although not at a level that renders the TSCYS invalid.

ATR T-score 90 or higher considered invalid.

PTS-TOT: An overall measure of posttraumatic stress. Elevated scores (T$\geq$ 70) suggest relatively severe posttraumatic disturbance. A T-score in the 65-69 range is often associated with at least one elevated PTSD symptom-cluster, and thus suggests mile to moderate posttraumatic stress. If the child has experienced or witnessed a trauma that produces significant emotional distress or disorganized/agitated behavior, **a raw PTS-TOT score of 40 or greater suggests PTSD**.

Completed by Mother, A⬛⬛⬛ P⬛⬛⬛, 2/24/15:

| SCALE | T-SCORE | SIGNIFICANCE |
|---|---|---|
| RESPONSE LEVEL | 37 |  |
| ATYPICAL RESPONSE | 68 |  |
| ANXIETY | 42 |  |
| DEPRESSION | 92 | Clinically Significant |
| ANGER/AGGRESSION | 75 | Clinically Significant |
| POST-TRAUMATIC STRESS-INTRUSION | 64 |  |
| POST-TRAUMATIC STRESS-AVOIDANCE | 90 | Clinically Significant |
| POST-TRAUMATIC STRESS-AROUSAL | 90 | Clinically Significant |
| POST-TRAUMATIC STRESS-TOTAL | 84 | Clinically Significant / Suggests Severe Posttraumatic Disturbance |
| DISSOCIATION | 75 | Clinically Significant |
| SEXUAL CONCERNS | 51 |  |

**Trauma Symptom Checklist for Children** (**Completed by children from ages 8-15**): For all clinical scales except SC and its sub-scales, T-scores at or above 65 are considered clinically significant. T-scores in the range of 60-65 are suggestive of difficulty and may represent sub-clinical but significant symptomatology. For the SC scale and its sub-scales (SC-P and SC-D) T-scores at or above 70 are considered clinically significant.

UNDERRESPONSIVE: t-score equal to or greater than 70, invalid; 65-70 t-score possibly under-responding

HYPERRESPONSIVE: t-score 90 or higher invalid; 75 -89 potential over-responder

Completed by Erin ____ M____, 2/24/15:

| SCALE | SCORE | SIGNIFICANCE |
|---|---|---|
| UNDERRESPONSE | 42 | |
| HYPERRESPONSE | 70 | |
| ANXIETY | 51 | |
| DEPRESSION | 67 | Clinically Significant |
| ANGER | 61 | Sub-Clinical but Significant |
| POST-TRAUMATIC STRESS | 58 | |
| DISSOCIATION | 74 | Clinically Significant |
| DISSOCIATION-OVERT | 76 | Clinically Significant |
| DISSOCIATION-FANTASY | 63 | Sub-Clinical but Significant |
| SEXUAL CONCERNS | 110 | Clinically Significant |
| SEXUAL CONCERNS – PREOCCUPATION OR UNUSUAL FOR GIVEN AGE | 111 | Clinically Significant |
| SEXUAL CONCERNS – DISTRESS OR CONFLICT REFLECTIVE OF SEXUAL MATTERS OR EXPERIENCES | 87 | Clinically Significant |

For all clinical scales except SC and its sub-scales, T-scores at or above 65 are considered clinically significant. T-scores in the range of 60-65 are suggestive of difficulty and may represent sub-clinical but significant symptomatology. For the SC scale and its sub-scales (SC-P and SC-D) T-scores at or above 70 are considered clinically significant.

**Fiona ▮ M▮**

Fiona ▮ M▮, 13 year old, female, Birth date:       2002

**Achenbach System of Empirically Based Assessment (ASEBA); the Child Behavior Checklist (CBCL)** The ASEBA is a comprehensive evidence-based assessment system developed through decades of research and practical experience. The ASEBA assesses competencies, strengths, adaptive functioning, and behavioral, emotional, and social problems from age 1½ to 18 years.

Completed by Mother, A▮ P▮, 2/24/15*:*

| SCALE | SCORE | CLINICAL SIGNIFICANCE |
|---|---|---|
| Anxious / Depressed | 15 | Clinical Range |
| Withdrawn / Depressed | 7 | Borderline Clinical Range |
| Somatic Complaints | 6 | Borderline Clinical Range |
| Social Problems | 8 | Borderline Clinical Range |
| Thought Problems | 11 | Clinical Range |
| Attention Problems | 9 | Borderline Clinical Range |
| Rule-Breaking Behavior | 10 | Borderline Clinical Range |
| Aggressive Behavior | 17 | Clinical Range |
| Other Problems | 8 | |
| | | |
| INTERNAL | 28 | Clinical Range |
| EXTERNAL | 27 | Clinical Range |
| SUM | 91 | Clinical Range |
| | | |
| ACTIVITIES | 5.05 | Borderline Clinical Range |
| SOCIAL | 5 | Borderline Clinical Range |
| SCHOOL | 7.47 | |
| TOTAL T | 28T | Clinical Range |

**Youth Self Report**: (YSR)

Completed by Fiona ▮ M▮ 2/24/15*:*

| SCALE | SCORE | CLINICAL SIGNIFICANCE |
|---|---|---|
| Depressive Problems | 13 | Borderline Clinical Range |
| Anxiety Problems | 5 | |
| Somatic Problems | 4 | |
| Attention Deficit/ Hyperactivity Problems | 10 | Borderline Clinical Range |
| Oppositional Defiant Problems | 6 | Borderline Clinical Range |
| Conduct Problems | 15 | Clinical Range |

| | | |
|---|---|---|
| ACTIVITIES | 5.75 | Borderline Clinical Range |
| SOCIAL | 7 | |
| SCHOOL | 4.4 | |
| TOTAL T | 33T | Clinical Range |

**Trauma Symptom Checklist for Young Children (**TSCYC): For all the clinical scales except PTS-TOT, T-scores less than or equal to 64 are considered normal, T-scores between 65 and 69 are deemed potentially problematic, and T-scores greater than or equal to 70 are interpreted as clinically significant.

RL T-score of 70 or higher considered invalid. Scores from T=65-T=69 suggest significant parental under-endorsement, although not at a level that renders the TSCYS invalid.

ATR T-score 90 or higher considered invalid.

PTS-TOT: An overall measure of posttraumatic stress. Elevated scores (T$\geq$ 70) suggest relatively severe posttraumatic disturbance. A T-score in the 65-69 range is often associated with at least one elevated PTSD symptom-cluster, and thus suggests mile to moderate posttraumatic stress. If the child has experienced or witnessed a trauma that produces significant emotional distress or disorganized/agitated behavior, **a raw PTS-TOT score of 40 or greater suggests PTSD**.

Completed by Mother, A██████ P█████, 2/24/15:

| SCALE | T-SCORE | SIGNIFICANCE |
|---|---|---|
| RESPONSE LEVEL | 41 | |
| ATYPICAL RESPONSE | 56 | |
| ANXIETY | 76 | Clinically Significant |
| DEPRESSION | 98 | Clinically Significant |
| ANGER/AGGRESSION | 78 | Clinically Significant |
| POST-TRAUMATIC STRESS-INTRUSION | 81 | Clinically Significant |
| POST-TRAUMATIC STRESS-AVOIDANCE | 109 | Clinically Significant |
| POST-TRAUMATIC STRESS-AROUSAL | 62 | Potentially Problematic |
| POST-TRAUMATIC STRESS-TOTAL | 83 | Clinically Significant / Suggests relatively severe posttraumatic disturbance |
| DISSOCIATION | 72 | Clinically Significant |
| SEXUAL CONCERNS | 59 | |

**Trauma Symptom Checklist for Children** (**Completed by children from ages 8-15**): For all clinical scales except SC and its sub-scales, T-scores at or above 65 are considered

clinically significant. T-scores in the range of 60-65 are suggestive of difficulty and may represent sub-clinical but significant symptomatology. For the SC scale and its sub-scales (SC-P and SC-D) T-scores at or above 70 are considered clinically significant.

UNDERRESPONSIVE: t-score equal to or greater than 70, invalid; 65-70 t-score possibly under-responding

HYPERRESPONSIVE: t-score 90 or higher invalid; 75 -89 potential over-responder

| SCALE | SCORE | SIGNIFICANCE |
|---|---|---|
| UNDERRESPONSE | 52 | |
| HYPERRESPONSE | 69 | |
| ANXIETY | 44 | |
| DEPRESSION | 61 | Sub-Clinical but Significant |
| ANGER | 67 | Clinically Significant |
| POST-TRAUMATIC STRESS | 54 | |
| DISSOCIATION | 73 | Clinically Significant |
| DISSOCIATION-OVERT | 78 | Clinically Significant |
| DISSOCIATION-FANTASY | 52 | |
| SEXUAL CONCERNS | 55 | |
| SEXUAL CONCERNS – PREOCCUPATION OR UNUSUAL FOR GIVEN AGE | 60 | |
| SEXUAL CONCERNS – DISTRESS OR CONFLICT REFLECTIVE OF SEXUAL MATTERS OR EXPERIENCES | 41 | |

For all clinical scales except SC and its sub-scales, T-scores at or above 65 are considered clinically significant. T-scores in the range of 60-65 are suggestive of difficulty and may represent sub-clinical but significant symptomatology. For the SC scale and its sub-scales (SC-P and SC-D) T-scores at or above 70 are considered clinically significant.

## Appendix 3: Documents Reviewed

| US v. B — List of Documents — Section I – Court & Legal Documents | | | |
|---|---|---|---|
| **Record/Exhibit** | **Name** | **Date** | **Description** |
| US DOJ Victim Notification Letter | A▓▓ P▓▓ | 1/26/2011 | US DOJ Notification Letter re: M▓▓ |
| US District Court Eastern District of Michigan | Criminal Complaint US v. J▓▓ B▓▓ Case: ▓▓ | 6/12/2009 | Criminal Complaint: Child Pornography |
| US District Court Eastern District of Michigan | Plea Agreement US v. J▓▓ B▓▓, Case: ▓▓ | 11/22/2010 | Plea Agreement XXX |
| US District Court Eastern District of Michigan | Indictment US v. J▓▓ B▓▓ Case: ▓▓ | 8/5/2010 | Indictment of J▓▓ B▓▓ and R▓▓ M▓▓ |
| List of Documents — Section II – Case Activity | | | |
| **Record** | **Name** | **Date** | **Description** |
| Victim Statements | P▓▓/M▓▓ Victim Impact Statements | 8/8/2011 | Statements on behalf of Erin, Fiona, A▓▓ ▓▓ |
|  |  |  |  |
| List of Documents — Section III – Health & Education | | | |
| **Record** | **Name** | **Date** | **Description** |
| Correspondence | Leo Niffeler, LMSW BCD | 3/15/2011 | Letter from therapist ; St. John Providence Eastwood Clinic regarding Fiona M▓▓'s therapy |
|  |  |  |  |

**<u>Appendix 4: Curricula vitae and resume</u>**

**KATHLEEN MAY LAWTON COULBORN FALLER, Ph.D., A.C.S.W., D.C.S.W., L.C.S.W.**

1613 S. University Avenue                                    1534 Millicent Rogers Road
Ann Arbor, MI 48104                                          El Prado, NM 87529
E-mail: kcfaller@umich.edu
Phone: 734 649 5452

### CURRICULUM VITAE

**EDUCATION**

| | |
|---|---|
| 1981 | Ph.D., Social Work and Psychology, University of Michigan, Ann Arbor, Michigan |
| 1973-74 | Advanced course in Family and Marital Treatment, Institute for Group Analysis, London, England |
| 1971 | Master's Degree in Social Work, University of Michigan, Ann Arbor, Michigan |
| 1964-65 | Graduate study in Political Science, University of Chicago, Chicago, Illinois |
| 1963 | A. B. in Political Science, Oberlin College, Oberlin, Ohio |

**EMPLOYMENT**

| | |
|---|---|
| 2014-pres | Marion Elizabeth Blue Professor Emerita of Children and Families, University of Michigan |
| 2014-pres | Co-Director, Family Assessment Clinic, Catholic Social Services of Washtenaw County |
| 2006-2014 | Marion Elizabeth Blue Professor of Social Work, University of Michigan |
| 1992-2014 | Professor, School of Social Work, University of Michigan |
| 1990-2014 | Director, Family Assessment Clinic, University of Michigan |
| 2008-2013 | Principal Investigator, National Child Welfare Workforce Institute. Sub-award. Children's Bureau, University of Michigan |
| 2003-2009 | Principal Investigator, Recruitment & Retention of Child Welfare Professionals Program, University of Michigan |
| 2000-2005 | Principal Investigator, Hasbro Early Assessment Project, University of Michigan |
| 2000-2004 | Principal Investigator, Training Program for Child Welfare Supervisors, University of Michigan |
| 1997-2000 | Principal Investigator, Interdisciplinary Child Welfare Training Program, University of Michigan, |
| 1995-2000 | Faculty Director, CIVITAS Child and Family Programs, University of Michigan |
| 1988-1992 | Associate Professor, School of Social Work, University of Michigan. |
| 1977-1995 | Co-Director, Interdisciplinary Project on Child Abuse and Neglect, University of Michigan |
| 1982-1988 | Assistant Professor, School of Social Work, University of Michigan. |
| 1977-1982 | Lecturer, School of Social Work, University of Michigan, |
| 1973-1974 | Senior Psychiatric Social Worker, York Clinic, Guy's Hospital, London, England. |
| 1970-1973 | Family Therapist, Family and School Consultation Project, Funded by NIMH, Ann Arbor, Michigan. |
| 1965-1968 | Case Worker, Cook County Department of Public Aid, Chicago, Illinois. |
| 1963-1964 | Group Worker, Manhattan General Hospital Drug Addiction Service, New York, New York. |

**AWARDS**

2014    Michigan Child Abuse and Neglect Social Work Award.

2012    Institute on Violence, Abuse and Trauma (IVAT). William Friedrich Memorial Child Sexual Abuse Research, Assessment and/or Treatment Award.

2012    Michigan Chapter of the National Association of Social Workers' Lifetime Achievement Award.

2011    National Children's Advocacy Center's Outstanding Lifetime Achievement Award.

2010    University of Michigan School of Social Work Distinguished Faculty Award.

2008    American Professional Society on the Abuse of Children's Outstanding Research Achievement Award.

1998    American Professional Society on the Abuse of Children's Outstanding Service Award.

**PUBLICATIONS**

**Books**

Faller, K.C., & Everson, M.D. (Eds.). (2014). *Contested issues in the evaluation of child sexual abuse.* London, UK: Routledge.

Staller, K., Faller, K. C., Vandervort, F., Birdsall, W.C., & Henry, J. (2010). *Seeking justice in child sexual abuse: Shifting burdens & sharing responsibilities.* New York: Columbia University Press.

Faller, K. C. (2008). *Interrogare il bambino sull'abuso sessuele.* Torino, Italy: Centro Scientifico Editore (Italian Translation of *Interviewing Children about Sexual Abuse*).

Faller, K. C. (2007). *Interviewing Children about Sexual Abuse: Controversies and Best Practice.* New York: Oxford University Press.

Faller, K. C. (2003). *Understanding and Assessing Child Sexual Maltreatment, 2nd edition.* Thousand Oaks, CA: Sage Publications.

Faller, K. C. (Ed.) (2000). *Maltreatment in Early Childhood: Tools for Research-based Intervention.* New York: Haworth Press.

Faller, K. C. (1996). *Study Guide: Evaluating Children Suspected of Having Been Sexually Abused.* Newbury Park, CA: Sage Publications.

Faller, K. C. (1993). *Child Sexual Abuse: Intervention and Treatment Issues.* Wash., D.C.: Department of Health and Human Services.

Faller, K. C. (1990). *Understanding Child Sexual Maltreatment.* Newbury Park, CA: Sage Publications.

Faller, K. C. (1988). *Child Sexual Abuse: An Interdisciplinary Manual for Diagnosis, Case Management, and Treatment.* New York: Columbia University Press.

Faller, K. C. (Ed.), (1981). *Social Work with Abused and Neglected Children: A Manual of Interdisciplinary Practice.* New York: The Free Press.

**Articles—peer reviewed**

Williams, J., Nelson-Gardell, D., Cordisco-Steele, L. & Tishelman, A. (2015). Perceptions of the value of extended assessments to resolve allegations of sexual abuse: It's the performance that counts. *Journal of Social Service Research.*

Saunders, D. G., Faller, K. C., & Tolman, R. M. (2015). Beliefs and recommendations regarding child custody and visitation in cases involving domestic violence: a comparison of professionals in different roles. *Violence Against Women,* 1077801215608845, first published on October 15, 2015 as doi:10.1177/1077801215608845.

Faller, K.C. (2015). Forty years if forensic interviewing of children suspected of sexual abuse: Historical benchmarks. *Social Sciences,4,* 34–65.

Williams, J., Nelson-Gardell, D., Faller, K. C., Cordisco-Steele, L. & Tishelman, A. (2014). Is There a Place for Extended Assessments for Evaluating Concerns about Child Sexual Abuse?

Perceptions of 1,294 Child Maltreatment Professionals. *Journal of Forensic Social Work, 3*(2), 88-105.

Williams, J., Nelson-Gardell, D., Faller, K. C., Tishelman, A. & Cordisco-Steele, L. (2013) Is There a Place For Extended Assessments in Addressing Child Sexual Abuse Allegations? How Sensitivity and Specificity Impact Professional Perspectives. *Journal of Child Sexual Abuse, 23(2),* 179-197.

Saunders, D. G., Tolman, R. M., & Faller, K. C. (2013). Factors associated with child custody evaluators' recommendations in cases of intimate partner violence. *Journal of Family Psychology, 27,* 473-483.

Ortega, R. & Faller, K.C. (2012).Training Child Welfare Workers from an Intersectional Cultural Humility Perspective: A Paradigm Shift. *Child Welfare, 90* (5), 27-50

Faller, K.C., & Everson, M.D. (2012). Contested issues in the evaluation of child sexual abuse allegations: Why consensus on best practice remains elusive; Contextualizing our concerns. *Journal of Child Sexual Abuse: Research, Treatment, & Program Innovations for Victims, Survivors, & Offenders, 21* (1), 3-18.

Everson, M.D. & Faller, K.C. (2012). Base rates, multiple indicators, and comprehensive forensic evaluations: Why sexualized behavior still counts in assessments of child sexual abuse allegations. *Journal of Child Sexual Abuse: Research, Treatment, & Program Innovations for Victims, Survivors, & Offenders, 21(1)* 45-71.

Hong, J.S., Lee, N.Y., Park, H.J., & Faller, K.C. (2011). Child maltreatment in South Korea: An ecological systems analysis. *Children and Youth Services Review, 33,* 1058-1066.

Faller, K.C., Grabarek, M., Nelson-Gardell, D., & Williams, J. (2011). Techniques employed by forensic interviewers conducting extended assessments: Results from a multi-site study. *Journal of Child and Adolescent Trauma, 20*(3).

Faller, K.C., & Nelson-Gardell, D. (2010). Extended evaluations in cases of child sexual abuse: How many sessions are sufficient? *Journal of Child Sexual Abuse: Research, Treatment, & Program Innovations for Victims, Survivors, & Offenders. 19* (6), 648-668.

Faller, K.C., Cordisco-Steele, L, & Nelson-Gardell, D. (2010). Allegations of sexual abuse of a child: What to do when a single forensic interview isn't enough. *Journal of Child Sexual Abuse: Research, Treatment, & Program Innovations for Victims, Survivors, & Offenders, 19*(5)*,* 572-589.

Faller, K.C., Grabarek, M., & Ortega, R.M. (2010). Commitment to Child Welfare Work: What Predicts Leaving and Staying? *Children and Youth Services Review, 32,* 840–846.

Faller, K.C., Masternak, M., Grinnell-Davis, C., Grabarek, M., Sieffert, J., & Bernatovicz, F. (2009). Realistic Job Previews in Child Welfare: State of Innovation and Practice. *Child Welfare, 88*(5), 23-48.

Faller, K.C., Grabarek, M., & Vandervort, F. (2009). Child welfare workers go to court: The impact of race, gender, and education on comfort with legal issues. *Children and Youth Services Review,* 31 (9), 972-977.

Jayaratne, S., & Faller, K. C. (2009). Commitment of private and public agency workers to child welfare: how long do they plan to stay? *Journal of Social Service Research,* 35(3), 251-261.

Gonzalez, R. P., Faller, K. C., Ortega, R. M., & Tropman, J. (2009). Exit Interviews of Child Welfare Workers. *Journal of Public Child Welfare, 3*(1), 40-63.

Faller, K.C., Ortega, M.B., & Pomeranz, E. (2008). Can Early Assessment Make a Difference in Child Protection? Results from a Pilot Study. *Journal of Public Child Welfare,* 2(1), 71-90.

Jayaratne, S., Faller, K., Ortega, R., & Vandervort, F. (2008). African American and White Child Welfare Workers' Attitudes Towards Policies Involving Race and Sexual Orientation. *Children and Youth Services Review, 30,* 955–966.

Vandervort, F., Gonzalez, R. P., & Faller, K.C. Legal Ethics and High Child Welfare Worker Turnover: An Unexplored Connection (2008). *Children and Youth Services Review, 30*(5), 546-563.

Faller, K. C., & Palusci, V. (2007). Commentary: Children's Advocacy Centers: Do they lead to positive case outcomes? *Child Abuse & Neglect: The International Journal 31*(10), 1021-1029.

Faller, K.C., & Vandervort, F. (2007). Interdisciplinary Clinical Teaching of Child Welfare Practice to Law and Social Work Students: When World Views Collide. *Journal of Law Reform, 41(*1), 121-165.

Faller, K.C. (2007). Coaching children about child abuse: Professionals' perceptions of the problem. *Child Abuse & Neglect: The International Journal. 31(*9), 947-959.

Faller, K.C., Birdsall, W. & Vandervort, F. (2006). Does successful criminal prosecution of child sexual abuse predict more severe sentences? *Child Abuse & Neglect: The International Journal, 30*(7), 815-828.

Faller, K.C. (2005). False accusations of child maltreatment: A contested issue. *Child Abuse & Neglect: The International Journal, 29*(12), 1327-1331.

Faller, K.C. (2005). Anatomical dolls: Their use in assessment of children who may have been sexually abused. *Journal of Child Sexual Abuse, 14*(3), 1-21.

Faller, K.C. (2003). Research and practice in child interviewing: Implications for children exposed to domestic violence. *Journal of Interpersonal Violence, 18*(4), 377-388.

DeVoe, E. & Faller, K. C. (2002). Questioning Strategies in Interviews with Children Who May Have Been Sexually Abused. *Child Welfare, 81*(1), 5-32.

Faller, K. C., Birdsall, W. C., Henry, J., Vandervort, F. Silverschanz, P. (2001). What Makes Sex Offenders Confess? An Exploratory Study. *Journal of Child Sexual Abuse, 10* (4), 31-49.

Faller, K. C. & Henry, J. (2000). Child Sexual Abuse: A Case Study in Community Collaboration. *Child Abuse & Neglect, 24*(9), 1215-1225.

Faller, K. C. (2000). Child maltreatment and endangerment in the context of divorce. *University of Arkansas Law Review, 22*(3), 429-452.

Faller, K. C. (2000). Child Abuse and Divorce: Competing Priorities and Agendas and Practical Suggestions. *Journal of Aggression, Trauma, & Maltreatment, 2*(4), 167-196.

Faller, K. C. (2000). Questioning Children who May have Been Sexually Abused: A Synthesis of Research and Practice. *Journal of Aggression, Trauma, & Maltreatment, 2*(4), 37-56.

Faller, K. C. (2000). Child Maltreatment and Protection in the United States. *Journal of Aggression, Trauma, & Maltreatment, 2*(4), 1-12.

DeVoe, E. R. & Faller, K. C. (1999). Characteristics of disclosure of children who may have been sexually abused. *Child Maltreatment 4*(3), 217-227.

Faller, K. C. (1998). The Parental Alienation Syndrome: What is it and what data support it? *Child Maltreatment, 3* (2), 100-115.

Faller, K. C. (1997). The polygraph: Its use in decision-making about child sexual abuse: An exploratory study. *Child Abuse and Neglect, The International Journal, 21* (10), 993-1008.

Faller, K. C. (1996). Interviewing children who may have been abused: A historical perspective and overview of controversies. *Child Maltreatment, 1*(2), 4-18.

Faller, K. C. & Plummer, C. (1996). Multi-offender/multi-victim cases of sexual abuse: The impact of acquittal. *Children's Legal Rights Journal, 16*(2), 23-30.

Faller, K. C. (1995). A clinical sample of women who have sexually abused children. *Journal of Child Sexual Abuse, 4*(3), 13-30.

Faller, K. C. & DeVoe, E. (1995). Allegations of sexual abuse in divorce. *Journal of Child Sexual Abuse, 4*(4), 1-25.

Faller, K. C. & Corwin, D. (1995). Children's interview statements and behaviors, professional consensus and research findings for the identification of sexually abused children. *Child Abuse and Neglect: The International Journal, 19*(1), 71-82.

Faller, K. C., Froning, M. & Lipovsky, J. (1991). The parent-child interview, use in evaluating child allegations of sexual abuse by the parent. *American Journal of Orthopsychiatry, 61*(4), 552-557.

Faller, K. C. (1991). Polyincestuous families: An exploratory study. *Journal of Interpersonal Violence, 6*(3), 310-322.

Faller, K. C. (1991). Possible explanations for child sexual abuse allegations in divorce. *American Journal of Orthopsychiatry, 61*(1), 86-91.

Faller, K. C. (1991). What happens to sexually abused children identified by Protective Services? *Children and Youth Services Review, 13*(1&2), 101-111.

Faller, K. C. (1989). The Role relationship between victim and perpetrator as a predictor of characteristics of intrafamilial sexual abuse. *Child & Adolescent Social Work Journal, 6*(3), 217-229.

Faller, K. C. (1989). Why sexual abuse: An exploration of the intergenerational hypothesis. *Child Abuse and Neglect: The International Journal, 14*(1), 543-548.

Faller, K. C. (1989). Characteristics of a clinical sample of sexual abused children: How boy and girl victims differ. *Child Abuse & Neglect: The International Journal, 13*(2), 281-291.

Faller, K. C. (1988). Criteria for judging the credibility of children's statements about their sexual abuse. *Child Welfare, 67*(5), 389-399.

Faller, K. C. (1988). Decision-making in cases of child sexual abuse. *American Journal of Orthopsychiatry, 58*(1), 121-128.

Faller, K. C. (1988). The myth of the 'Collusive Mother': Variability in the functioning of mothers of victims of intrafamilial sexual abuse. *Journal of Interpersonal Violence, 3*(2), 190-196.

Faller, K. C. (1988). Spectrum of sexual abuse in daycare. *Journal of Family Violence, 3*(4), 238-298.

Faller, K. C. (1988). Young age of victims of intrafamilial sexual abuse. *Victimology, 13*.

Faller, K. C.( 1987). Women who sexually abuse children. *Victims and Violence, 2*(4), 263-276.

Faller, K. C. (1985). Unanticipated Problems with the United States Child Protection System. *Child Abuse and Neglect: The International Journal, 9*, 63-69.

Faller, K. C. (1984). Is the child victim of sexual abuse telling the truth? *Child Abuse & Neglect: The International Journal, 8*, 473-481.

Faller, K. C. (April-May 1984). Permanency planning with scarce resources: A classification system for child welfare cases. *Children Today, l3*(2), 2-5,36.

Faller, K. C. (April 1981). Interdisciplinary management of child sexual abuse, with Ellen Tickner. *Proceedings: Fifth National Conference on Child Abuse and Neglect*, Milwaukee, Wisconsin,.

Faller, K. C. & Bowden, M.L. (1979). A course on intervention strategies in child abuse and neglect. *Child Abuse & Neglect: The International Journal, 3*(1), 227-234.

Faller, K. C. (November, 1978). Intervention strategies for school counselors in child abuse and neglect. *Research in Education.* Ann Arbor, Michigan.

**Articles--invited**

Faller, K.C. (2013). Asking children about child neglect. *APSAC Advisor.*

Faller, K.C. (2010). APSAC responds to inclusion of PAS/PAD information in the Diagnostic and Statistical Manual of Mental Disorders. *APSAC Advisor, 22*(2&3), 20-23.

Faller, K.C. (2007). Mother-blaming in the Shadow of Incest: Commentary on "Motherhood in the Shadow of Incest," by Rachel Lev-Wiesel. *Journal of Child Sexual Abuse, 16*(1), 129-136.

Faller, K. C. (2004). Book review essay: Sexual abuse of children: Contested issues and competing interests. *Criminal Justice Review. 29*(2), 359-378.

Faller, K. C. (2002, Dec.). Disclosure in cases of sexual abuse. *The Child Advocate, 4* (3), 1, 6-9.

Faller, K. C. & Bellamy, C. (2000). Mental health problems and child maltreatment: Parents with personality disorders, *The Solutions Series, 1*(1). 18 pp. Atlanta, GA.: National Resource Center on Child Maltreatment.

Faller, K. C. (2000). Children with a secret. Special Issue: Secret Spaces of Childhood. *Michigan Quarterly Review, 39*(2), 314-328.

Faller, K. C. (1999). Focused questions for interviewing children suspected of maltreatment and other traumatic experiences. *APSAC Advisor, 12*(1), 14-18.

Faller, K. C., Mildred, J., Plummer, C., DeVoe, E., Churchill, S., Sanders, L., McPherson, M., Almy, W., & Doyle, K. (1997). Sexual history taking guidelines. *APSAC Advisor, 10*(3), 8-11.

Faller, K. C. (1994). Child sexual abuse allegations: How to decide when they are true. *Violence Update, 4*(6), 2-4,8-11.

Faller, K. C. (1994). Ritual abuse: A review of the research. *The APSAC Advisor, 7*(2), 1, 19-27.

Faller, K. C. (1993). Ritual abuse, A continuum of belief. *Believe the Children Newsletter,* Fall, 2-3.

Faller, K. C., Olafson, E., & Corwin, D. (1993). Research on false allegations of sexual abuse in divorce. *The APSAC Advisor, 6*(3):1,7-10.

Faller, K. C. (1992). Can therapy induce false allegations of sexual abuse? *The APSAC Advisor, 5*(1), 3-8.

Faller, K. C. (1991). Treatment of boy victims of sexual abuse. *The APSAC Advisor, 4*(4), 7-8.

Faller, K. C. (1990). Types of questions for children alleged to have been sexually abused. *The APSAC Advisor, 3*(1),3-5.

Faller, K. C. (1990). Sexual abuse of children in cults: A clinical perspective. *Roundtable, 2*(2), 11-13.

**Book chapters**

Faller, K.C. (2016). Disclosure Failures: Statistics, Characteristics, and Strategies to Address Them. In William O'Donohue & Matthew Fanetti (Eds.) *Forensic Interviews Regarding Child Sexual Abuse: A Guide to Evidence-Based Practice.* Springer Publishers.

Faller, K.C., Shlonsky, A., Moody, B., & Gough, P. (2014). Child maltreatment in North America: United States and Canada. In J. Conte (Ed.), *Child abuse and neglect worldwide.* Oxford, UK: Praeger.

Faller, K.C. (2014). Child sexual abuse. In G. Mallon & G. Alexander (Eds.). *Child welfare for the twenty-first century: A handbook of practices, policies, and programs, 2nd edition.* New York: Columbia University Press.

Anderson, G., Faller, K.C., & Leake, R. (2013). Chapter 11: Social work traineeship programs. In K. Briar-Lawson, M. McCarthy, & N. Dickinson (Eds.), *The Children's Bureau: Shaping a century of child welfare practices, programs, and policies.* Washington, D.C.: The NASW Press.

Faller, K.C., & Vandervort, F. (2012). Chapter II. 4 What works in protecting child witnesses. In P. Curtis & G. Alexander (Eds.), *What works in Child Welfare .* New York: Child Welfare League of America.

Faller, K.C. (2012). Chapter 33: Helping students who have been physically or sexually abused. In C. Franklin, M. Harris, & P. Allen Meares (Eds.), *School Services Sourcebook.* New York: Oxford University Press.

Faller, K.C. (2011) Volume II, Chapter 1: Navigating Solutions, Section II: Child Abuse: Victim Services. M Koss, J. White, A. Kazdin (Eds.). *Violence against women and children.* (pp. 11-25). Washington, D.C.: American Psychological Association.

Faller, K.C. (2009). Allegations of sexual abuse in divorce. *Child Abuse - III - The Right of Freedom.* Lumen Humanitas Edit. Buenos Aires – Argentina.

Faller, K.C. (2009). Interviewing the prepubertal child for possible sexual abuse. In C. Christian & R. Reece (Eds.), *Child Abuse: Medical diagnosis and management, 3rd edition.* American Academy of Pediatrics.

Faller, K.C. (2006). Helping students who have been physically or sexually abused: Strategies and Interventions. In C. Franklin, M.B. Harris, & P. Allen-Meares (Eds.), *The school sourcebook: A guide for school-based professionals.* New York: Oxford University Press*.*

Faller, K.C., Meezan, W., Mendez, M.M., Tropman, J., & Vandervort, F. (2004). The supervisor in child welfare. In M. Austin & K. Hopkins, (Eds.), *Human Service supervision in the learning organization.* Thousand Oaks, CA.: Sage.

Faller, K. C. (2001). Chapter 9: Children as Witnesses. In M. Kluger, G. Alexander, & P Curtis (Eds.), *What Works in Child Welfare,* pp. 89-96. Wash., D.C.: Child Welfare League of America.

Faller, K. C. (2000).Chapter 13: Individual change in children and direct social work practice. In P. Allen-Meares & C. Garvin (Eds.), *Handbook on Direct Social Work Practice,* pp.161-180. Newbury Park, CA.: Sage Publications.

Zellman, G. & Faller, K. C. (1995). Reporting child abuse. In J. Briere, L. Berliner, C. Jenny, T. Reid (Eds.), *APSAC Handbook on Child Maltreatment*, pp. 359-382. Newbury Park, CA.: Sage.

Faller, K. C. (1994). Extrafamilial sexual abuse. In S. Kaplan & D. Pelcovitz (Eds.), *Child and Adolescent Clinics of North America*, pp. 713-727. New York: W.B. Saunders & Co.

Faller, K. C. (1995). Assessment and treatment issues in child sexual abuse. In G. Rekers (Ed.), *Handbook of Child and Adolescent Sexual Problems.* pp. 209-231. Lexington, MA.: Lexington Books.

Faller, K. C. (1992). Child sexual abuse: Causes, patterns, and treatment. In H. Nakken, G. VanGemert, & T. Zandberg (Eds.), *Research in Special Education*. pp. 123-139. United Kingdom: Edwin Mellen.

Faller, K. C. (1990). Sexual abuse by paternal caretakers: A comparison of abusers who are biological fathers in intact families, stepfathers, and non-custodial fathers. Pp. 65-73 In A. Horton, B. Johnson, L. Roundy, & D. Williams (Eds.), *The Incest Perpetrator: A Family Member No One Wants to Treat.* pp. 44-65. Newbury Park, CA.: Sage.

Duquette, D., & Faller, K. C. (1988). Interdisciplinary teams in professional schools: A case study. In D. Bross, R. Krugman, M. Lenherr, D. A. Rosenberg, and B. Schmidt (Eds.), *The New Child Protection Team Handbook.* pp. 535-547. New York: Garland Publishing, Inc.

Faller, K. C. (1980). Eltern-Kind-Beziehung bei Kindemishandlung und Vernachlassigung. (Parent-Child Interaction in Child Abuse and Neglect: Assessment and Treatment). In Josef Duss-von Werdt and Rosmarie Welter-Enderlin, (Eds.), *Der Familienmensch*, Stuttgart: Klett-Cotta.

Faller, K. C. (January 1979). Die Machtdimension in der Familie und ihre Verwending in der Therapie. (Making Use of the Power Dimension of Family Functioning in Therapy). *Familiendynamik*, Stuttgart: Klett-Cotta.

**Media productions**

*Interviewing for Child Sexual Abuse: A Forensic Guide.* (1998). (videotape), Guilford Press.
*Testifying about Child Sexual Abuse: A Courtroom Guide.* (1998). (videotape), Guilford Press.

**Encyclopedia/dictionary entries**

Faller, K. C. (forthcoming). Child Abuse and Neglect, Special Needs of Families and Children of Color. In Linwood Cousins (Ed.). *Encyclopedia of Human Services and Diversity.* Thousand Oaks, CA: Sage.

Faller, K. C. (2010). Investigative Interviewing of Children In Claire Renzetti & J. Adelson (Eds.), *Encyclopedia of interpersonal violence.* Thousand Oaks, CA: Sage.

Faller, K.C. (2010). Child sexual abuse: Disclosure, reporting, and intervention. *Encyclopedia of trauma and abuse.* Thousand Oaks, CA: Sage.

Faller, K. C. (1998). Child Sexual Abuse: Implications for Mental Health. *Dictionary of Mental Health*, pp. 435-447. San Francisco: Academic Press.

Faller, K.C. (1996). Child Abuse. *Dictionary of Ethics, Theology, and Society*. Edited by P.B. Clarke & A. Lindsey. London: Routledge.

Protective Services for Children. *Encyclopedia of Social Work. 18th Edition*, Silver Springs, Maryland: National Association of Social Work, 1986.

**Book reviews**

*Child sexual abuse in Victorian England,* by Louise A. Jackson, *Children and Youth Services Review.* Forthcoming.

*Vulnerable Populations: V.II*, by Suzanne Sgroi. *The APSAC Advisor.* 1997.

*With the Best of Intentions: The Child Sexual Abuse Prevention Movement*, by Jill Berrick and Neil Gilbert. *Children and Youth Services Review.* 1993.

*Preventing Physical and Emotional Abuse of Children*, by David Wolfe. *Journal of Teaching in Social Work.* 1993.

*Family Sexual Abuse: Frontline Research and Evaluation*, by Michael Quinn Patton, (Ed.). *Child Abuse and Neglect: The International Journal. 16*, 1992.

*Wounded Innocents: The Real Victims of the War Against Child Abuse*, by Richard Wexler. *Journal of Interpersonal Violence. 6*(4), 1991.

*Systemic Treatment of Incest,* by Terry Trepper and Mary Jo Baxter. *Child Abuse and Neglect: The International Journal. 15*: 1991.

*Child Abuse and Neglect: Sharing Responsibility*, by Pamela Mayhall and Katherine Norgard. *Children and Youth Services Review.* 1985.

*Techniques for Dealing with Child Abuse*, by Arlene Baxter. *Victimology.* 1985.

**Journal Editions**

Faller, K. C. & Everson, M. (2012). Contested issues in the evaluation of child sexual abuse. *Journal of Child Sexual Abuse: Research, Treatment, & Program Innovations for Victims, Survivors, & Offenders.*

Faller, K. C. & Everson, M. (1996). The Child Interview: Special Section. *Child Maltreatment. 1*(2): 1-80.

Faller, K. C. & Everson, M. (1996). The Child Interview: Special Section. *Child Maltreatment. 1*(3): 103-150.

Faller, KC (1991). Special Issue: Child Welfare Policy and Practice. *Children and Youth Services Review.* *13*(1&2).

**WORKS IN PROGRESS**
**Books**
Faller, K.C. *Interviewing Children about Sexual Abuse: Controversies and Best Practice, 2nd edition.* Oxford University Press.
**Journal editions**
Faller, K. C. & Friend, C. *The Witch Hunt Narrative*: Revisiting Child Sexual Abuse in Daycare. *Journal of Interpersonal Violence.*

**RESEARCH REPORTS**
*Final report*: *Recruitment and Retention of Child Welfare Employees 2010.*
*Final report*: *Hasbro Early Assessment Project, 2005.*
*Final report: Training Program for Child Welfare Supervisors, 2004.*
*Final report: Interdisciplinary Child Welfare Training Program, 2001.*
*Children Who May have Been Sexually Abused: A Summary of Findings*, with Ellen DeVoe. 1999.
*Final Report: Computer Assisted Interviewing of Children Suspected of Having Been Sexually Abused* with Ellen DeVoe. National Institute of Mental Health, 1995.
*Children at Risk: A Study of Fifty-One Families*, with Donald Duquette and Sandra Mortenson, Ann Arbor, Michigan: Washtenaw County Coordinating Council for Children at Risk, 1981.

**Monographs**
*Diffusion of Behavior Modification into Human Service Organizations: A Study of Knowledge Utilization*, Ann Arbor, Michigan: CRUSK, Institute for Social Research, 1978, 98 pp.

**Dissertation**
*Social Structural Variables in Families That Abuse and Neglect Their Children.* 1981, 349 pp.

**GRANTS, CONTRACTS, FELLOWSHIPS, AND SCHOLARSHIPS**

| | |
|---|---|
| 2013-2014 | Distinguished Faculty-Graduate Student Seminar: The Safety of Minors on College and University Campuses: A Social Justice Challenge. Principal Investigator. $7,500. |
| 2011-2012 | Systems of Care Infrastructure Development Grant with American Indian Health and Family Services and Michigan Intertribal Council. Substance Abuse and Mental Health Services Administration, Principal Investigator on Family Assessment Clinic subaward, Co-investigator (Sandra Momper, P.I.) on the University of Michigan School of Social Work subaward. $175,000. |
| 2008-2013 | National Child Welfare Workforce Institute. Sub-award. Children's Bureau, Department of Health and Human Services, Principal Investigator. $300,000. |
| 2004-2013 | State of Michigan Department of Human Services Contract Coun 09-099475. $30,000 per year. |
| 2008 | Child Welfare Planning Grant. Anne E. Casey Foundation. Principal Investigator. $18,000 |
| 2003 – 2010 | Curriculum for Recruitment and Retention of Child Welfare Employees, Children's Bureau, Department of Health and Human Services, Principal Investigator $1,000,000. |

2001-        Hasbro Early Assessment Project, Hasbro Children's Foundation, Principal
Investigator
2004         $144,000.
2000-        Training Program for Public Child Welfare Supervisors, Children's Bureau,
Department 2004              of Health and Human Services, Principal Investigator. $600,000
1998-        Public Child Welfare Traineeship Program, Act 426, USDHHS, Principal Investigator.
2000         $150,000
1998-        Substance Abuse and Mental Health Services Administration. #SM-52379, USDHHS,
1999         Principal Investigator. $75.000
1997-        Interdisciplinary Child Welfare Training Program, Children's Bureau, Department of
2000         Health and Human Services, Principal Investigator, $600,000.
1996-        Child Welfare Planning Grant, Michigan Family Independence Agency, Director.
1997         $50,000
1994-        CIVITAS Child and Family Programs; CIVITAS Initiative, Faculty Director.
1999         $900,000.
1993-        Computer Assisted Interviewing of Children Suspected of Having Been
1995         Sexually Abused, research sub-contract with Morphonix, funding source, National
             Institute of Mental Health; Research Director. $150,000
1986-        NIMH Child Mental Health Training Grant, U.S. Department of Health
1992         and Human Services; Principal Investigator.~$200,000
1985-        Family Assessment Clinic, A Multidisciplinary Team, University of Michigan
present      Director.~$150,000 per year.
1979-        Multidisciplinary Training Grant, Michigan Department of Social Services;
1989         Project Director.          ~$150,000 per year.
1978-        Research Grant from the University of Michigan Division of Research and
1984         Development Administration for "Family-Community Intervention: Child Abuse and
             Neglect." $10,000.

## PRESENTATIONS GIVEN AT CONFERENCES

2015    <u>Protections for child witnesses.</u> With Frank Vandervort, J.D. One Child, Many Hands:
        Multidisciplinary Conference on Child Welfare, Field Center for Children's Policy, Practice, &
        Research, University of Pennsylvania.
2015    <u>Sexual abuse disclosure failures and what to do about them.</u> 31st International Symposium
        on Child Abuse, Huntsville, AL.
2015    <u>Family treatment roadmap.</u> With Mary Ortega, LMSW. 31st International Symposium on
        Child Abuse, Huntsville, AL.
2015    <u>Comprehensive family assessments.</u> Partners in Courage Annual Conference, Austin, TX.
2014    <u>Applying new research to asking children about child maltreatment and endangerment.</u>
        2014 Alaska Child Maltreatment Conference, Anchorage, AK.
2014    <u>Comprehensive family assessments in child maltreatment cases.</u> 2014 Alaska Child
        Maltreatment Conference, Anchorage, AK.
2014    <u>Sexual abuse allegations in divorce.</u> 2014 Alaska Child Maltreatment Conference,
        Anchorage, AK.
2014    <u>Extended assessments/evaluations when there are concerns about child abuse; Current
        state of the art & science.</u> 2014 Alaska Child Maltreatment Conference, Anchorage, AK.

2014  The Coached Child: Is Coaching a Problem in Child Sexual Abuse Cases? Michigan 32nd Statewide Conference on Child Abuse and Neglect, Plymouth, MI.

2014  Comprehensive Family Assessments in Child Maltreatment Cases. With Mary Ortega, L.M.S.W. Colloquium of the American Professional Society on the Abuse of Children, New Orleans.

2014  Extended Assessments/Extended Forensic Interviews: Current State of the Art and the Science. When Words Matter, Baltimore, MD.

2014  The Importance of Early, Comprehensive Assessments of Families Involved in the Child Welfare System. The 30th National Symposium on Child Maltreatment, Huntsville, AL.

2014  The Coached Child. The 30th National Symposium on Child Maltreatment, Huntsville, AL.

2014  Extended Assessments/Extended Forensic Interviews: Current State of the Art and the Science. With Linda Cordisco-Steele. 2014 San Diego International Conference on Child and Family Maltreatment. San Diego, CA.

2014  Asking Children about Maltreatment & Endangerment. 2014 San Diego International Conference on Child and Family Maltreatment. San Diego, CA.

2014  Longitudinal Assessment of the National Child Welfare Workforce Institute Traineeship Programs: Innovative Approaches and Lessons Learned From a Multi-Site Partnership Evaluation. With others. Conference of the Society for Social Work and Research, San Antonio, TX.

2013  Sexual Abuse Disclosure: What the Research Tells Us (and Practice Implications). 10th Annual Seminar in Forensic Sciences, S. Padre Island, TX.

2013  Comprehensive Family Assessments. 13th Annual Children's Cove Conference on Child Sexual Abuse, Hyannis, MA.

2013  The Coached Child: Is Coaching a Problem in Child Sexual Abuse. 13th Annual Children's Cove Conference on Child Sexual Abuse, Hyannis, MA.

2013  Sexual Abuse Allegations in Divorce. 10th Annual Maryland Children's Alliance Mid-Atlantic Conference on Child Abuse and Neglect, We Treasure Our Children, Annapolis, MD.

2013  Developmentally Delayed Parents and Permanency Planning. 10th Annual Maryland Children's Alliance Mid-Atlantic Conference on Child Abuse and Neglect, We Treasure Our Children, Annapolis, MD.

2013  Assessment and Treatment of Parents whose Children Have been Sexually Abused, with Mary Ortega, ACSW and Orli Avi-Yonah, Ph.D, L.P., LMSW. 32nd Annual Michigan Child Abuse & Neglect Conference: Prevention, Assessment, and Treatment. Plymouth, MI.

2013  Family Treatment Roadmap, with Mary Ortega, ACSW and Roberta Hirshon LMSW. Colloquium of the American Professional Society on the Abuse of Children, Las Vegas, NV.

2013  First Do No Harm: Sensitivity and Specificity in Child Sexual Abuse Evaluations, with Debra Nelson-Gardell, Ph.D., & Javonda Williams, Ph.D. Colloquium of the American Professional Society on the Abuse of Children, Las Vegas, NV.

2013  The Need for Early, Comprehensive Assessments for Adequate Case Planning, with Frank Vandervort, J.D., One Child, Many Hands Conference, University of Pennsylvania, Philadelphia, PA.

2013  Keynote: Child Sexual Abuse and Social Justice: Who Are the Stakeholders And What Are the Stakes? Conference of the Society for Social Work and Research, San Diego, CA.

2013  First Do No Harm: Sensitivity and Specificity in Assessment for Alleged Sexual Abuse. 29th National Symposium on Child Abuse, Huntsville, AL.

2013   <u>Parental Alienation Syndrome/Disorder: Recent Developments</u>. 29th National Symposium on Child Abuse, Huntsville, AL.

2013   <u>Sensitivity or Specificity: Helping Children Tell What Happened</u>, with Debra Nelson-Gardell, Ph.D., & Javonda Williams, Ph.D. National Organization of Forensic Social Work, Seattle.

2013   <u>Panel Presentation on Expert Testimony in Child Abuse</u>, with Viola Vaughn-Eden, Ph.D., Javonda Williams, Ph.D., Debra Nelson-Gardell, Ph.D. Moderator. National Organization of Forensic Social Work, Seattle.

2012   <u>Cultural competence + cultural humility=cultural responsiveness</u>, with Prof. Robert Ortega. Colloquium of the American Professional Society on the Abuse of Children, Chicago.

2012   <u>The challenges of collaboration between social workers and lawyers: When world views collide</u>, with Prof. Frank Vandervort. Colloquium of the American Professional Society on the Abuse of Children, Chicago.

2012   <u>Forensic interviewing panel</u>, with Patricia Toth, J.D., and Kee MacFarlane, M.S.W. Julie Kenniston, M.S.W., moderator. Colloquium of the American Professional Society on the Abuse of Children, Chicago.

2012   <u>Reflections on 30 years of evaluating and testifying about suspected child sexual abuse cases</u>, with David Corwin, M.D. & Mark Everson, Ph.D. 17th International Conference on Violence, Abuse & Trauma, San Diego.

2012   <u>Extended forensic evaluations for child sexual abuse allegations</u>. 17th International Conference on Violence, Abuse & Trauma, San Diego.

2012   <u>Family treatment roadmap</u>, with Mary Ortega and Roberta Hirshon, Michigan Statewide Conference on Child Abuse and Neglect, Plymouth, MI

2012   <u>Protecting Child Witnesses</u>, with Frank Vandervort. 28th National Symposium on Child Maltreatment, Huntsville, AL.

2012   <u>Family Treatment Roadmap</u>, with Mary Ortega & Abigail Eiler. 28th National Symposium on Child Maltreatment, Huntsville, AL.

2012   <u>Extended Assessments, a Review of the Research and Next Steps</u>, with Debra Nelson-Gardell, Javonda Williams, & Linda Cordisco-Steele. 28th National Symposium on Child Maltreatment, Huntsville, AL.

2012.  <u>Cultural Humility</u>. With Robert Ortega. 28th National Symposium on Child Maltreatment, Huntsville, AL.

2011   <u>Proving Child Sexual Abuse Cases in Court: Mental Health/Legal Collaboration</u>. One Child, Many Hands: Interdisciplinary Child Welfare Conference, University of Pennsylvania, Philadelphia. With Frank Vandervort

2011   <u>Report of the Qualitative Interviews with NCWWI Traineeship Principal Investigators</u>. National Child Welfare Workforce Institute Traineeship Annual Meeting, Chicago

2011   <u>APSAC Plenary Session on Forensic Interviewing—panel</u>. American Professional Society on the Abuse of Children Colloquium, Philadelphia

2011   <u>Research session: Perceived need for extended assessments of child sexual abuse</u>. American Professional Society on the Abuse of Children Colloquium, Philadelphia With Debra Nelson-Gardell and Javonda Williams

2011   <u>Questioning children about maltreatment and endangerment</u>. American Professional Society on the Abuse of Children Colloquium, Philadelphia

2011   <u>Comprehensive Family Assessments</u>. 16th Annual Northern New England Conference on Child Maltreatment, Portland, ME.

2011    Disclosure of child sexual abuse: An event or a process. 16th Annual Northern New England Conference on Child Maltreatment, Portland, ME.

2011    Keynote: Child Focused-Family Friendly Assessments in Child Welfare. Michigan State Court Administrators Office, Lansing, MI.

2011    Assessments of Mothers in Child Welfare. Michigan State Court Administrators Office, Lansing, MI.

2011    Brieland Child Welfare Lecture: Social Justice and Child Sexual Abuse, University of Illinois School of Social Work, Urbana-Champaign, IL

2011    Extended assessments when abuse is suspected but not disclosed: Perceived need and models for extended assessment process. With Debra Nelson-Gardell, Linda Cordisco-Steele, Javonda Williams, and Amy Tishelman. National Symposium on Child Abuse, Huntsville, AL

2011    Parental Developmental Disabilities and Permanency Planning with Mary Ortega. National Symposium on Child Abuse, Huntsville, AL

2011    Asking open-ended questions about parental maltreatment and endangerment. National Symposium on Child Abuse, Huntsville, AL

2011.   Allegations of abuse in divorce: Latest research and best practice. San Diego International Conference on Child Maltreatment

2011    Questioning children about people, places, maltreatment and endangerment. San Diego International Conference on Child Maltreatment

2010    Fauri Memorial Lecture: Can Class Action Lawsuits Be A Catalyst For Change In Child Welfare? What Can The Michigan Case Tell Us? With Terri Gilbert, Sara Bartosz, & Vivek Sankaran.

2010    Parents with Developmental Disabilities and Permanency Planning. Michigan Statewide Conference on Child Abuse & Neglect, with Mary Ortega, Plymouth, MI.

2010    Cultural Humility: A paradigm shift in child welfare, with Robert Ortega International Society for the Prevention of Abuse & Neglect. 18th International Congress, Honolulu.

2010    Interactive Session: Extended Assessments in Child Sexual Abuse. International Society for the Prevention of Abuse & Neglect, with Debra Nelson-Gardell. 18th International Congress, Honolulu.

2010    Allegations of sexual abuse in divorce. Oklahoma Conference on Child Abuse and Neglect, Norman, OK.

2010    Extended Assessments in Child Abuse. Oklahoma Conference on Child Abuse and Neglect, Norman, OK.

2010    Extended Assessments in Child Sexual Abuse with Debra Nelson-Gardell & Linda Cordisco Steele American Professional Society on the Abuse of Children, New Orleans

2010    Allegations of sexual abuse in divorce. American Professional Society on the Abuse of Children, New Orleans

2010    Grandparents in distress. Michigan Chapter of the National Association of Social Workers, Dearborn, MI presented with Mary Ortega.

2010    Allegations of abuse in divorce.        National    Symposium    on    Child    Maltreatment. Huntsville, AL.

2010    Grandparents in distress. National Symposium on Child Maltreatment        . Huntsville, AL. Co-presented with Mary Ortega.

2010    The Shifting Boundaries of Childhood. Discussant on a panel of papers, School of Social Work, University of Michigan.

2009   Social Work and Legal Collaboration: When world views collide. Field Center National Conference on Child Welfare: One Child, Many Hands, University of Pennsylvania. Co-presented with Frank Vandervort, J.D.

2009   Plenary—20 years of experience in interpersonal violence   International Violence, Abuse, and Trauma Conference. San Diego.

2009   Extended Assessments in Child Sexual Abuse. International Violence, Abuse, and Trauma Conference., San Diego.

2009   Final Plenary. International Violence, Abuse, and Trauma Conference . San Diego.

2009   Grandparents in distress: Grandparents raising their grandchildren. Michigan Statewide Conference on Child Abuse & Neglect. Co-presented with Mary Ortega

2009/   Trauma and Memory. International Congress on Violence, Trauma, and Abuse, Buenos Aires, Argentina.

2009   Legal issues in child protection: A United States perspective. International Congress on Violence, Trauma, and Abuse, Buenos Aires, Argentina; Spanish translation

2009   Decision-making in child sexual abuse . International Congress on Violence, Trauma, and Abuse, Buenos Aires, Argentina       ; Spanish translation

2009   Commitment to Child Welfare Work. National Conference on Child Abuse & Neglect, Atlanta, GA. With Prof. Robert Ortega.

2009   Recruitment and Retention of Child Welfare Professionals: Race Matters. National Conference on Child Abuse & Neglect, Atlanta, GA. With Prof. Robert Ortega.

2009   Children who are reluctant to disclose Child Sexual Abuse. National Symposium of Child Abuse, Huntsville, AL.

2009   Extended assessments in child sexual abuse. National Symposium of Child Abuse, Huntsville, AL. With Linda Cordisco-Steele & Prof. Debra Nelson-Gardell.

2009   Assessment of child sexual abuse. Special Symposium I: Assessment of Alleged Child Victim: Finding the Truth and Protecting the Child, Korean Association of Forensic Psychologists. Seoul National University, Seoul, S. Korea.

2008   Allegations of sexual abuse in divorce: Research and case management. Summit Conference for Judges and Court Staff: Stop the Silence; Stop Child Sexual Abuse, University of Maryland, College Park, MD.

2008   Outsourcing child welfare services. Colloquium of the American Professional Society on the Abuse of Children. Phoenix, AZ With Prof. Robert Ortega & Prof. Alberta Ellett.

2008   Extended Assessments in Child Sexual Abuse. Colloquium of the American Professional Society on the Abuse of Children. Phoenix, AZ With Linda Cordisco-Steele.

2008   Cultural Humility in Child Welfare Service Delivery. Colloquium of the American Professional Society on the Abuse of Children. Phoenix, AZ With Prof. Robert Ortega.

2008   Facilitating children's disclosures of sexual abuse. San Diego International Conference on Child and Family Maltreatment.

2008   The coached child: Is coaching a problem in child sexual abuse. 24th National Symposium on Child Abuse. Huntsville, AL.

2008   Extended assessments/forensic evaluations of children who may have been sexually abused. 24th National Symposium on Child Abuse. Huntsville, AL. With Linda Cordisco Steele and Debra Nelson. Gardell, Ph.D.

2008   Sources of disclosure failures in child sexual abuse. 24th National Symposium on Child Abuse. Huntsville, AL.

2007    Multidisciplinary assessments in complex child welfare cases. Bergstrom Conference, University of Michigan Law School.

2007    Decision-making in child sexual abuse. Colorado State Child Welfare Conference, Keystone, CO.

2007    Disclosure of child sexual abuse. Colloquium of the American Professional Society on the Abuse of Children, Boston, MA. With Erna Olafson, PhD, PsyD.

2007    False allegations of sexual abuse. Colloquium of the American Professional Society on the Abuse of Children, Boston, MA. With Erna Olafson, PhD, PsyD

2007    Psychological evaluation in juvenile and family cases: Essentials of mental health assessment. National Association of Counsel for Children Conference, Keystone, CO. With Thomas Lyon, JD, PhD & Norton Roitman, MD.

2007    Assessing allegations of abuse in divorce: What lawyers need to know. National Association of Counsel for Children Conference, Keystone, CO.

2007    Extended assessment of children. Michigan Statewide Conference on Child Abuse and Neglect, Plymouth, MI. Peer reviewed. With Mary Ortega, ACSW.

2007    Rountable: Cultural Humility. Council on Social Work Education: APM, San Francisco. With Robert Ortega, Ph.D.

2007    Keynote: How children disclose sexual abuse. Congreso Violencia, Buenos Aires, AR.. Keynote.

2007    Open forum: Child sexual abuse. Congreso Violencia, Buenos Aires, AR.

2008    Parental alienation syndrome. San Diego International Conference on Child and Family Maltreatment.

2007    Deciding whether the child has been sexually abused. 23rd National Symposium on Child Abuse. Huntsville, AL.

2007    Extended assessments in child sexual abuse cases. 23rd National Symposium on Child Abuse. Huntsville, AL.

2007    Cultural Humility. Grantees' Meeting of Child Welfare Grants. Washington, D.C. with Robert Ortega, Ph.D.

2007    The Hasbro Early Assessment Project. Child Advocacy Law Clinic 30 Anniversary Symposium. UM Law School. Panel presentation—Chair Anne Reyes Robbins, MSW.

2007    The Challenges of Interdisciplinary Professional Education in Child Advocacy. Child Advocacy Law Clinic 30 Anniversary Symposium. UM Law School. Panel presentation—Chair Frank Vandervort, JD.

2007    How Children Talk About Abuse. Arizona Court Improvement Project. Arizona Supreme Court. Keynote.

2006    Demonstrative Communication in Forensic Interviewing. Midwest Conference on Child Sexual Abuse. Madison, WI

2006    Beyond leading questions: Question controversies in forensic interviews. Midwest Conference on Child Sexual Abuse. Madison, WI.

2006    Questioning children about Sexual Abuse. Child Maltreatment Conference, University of Toronto SCAN Program and Hospital for Sick Children.

2006    Keynote: Allegations of Abuse in Custody/Access Cases. Child Maltreatment Conference, University of Toronto SCAN Program and Hospital for Sick Children.

2006    Early Multidisciplinary Assessment of Serious Child Protection Cases Involving Young Children. Children's Bureau 2006 Conference "Many Paths, One Direction: Strategies for Achieving Lasting Reform in Child Welfare."

2006    Beyond leading questions: Complexities of interviewing children. APSAC Colloquium, Nashville, TE .With Mark Everson, Ph.D., University of North Carolina at Chapel Hill.

2006    Demonstrative communication in forensic interviewing. APSAC Colloquium, Nashville, TE. With Mark Everson, Ph.D., University of North Carolina at Chapel Hill.

2006    Keynote: The Process of Disclosure of Child Sexual Abuse. Nordic International Congress on Child Abuse and Neglect, Malmo, Sweden.

2006    Allegations of Abuse in Divorce. Nordic International Congress on Child Abuse and Neglect, Malmo, Sweden.

2006    Keynote: Beyond leading questions. Canadian Society for the Investigation of Child Abuse, Calgary, Alberta, CA.

2006    The Coached Child: Professional Perceptions. Canadian Society for the Investigation of Child Abuse, Calgary, Alberta, CA.

2006    A model for assessment of abuse allegations in divorce. 22nd National Symposium on Child Abuse Huntsville, AL.

2006    Communicating with children: More than words.       22nd National Symposium on Child Abuse, Huntsville, AL.

2006    Beyond leading questions: Complexities of interviewing children. Eastern Conference on Child Sexual Abuse Treatment Wash., D.C.

2006    Demonstrative communication in forensic interviewing. Eastern Conference on Child Sexual Abuse Treatment, Wash., D.C.

2006    Accusations of child abuse in family court. 20th International San Diego Conference on Child and Family Maltreatment, San Diego   . With Prof. John E.B Myers, Hon Harry Elias, Hon. Lorna Alksne.

2006    Psychological evidence in sexual abuse cases.20th International San Diego Conference on Child and Family Maltreatment, San Diego. With Prof. Thomas Lyon, USC Law School

2005    Evidence based treatment of traumatized children. Child Abuse and Neglect Prevention, Assessment and Treatment. Ypsilanti, MI. With Mary Ortega, A.C.S.W.

2005    Multidisciplinary assessment of allegations of abuse in divorce/custody cases. Child Abuse and Neglect Prevention, Assessment and Treatment. Ypsilanti, MI. With Mary Ortega, A.C.S.W.

2005    Recurring reports of child maltreatment with no resolution. Colloquium of the American Professional Society on the Abuse of Children, New Orleans

2005    Evaluating the quality of forensic interviewing: Results from a pilot study. Colloquium of the American Professional Society on the Abuse of Children, New Orleans. With Ilene Berson, Ph.D., Michael Haney, Ph.D., Jon Conte, Ph.D., & Kee MacFarlane, M.S.W.

2005    Multidisciplinary assessments of substantiated CPS Cases involving young children: Findings from a pilot study. Colloquium of the American Professional Society on the Abuse of Children, New Orleans

2005    Child and system outcomes from multidisciplinary assessments of substantiated serious CPS cases involving young children. 15th National Conference on Child Abuse and Neglect. Boston.

2005    Understanding child welfare workforce challenges. With Robert Ortega. .Children's Bureau Child Welfare Grantees Conference and Meeting. Washington, D.C.

2005    Structure in forensic interviews: An evidence-based critique. 21st National Symposium on Child Abuse. Huntsville, AL.

2005    Multidisciplinary evaluation of complex child welfare cases, with Mary Ortega, ACSW. 21st National Symposium on Child Abuse. Huntsville, AL.

2005    Evaluating forensic interviews. International Conference on Child and Family Maltreatment. San Diego.

2005    The coached child. International Conference on Child and Family Maltreatment. San Diego.

2005    Use of media in forensic interviewing. International Conference on Child and Family Maltreatment.  San Diego.

2005    Peer review of forensic interviews. International Conference on Child and Family Maltreatment. San Diego.

2004    Disclosure of child sexual abuse. International Congress on Child Abuse and Neglect. Brisbane, AU.

2004    The power and limitations of multivariate analysis to understand successful criminal prosecution of child sexual abuse. Society for Social Work and Research, New Orleans. Symposium organized by Karen Staller; with Bill Birdsall, Jim Henry, Frank Vandervort, and Elana Buch.

2004    Successful criminal prosecution of child sexual abuse: A mixed methods study.        San Diego Conference of Child Maltreatment, Center for Child Protection, Children's Hospital and Health Center, with Karen Staller, Bill Birdsall, Frank Vandervort, and Elana Buch.

2004    The Hasbro Early Assessment Project. National Symposium on Child Maltreatment, Huntsville, AL, with Mary Ortega, M.S.W.

2004    Models for extended evaluations of sexual abuse cases. National Symposium on Child Maltreatment, Huntsville, AL.

2004    The use of media in forensic interviews. National Symposium on Child Maltreatment, Huntsville, AL.

2004    Legal issues in child sexual abuse. Imagine: Breaking the Cycle Conference XXVI, South Bend, Indiana.

2003    Contested issues in child sexual abuse. Annual New Jersey MDT Conference Crimes against Children. Trenton, New Jersey

2003    Decision-making in child sexual abuse. Annual New Jersey MDT Conference Crimes against Children, Newark.

2003    Evidence-based practice in forensic interviewing. Colloquium of the American Professional Society on the Abuse of Children, Orlando. 11th annual national conference

2003    The Parental Alienation Syndrome, parental alienation, and the alienated child. Colloquium of the American Professional Society on the Abuse of Children, Orlando. 11th annual national conference

2003    Successful criminal prosecution of child sexual abuse: A mixed methods study. International Conference on Family Violence, San Diego. with James Henry, Ph.D., Western Michigan University (other co-authors, Karen Staller, Bill Birdsall, Frank Vandervort, Elana Buch.

2003    Advanced Forensic Interviewing. 11th Annual Conference on Child Abuse and Neglect, Bretton Woods, New Hampshire.

2003    Sexual abuse in religious settings. 11th Annual Conference on Child Abuse and Neglect, Bretton Woods, New Hampshire.

2003    Parental alienation syndrome, parental alienation, and the alienated child. 11th Annual Conference on Child Abuse and Neglect, Bretton Woods, New Hampshire

2003    Decision-making in Child Sexual Abuse: A Process or an Event? 4th Annual Child Abuse Summit, Portland, Oregon

2003    Interviewing Children who are Reluctant to Disclose Sexual Abuse: A Process or an Event? 4th Annual Child Abuse Summit, Portland, Oregon

2003   <u>Children's Disclosures of Child Sexual Abuse: A Process or an Event?</u> 4th Annual Child Abuse Summit, Portland, Oregon

2003   <u>Coordinated Intervention Can Work: Successful Criminal Prosecution of Child Sexual Abuse.</u> 14th National Conference on Child Abuse and Neglect, St. Louis, MO. with James Henry, Ph.D.

2003   <u>Early Assessment and Follow-up to Help Children and Families Reported to Child Protective Services.</u> 14th National Conference on Child Abuse and Neglect, St. Louis, MO. with Elaine Pomeranz, M.D.

2003   <u>Multidisciplinary Assessment of First-time Referrals to Child Protective Services Cases Involving Young Children.</u> Children's Bureau, Conference for Child Welfare Training and Adoption Opportunities, Washington. D.C. with Deborah Willis, M.S.W., M.A., & Jan Baeszler.

2003   <u>Forensic Interviewing Dilemmas in Sexual Abuse Cases: Null Findings, False Negatives, and Recantations.</u> Nineteenth National Symposium on Child Abuse, Huntsville, AL. with Julie Javeri.

2003   <u>Multidisciplinary Assessment of Complex Child Welfare Cases.</u> Nineteenth National Symposium on Child Abuse, Huntsville, AL. with Mary Ortega, M.S.W.

2003   <u>Parental Alienation Syndrome, Parental Alienation, and the Alienated Child.</u> Nineteenth National Symposium on Child Abuse, Huntsville, AL.

2002   <u>Contested Issues in Interviewing Children About Sexual Abuse</u>, American Professional Society on the Abuse of Children, New Orleans.

2002   <u>Forensic Interview Protocols: A Critique</u>, American Professional Society on the Abuse of Children, New Orleans.

2002   <u>Evidence-based Practice and Child Forensic Interviewing,</u> International Society on the Prevention and Treatment of Child Abuse and Neglect, Denver, CO. with David Corwin, M.D.

2002   <u>Successful Criminal Prosecution of Child Sexual Abuse</u> (poster session) International Society on the Prevention and Treatment of Child Abuse and Neglect, Denver, CO. with James Henry, Ph.D.

2002   <u>Early Assessment of Cases Referred to Child Protective Services</u> (poster session), International Society on the Prevention and Treatment of Child Abuse and Neglect, Denver, CO. with Elaine Pomeranz, M.D.

2002   American Professional Society on the Abuse of Children, <u>Forensic Interviewing Institute</u> (1 day) International Society on the Prevention and Treatment of Child Abuse and Neglect, Denver, CO.

2002   <u>Allegations of Sexual Abuse in Divorce,</u> Seventh Annual Northern New England Conference on Child Maltreatment, Portland, Maine

2002   <u>Parental Alienation Syndrome: What Are the Research Findings?,</u> Seventh Annual Northern New England Conference on Child Maltreatment, Portland, Maine

2002   <u>Decision-making in Child Sexual Abuse</u>. Seventh Annual Northern New England Conference on Child Maltreatment, Portland, Maine

2002   <u>Pre-conference Institute—Assessing Allegations of sexual abuse in divorce.</u> Midwest Conference on Child Sexual Abuse, Madison, WI.

2002   <u>Parental Alienation Syndrome: What Does Research Tell Us?</u> Midwest Conference on Child Sexual Abuse, Madison, WI.

2002   <u>Allegations of Abuse in Divorce Proceedings</u>. Summit on Children and the Courts: Improving Court Responses to Child Victims of Intra-Familial Violence and Sexual Abuse, THE Children's Law and Policy Initiative at Massachusetts Citizens For Children, Boston, MA.

2002   <u>Decision-making in Child Sexual Abuse.</u> 21st Annual Michigan Statewide Conference on Child Abuse and Neglect, University of Michigan, Ypsilanti, MI.

2002   <u>Update on Allegations of Sexual Abuse in Divorce.</u> Nineteenth National Symposium on Child Sexual Abuse, Huntsville, AL..

2002   <u>Contested Issues and Current Controversies in Interviewing Children Who May Have Been Sexually Abused.</u> Nineteenth National Symposium on Child Sexual Abuse, Huntsville, AL.

2002   <u>Forensic Interviewing of Young Children: Research & Practice.</u> (Institute) San Diego Conference on Child and Family Maltreatment, San Diego, CA.

2002   <u>What Makes Sex Offenders Confess?</u> San Diego Conference on Child and Family Maltreatment, San Diego, CA.

2002   <u>A New Approach to Substantiated CPS Cases with Young Children.</u> San Diego Conference on Child and Family Maltreatment, San Diego, CA.

2002   <u>What Makes Sex Offenders Confess?</u> Society for Social Work and Research, San Diego.

2001   <u>Parental Mental Health Problems and Children's Welfare.</u> 5th New England Conference on Child Sexual Abuse, University of Vermont, Burlington, VT.

2001   <u>Domestic Abuse and Children's Welfare.</u> 5th New England Conference on Child Sexual Abuse, University of Vermont, Burlington, VT.

2002   <u>Allegations of Sexual Abuse in Divorce.</u> Kansas Professional Society on the Abuse of Children, Topeka, KS., with Anne Haralambie, J.D.

2001   <u>The Art and Science of Forensic Interviewing of Young Children.</u> (Institute). Prevent Child Abuse South Carolina, Columbus, S.C.

2001   <u>The Parental Alienation Syndrome: A Critical Analysis of Issues.</u> National Association of Counsel for Children, San Diego, CA.

2001   <u>The Art and Science of Forensic Interviewing of Young Children.</u> (Institute). Georgia Council on Child Abuse, Atlanta, Ga.

2001   <u>An Update on Allegations of Abuse in Divorce.</u> Colloquium, American Professional Society of the Abuse of Children, Washington, D.C., with Thomas Lyon, J.D., Ph.D.

2001   <u>Pre-conference Workshop: Screening for Substance Abuse in Child Welfare Clients.</u> National Conference on Child Abuse and Neglect, Albuquerque, with Melnee McPherson, M.S.W.

2001   <u>Decision-making in Child Sexual Abuse.</u> Seventeenth National Symposium on Child Sexual Abuse, National Children's Advocacy Center, Huntsville, AL.

2001   <u>The Art and Science of Forensic Interviewing.</u> Seventh Annual South Carolina Professional Colloquium on Child Abuse, Charleston, S.C.

2001   <u>Decision-making in Child Sexual Abuse Cases.</u> Seventh Annual South Carolina Professional Colloquium on Child Abuse, Charleston, S.C.

2001   <u>Predictors of Confession to Child Sexual Abuse.</u> Fifteenth Annual San Diego Conference on Responding to Child Maltreatment, San Diego, CA.

2001   <u>Update on Findings about Allegations of Abuse in Divorce & Custody cases.</u> Fifteenth Annual San Diego Conference on Responding to Child Maltreatment, San Diego, CA.

2000   <u>Patterns of Disclosure in Child Sexual Abuse Victims.</u> Fifteenth Annual San Diego Conference on Responding to Child Maltreatment, San Diego, CA.

2000   <u>Forensic Interviewing: Parts 1&2.</u>Midwest Regional Children's Advocacy Center Conference on Child Abuse, Minneapolis, MN.

2000   <u>Keynote Presentation: The Needs of Child Victims of Sexual Abuse: Research and Practice Implications.</u> National Organization for the Treatment of Abusers 10th Annual Conference, Dublin, Ireland.

2000   <u>Seminar: Allegations of Sexual Abuse in Divorce.</u> National Organization for the Treatment of Abusers 10th Annual Conference, Dublin, Ireland.

2000  Keynote: The Art and Science of Forensic Interviewing of Young Children. Child and Adolescent Sexual Abuse Victims and Sexual Offenders, Fourth Annual Broken Boundaries Conference, Providence, R.I.

2000  Forensic Interviewing of Children who May Have Been Sexually Abused. 2000 Western Regional Symposium on Child Abuse and Sexual Assault. Eugene, Oregon.

2000  Interviewing Child Sexual Abuse Victims. Children's Advocacy Services Fourth Annual Symposium. St. Louis, MO.

2000  A Critical Review of Forensic Interview Protocols Recommended for Investigation of Child Sexual Abuse. APSAC Colloquium on Child Maltreatment, Chicago.

2000  Keynote: Child sexual abuse in historical and political perspective. Current Thinking/New Directions Conference. Children's Cove & District Attorney's Office, Cape Cod, MA.

2000  Keynote: Child sexual abuse in historical and political perspective. Current Thinking/New Directions Conference. Children's Cove & District Attorney's Office, Cape Cod, MA.

2000  Successful Management of Child Sexual Abuse Cases. Colloquium, American Professional Society of the Abuse of Children, Chicago, IL.

2000  Protocols for Interviewing Children who may have been Sexually Abused. 19th Annual Child Abuse and Neglect Conference, University of California at Davis, Sacramento, CA.

2000  Forensically Defensible Questioning Techniques for Children who may have been Sexually Abused. 19th Annual Child Abuse and Neglect Conference, University of California at Davis, Sacramento, CA.

2000  Decision-making in Child Sexual Abuse. 19th Annual Child Abuse and Neglect Conference, University of California at Davis, Sacramento, CA.

2000  Child Sexual Abuse: Abuse and System Impacts. Annual Conference, New Mexico Crime Victims Reparations Commission, Albuquerque.

2000  Child Sexual Abuse: A Case Study In Community Collaboration. With James Henry, Ph.D. Annual Conference Michigan Chapter NASW, Mt. Pleasant, MI.

2000  Questioning Children Who May Have been Sexually Abused. Eighth Annual Children's Justice Act Conference, Seattle, WA.

2000  Forensic Interviewing: Problem Cases. Eighth Annual Children's Justice Act Conference, Seattle, WA.

2000  Forensic Interviewing in Child Sexual Abuse. Annual Conference, New Mexico Crime Victims Reparations Commission, Albuquerque.

2000  False positive and false negative allegations of sexual abuse, with Erna Olafson, Ph.D., Psy.D., San Diego Conference, Responding to Child Maltreatment, San Diego CA.

2000  Forensic Interviewing. with Kee MacFarlane, M.S.W. American Professional Society on the Abuse of Children Day Long Institute, San Diego, CA.

2000  Forensic interviewing: A mental health perspective. Forensic Interviewing Conference: Addressing the Investigation and Prosecution of Child Sexual Abuse in the New Millenium. Commonwealth of Kentucky, Louisville, KY.

2000  A Critical Analysis Of Protocols For Interviewing Children Who May Have Been Sexually Abused. Sixteenth National Symposium on Child Sexual Abuse. Huntsville, AL.

2000  Assessment of Child Maltreatment Cases With Parental Substance Abuse, Domestic Violence, And Mental Health Problems. With Frank Vandervort, J.D. Sixteenth National Symposium on Child Sexual Abuse. Huntsville, AL.

1999  Forensically Defensible Interviewing of Children. With Melissa McDermott, A.C.S.W. APSAC Rhode Island Chapter, Providence, R.I.

1999  Child Maltreatment And Endangerment In The Context Of Divorce. Child Embattled by Divorce Symposium, University of Arkansas Law School, Little Rock, AR.

1999    <u>Interviewing Children Who May Have Been Sexually Abused.</u> New Mexico Coalition of Sexual Assault Programs, Inc., Albuquerque, N.M.

1999    <u>Allegations of Sexual Abuse in Divorce.</u> Fifteenth Annual Symposium, Georgia Council on Child Abuse, Atlanta, GA.

1999    <u>Focused Questions for Asking about Child Endangerment and Maltreatment.</u> Michigan Statewide Conference on Child Abuse, University of Michigan Hospitals, Ann Arbor, MI.

1999    <u>The Art and Science of Forensic Interviewing,</u> with Mark Everson, Ph.D., APSAC Colloquium on Child Maltreatment, San Antonio, TX.

1999    <u>Allegations of Sexual Abuse in Divorce,</u> with Thomas Lyon, J.D., Ph.D., APSAC Colloquium on Child Maltreatment, San Antonio, TX.

1999    <u>Question Design for Forensic Interviewers.</u> With Kee MacFarlane, M.S.W. Responding to Child Maltreatment, Children's Hospital and Health Center, San Diego..

1999    <u>Media in Forensic Interviewing: Research Findings and Practice Implications.</u> Responding to Child Maltreatment, Children's Hospital and Health Center, San Diego..

1999    <u>Expert Testimony in Child Maltreatment Cases: Courtroom Skills for All Disciplines.</u> With Hon. Harry Elias, Paul Stern, J.D., & David Chadwick, M.D. APSAC Advanced Training Institutes.

1998    <u>Allegation of Abuse in Divorce,</u> National Conference on Child Abuse and Neglect, Cincinnati, OH.

1998    <u>Interviewing Children Who May Have Been Sexually Abused,</u> Western Regional Conference, National Children's Advocacy Center, Anchorage, AL.

1998    <u>Forensic Interviewing for Child Sexual Abuse,</u> Midwest Conference on Sexual abuse and Incest, University of Wisconsin, Madison.

1998    <u>Keynote—History of Children's Advocacy,</u>
<u>Evaluation of sex offender treatment</u>
<u>Allegations of sexual abuse and divorce</u>
Florida Children's Advocacy Center Annual Conference, Lakeland, FL.

1998    <u>Closing keynote—Children's Memory and Suggestibility,</u> Statewide conference, Louisiana Department of Human Resources, Lafayette, LA. (half day).

1998    <u>Lessons Learned from Lawsuits,</u> with Kee MacFarlane, M.S.W., APSAC Colloquium, Chicago.

1998    <u>The Polygraph: Uses and Abuses,</u> with Theodore Cross, Ph.D., Brandeis University. APSAC Colloquium, Chicago.

1998    <u>Interview in Children Using Focused Questions about Maltreatment and Endangerment.</u> Child Protection: Our Responsibility, Cedar Rapids, Iowa.

1998    <u>Allegations of Abuse and Divorce.</u> Child Protection: Our Responsibility, Cedar Rapids, Iowa--(1/2 day)

1998    <u>Allegations Of Abuse And Divorce: Research and Practice,</u> Michigan Chapter of the National Association of Social Workers, Traverse City, MI.

1998    <u>Focused Questions for Interviewing Children,</u> Statewide Conference, American Professional Society on the Abuse of Children, New Jersey Chapter, Newark, N. J.

1998    <u>Assessing Allegations of Abuse in Divorce,</u> Statewide Conference, American Professional Society on the Abuse of Children, New Jersey Chapter, Newark, N. J..

1998    <u>Allegations of Child Abuse in Divorce,</u> Annual Domestic Relations Conference, Arizona State Supreme Court, Phoenix, AZ.

1998    <u>Allegations of Sexual Abuse in Divorce,</u> Fourteenth National Symposium on Child Sexual Abuse, National Children's Advocacy Center, Huntsville, AL.

1998    <u>The Use of Media in Child Interviewing,</u> Fourteenth National Symposium on Child Sexual Abuse, National Children's Advocacy Center, Huntsville, AL.

1998    Allegations of Abuse And Divorce: Case Management Strategies, 98 Children's Justice Conference, Washington Department of Social and Health Services, Bellevue, WA.

1998    Allegations of Abuse And Divorce: Research Findings 98 Children's Justice Conference, Washington Department of Social and Health Services, Bellevue, WA.

1998    APSAC Institute: The Art and Science of Forensic Interviewing, with Mark Everson & Thomas Lyon, Responding to Child Maltreatment, Children's Hospital and Health Center, San Diego.

1998    Interviewing Strategies: Relating Research to Practice. Responding to Child Maltreatment, Children's Hospital and Health Center, San Diego.

1998    The U.S. Child Protection System. International Panel: Comparing Child Protection Systems, Responding to Child Maltreatment, Children's Hospital and Health Center, San Diego.

1997    Open Forum: Leading Questions in Forensic Interviews, Kathleen Coulborn Faller, Ph.D., Convenor, Mark Everson, Ph.D., John E. B. Myers, J.D., Patricia Toth, J.D., Barbara Boat, Ph.D., Wendy Bourg, Ph.D., Nancy Lamb, J.D., David Corwin, M.D., Panelists. Fifth National APSAC Colloquium, Tucson, AZ.

1997    The Polygraph, Its Use in Decision-making About Child Sexual Abuse: An Exploratory Study, The International Family Violence Research Conference, University of New Hampshire, Durham, N. H.

1997    Focused Questions for Interviewing Children about Child Maltreatment and other Endangering Behaviors, Midwest Conference on Child Sexual Abuse and Incest, University of Wisconsin, Madison, WI.

1997    Allegations of Abuse in Divorce: Research and Case Management, Midwest Conference on Child Sexual Abuse and Incest, University of Wisconsin, Madison, WI.

1997    Forensic Interviewing, Midwest Conference on Child Sexual Abuse and Incest, University of Wisconsin, Madison, WI.

1997    APSAC Institute: The Art and Science of Forensic Interviewing, with Mark Everson, Ph.D., & Nancy Lamb, J.D., APSAC Colloquium, Miami (2 one day institutes).

1997    Interviewing Young Children Who May Have Been Sexually Abused, Annual Conference Michigan Association of Children's Alliances, Ypsilanti, MI.

1997    Child Sexual Abuse, Annual Conference of the Michigan Foster Care Review Board, Grand Rapids, MI.

1997    Peer Review in a Hierarchical Institution, with Robert Passick, Ph.D., Midwest Clinical Law Conference, University of Michigan Law School, Ann Arbor, MI.

1997    APSAC's Commitment to the U.N. Convention on the Rights of the Child, Advancing Children's Futures; The Role of Non-Governmental Organizations in Supporting Children's Rights, Indiana University-Purdue University, Indianapolis, IN.

1997    Child Abuse as a Form of Family Violence, The Eight International Conference on Family Violence and Child Welfare, Seoul, S. Korea.

1997    National Conference: Developing a Research Agenda in Child Abuse and Neglect, Center for Child Protection and Children's Rights, Bangkok, Thailand. (4 days).

1997    APSAC Institute: The Art and Science of Forensic Interviewing, with Mark Everson & Thomas Lyon,, Responding to Child Maltreatment, Children's Hospital and Health Center, San Diego.

1996    Research on Corroboration of Child Sexual Abuse, with Ellen DeVoe, International Conference on Trauma and Memory, University of New Hampshire, Durham, N. H.

1996    Questioning strategies to be used with children who may have been sexually abused, with Ellen DeVoe, International Congress on Child Abuse and Neglect, Dublin, Ireland

1996   Research on allegations of abuse in divorce, with Ellen DeVoe, Eleventh International Congress on Child Abuse and Neglect, Dublin, Ireland

1996   The joys and sorrows of multidisciplinary evaluation, Protecting Children: American Perspectives: A Multiprofessional Conference, Glasgow, Scotland

1996   APSAC Institute: The Art and Science of Forensic Interviewing, with Larry Ricci, Thomas Lyon, & William Walsh, Colloquium of the American Professional Society on the Abuse of Children, Chicago, IL. 2 one day Institutes

1996   Sexual abuse allegations in divorce, Protecting Children: American Perspectives: A Multiprofessional Conference, Glasgow, Scotland

1996   Allegations of sexual abuse in divorce: Research and case management, National Conference on Child Abuse and Neglect, Wash., D.C.

1996   Child abuse prevention programs that work, Children's Trust Fund Conference, Lewiston, MI.

1996   New controversies in child interviewing, Michigan Professional Society on the Abuse of Children, Mt. Pleasant, MI.

1996   Children's memory, suggestibility, and credibility as witnesses of abuse, North Carolina Division of Social Services, Raleigh, N.C.

1996   Working with non-abusive parents, Michigan Statewide Conference on Child Abuse, University of Michigan Hospitals, Ann Arbor, MI.

1996   Assessing Allegations of Child Sexual Abuse, with Rosemary Niedzwicki, Second International Symposium on Child Custody Evaluations, Association of Family and Conciliation Courts, Orlando, FL.

1996   APSAC Institute: The Art and Science of Forensic Interviewing, with Mark Everson & Catherine Stephenson, Responding to Child Maltreatment, Children's Hospital and Health Center, San Diego.

1996   Psychotherapy with Alleged Victims of Child Sexual Abuse, with Mark Everson, Responding to Child Maltreatment, Children's Hospital and Health Center, San Diego.

1995   APSAC Institute: The Art and Science of Forensic Interviewing, with Mark Everson, Colloquium of the American Professional Society on the Abuse of Children, Tucson, AZ. 2 one day Institutes

1995   Questioning Strategies for Children Who May Have Been Sexually Abused, with Ellen DeVoe, The Fourth International Family Violence Conference, University of New Hampshire, Durham, N. H.

1995   Allegations of Sexual Abuse in Divorce. The Fourth International Family Violence Conference, University of New Hampshire, Durham, N. H.

1995   Forensically Defensible Interviewing of Children. Midwest Conference on Child Sexual Abuse, Madison, WI.

1995   Computer Assisted Interviewing of Children Who May Have Been Sexually Abused. Midwest Conference on Child Sexual Abuse, Madison, WI.

1995   Investigation of Sexual Abuse Allegations Involving Preschoolers. First National Research and Best Practice Symposium on Sexual Abuse of Young Children. Institute for the Prevention of Child Abuse, Toronto, ONT.

1995   Assessment of Child Abuse in Child Custody Cases, with D. Corwin, M.D. San Diego Conference on Responding to Child Maltreatment. Center for Child Protection, Children's Hospital, San Diego, CA.

1995    Computer Assisted Interviewing, with Ellen DeVoe, A.C.S.W. San Diego Conference on Responding to Child Maltreatment. Center for Child Protection, Children's Hospital, San Diego, CA.

1995    APSAC Institute: The Art and Science of Forensic Interviewing of Children Who May Have Been Sexually Abused. San Diego Conference on Responding to Child Maltreatment. Center for Child Protection, Children's Hospital, San Diego, CA.

1994    Women Who Sexually Abused Children. International Symposium on the Sexual Offender. Klinik und Poliklinik fur Kinder- und Jugendpsychiatrie, Universitat Munster, Germany.

1994    Allegations of Sexual Abuse in Divorce. Eleventh Annual Conference: Confronting our Sexually Violent Society. Albany County Rape Crisis Center, Albany, N.Y.

1994    Child sexual abuse: The art and Science of Forensic Interviewing. Eleventh Annual Conference: Confronting our Sexually Violent Society. Albany County Rape Crisis Center, Albany, N.Y.

1994    Polyincestuous Families. Child Protection Center Fall Conference: Interdisciplinary Approaches to Child Abuse Prevention, Investigation, and Treatment. St. Luke's Hospital, Cedar Rapids, IA.

1994    Suggestibility and Credibility of Children's Recollections. Child Protection Center Fall Conference: Interdisciplinary Approaches to Child Abuse Prevention, Investigation, and Treatment. St. Luke's Hospital, Cedar Rapids, IA.

1994    Extrafamilial Sexual Abuse. Child Protection Center Fall Conference: Interdisciplinary Approaches to Child Abuse Prevention, Investigation, and Treatment. St. Luke's Hospital, Cedar Rapids, IA.

1994    Allegations of Sexual Abuse during Divorce Proceedings. Child Protection Center Fall Conference: Interdisciplinary Approaches to Child Abuse Prevention, Investigation, and Treatment. St. Luke's Hospital, Cedar Rapids, IA.

1994    Basic Interviewing Skills and Issues in Joint Interview/investigations of Child Sexual Abuse. Fourth Gulf Regional Conference on Child Abuse. Children's Advocacy Center, Mobile, AL.

1994    Interviewing Young Victims of Abuse. Eleventh Annual Conference on Infancy and Childhood. (1 day) Utah State University, Logan, UT.

1994    The Art and Science of Forensic Interviewing. Second Oklahoma Conference on Child abuse and Neglect. The University of Oklahoma, Oklahoma City.

1994    Women Who Sexually Abuse Children. Thirteenth Annual Michigan Statewide Conference: Child Abuse and Neglect. The University of Michigan Medical School, Ann Arbor, Mi.

1994    Ritual Abuse: Current Knowledge and Research. Second Oklahoma Conference on Child abuse and Neglect. The University of Oklahoma, Oklahoma City.

1994    The Art and Science of Forensically Interviewing Children. Second Oklahoma Conference on Child abuse and Neglect. The University of Oklahoma, Oklahoma City.

1994    Allegations of Sexual Abuse in Divorce. Fourth Annual Time for Effective Action on Maltreatment of Minors Conference, University of Minnesota, Minneapolis.

1994    An Exploratory Study of 215 Cases of Sexual Abuse and Divorce. San Diego Conference: Responding to Child Sexual Abuse. San Diego, CA.

1994    Interviewing Children Alleged to Have Been Sexually Abused. Twelfth Annual Child Victimization Conference, (2 days) Arlington, TX.

1994    Children as Historians. North Carolina Professional Society on the Abuse of Children, Statewide Conference, Raleigh, N.C.

1994   The Art and Science of Forensic Interviewing, with Mark Everson, Ph.D. American Professional Society on the Abuse of Children Colloquium. (2 days) Boston.

1994   Ritual Abuse, a Review of the Research, with Susan Kelley, Ph.D. American Professional Society on the Abuse of Children Colloquium. Boston.

1994   Research Using a Computer Assisted Interview with Children Suspected of Having Been Sexually Abused, with Jane Mildred, A.C.S.W. and Ellen DeVoe, A.C.S.W. American Professional Society on the Abuse of Children Colloquium. Boston.

1993   Allegations of Sexual Abuse in Divorce. NASW Annual Conference. Anchorage.

1993   Keynote: Child Sexual Abuse; Truth and Consequences. NASW Annual Conference. Anchorage.

1993   Plenary Session: Female Sex Offenders. National Society for the Prevention of Cruelty to Children. Manchester, Eng.

1993   Allegations of Sexual Abuse in Divorce. National Society for the Prevention of Cruelty to Children. Manchester, Eng.

1993   Assessing Children Alleged to Have Been Sexually Abused. Michigan Statewide Conference on Child Abuse. Ann Arbor, MI.

1993   Allegations of Sexual Abuse in Divorce, with D. Corwin, M.D. National Conference on Child Abuse and Neglect. Pittsburgh.

1993   Ask the author: Session on NCCAN User Manual Series, with J. Howard, M.D. & M. Salus, M.S.W. National Conference on Child Abuse and Neglect. Pittsburgh.

1993   Criteria for Substantiating Child Sexual Abuse. San Diego Conference, Health Science Response to Child Maltreatment. Children's Hospital and Health Center, San Diego.

1993   Allegations of Sexual Abuse in Divorce, with David Corwin, M.D. San Diego Conference, Health Science Response to Child Maltreatment. Children's Hospital and Health Center, San Diego.

1993   APSAC Institute: Interviewing Young Children Suspected of Being Sexually Abused, with Barbara Bonner. San Diego Conference, Health Science Response to Child Maltreatment. Children's Hospital and Health Center, San Diego.

1993   Children's Memory and Suggestibility as it Relates to Accounts of Sexual Abuse. False Memory Syndrome Conference. Schoolcraft College, MI.

1993   Children as historians. Conference on Child Custody Cases. New Jersey Coalition for Battered Women, Rutgers, N. J.

1993   Backlash in Child Welfare. Children's Aid Societies of Essex County Annual Meeting, Windsor, Ont.

1993   Ritual Abuse: A Professional Overview. First National Conference of Believe the Children, Chicago.

1993   Research on Allegations of Sexual Abuse in Divorce. Conference on Child Sexual Abuse. Wayne State Law School, Detroit.

1992   Sex Offender Assessment and its Relationship to Treatment. Midwest Conference on Child Sexual Abuse. Madison, WI.

1992   Interviewing the Child Suspected of Sexual Abuse. Midwest Conference on Child Sexual Abuse. Madison, WI.

1992   Child Abuse. Michigan State Medical Society Annual Conference. Dearborn, MI.

1992   Psychosocial Indicators of Child Maltreatment. Michigan State Medical Society Annual Conference. Dearborn, MI.

1992   APSAC Institute: Interviewing the Young Child Alleged to Have Been Sexually Abused, with Barbara Bonner, Ph. D, and Mark Everson, Ph. D. Responding to Child Maltreatment,

Conference of the Center for Child Protection, Children's Hospital and Health Center, San Diego, CA.

1992   Keynote: Backlash against Child Welfare. Top of Michigan Children's Agencies, Charlevoix, MI.

1992   Interviewing Children Alleged to Have Been Sexually Abused, with Barbara Bonner, Ph. D. International Congress on Child Abuse and Neglect, Chicago.

1992   Sexual Abuse of Children in Foster Care. National Conference on Responding to Child Maltreatment, San Diego, CA.

1991   Possible Explanations for Allegations in Divorce. Ninth National Conference on Child Abuse and Neglect, Denver, CO.

1991   Interviewing the Young Child Alleged to Have Been Abused, with Barbara Bonner, Ph. D. Ninth National Conference on Child Abuse and Neglect, Skill Session, Denver, CO.

1991   Permanency Planning and Child Sexual Abuse. National Conference for Foster Care Review Boards, Portland, Oregon.

1991   Possible Explanations for Allegations of Sexual Abuse in Divorce. First North American Conference on Child Abuse and Neglect, Toronto, Canada

1991   Polyincestuous Families: An Exploratory Study. National Conference on Sexual Abuse of Children, Children's Advocacy Center, Huntsville, Alabama.

1991   Polyincestuous Families: An Exploratory Study. The San Diego Conference: Responding to Child Maltreatment, San Diego, California.

1990   Preparing Children for Court Testimony, with Lisa D'Aunno, J.D. Michigan Statewide Conference on Child Abuse and Neglect, Ann Arbor, Michigan.

1990   Polyincestuous Families. Michigan Statewide Conference on Child Abuse and Neglect, Ann Arbor, Michigan.

1990   Criteria for Determining the Credibility of Children's Statements About their Sexual Abuse. National Conference on the Victimization of Children, Atlanta, Georgia.

1990   Sexual Abuse of Children in Family Foster Care. National Conference on the Victimization of Children, Atlanta, Georgia.

1990   An Exploratory Study of Polyincestuous Families. American Humane Association Annual Conference, Nashville.

1990   A Follow-up Study of Sexually Abused Children Identified by Protective Services. National Conference on Child Abuse and Neglect, San Diego, CA.

1989   Parent-Child Interaction: Assessment and Treatment; National Association of Social Workers, New Mexico Chapter, Annual Conference, Santa Fe, N. M.

1989   Differential Diagnosis with High Risk Families. National Association of Social Workers, New Mexico Chapter, Annual Conference, Santa Fe, N. M.

1989   Women Who Sexually Abuse Children. Children's Hospital, Annual Conference on Child Abuse and Neglect, Columbus, OH.

1989   Child Sexual Abuse: Patterns, Causes, and Intervention. Lustrum Congress: Intervention in Special Education, University of Groningen, Groningen, The Netherlands.

1989   Adolescent Sex Offenders. National Center on Child Abuse and Neglect: State Liaison Officers Meeting, Washington, D.C..

1989   Criteria for Determining Whether Children Have Been Sexually Abused. Child Welfare League of America, Midwest Regional Conference, Chicago.

1998   Adolescent Sex Offenders. National Center on Child Abuse and Neglect: Children's Justice Act and Challenge Grantees Conference, Washington, D.C.

1989   <u>Causes of Sexual Violence.</u> Director's Discovery Conference on Sexual Violence, Michigan, Lansing, MI.

1989   <u>Coordinating Community Responses to Child Sexual Abuse</u>; Statewide Conference on Child Abuse And Neglect, Durham, N.C.

1989   <u>Women Who Sexually Abuse Children</u>, Statewide Conference on Child Abuse And Neglect, Durham, N. C.

1989   <u>Criteria for Determining Whether Children Have Been Sexually Abused</u>. National Association of Social Workers, San Francisco.

1989   <u>Discussant, Think Tank on Ritual Sexual abuse of Children</u>. National Conference on Child Abuse and Neglect, Salt Lake City, UT.

1989   <u>Criteria for Determining Whether Children Have Been Sexually Abused</u>. National Conference on Child Abuse and Neglect, Salt Lake City, UT.

1988   <u>Women Who Sexually Abuse Children</u>. National Association of Social Workers, Philadelphia.

1988   <u>Women Who Sexually Abuse Children</u>. National Conference on the Victimization of Children, Anaheim, CA.

1988   <u>A Follow-Up Study of 58 Sexually Abused Children Identified by the Child Protection System</u>, Annual Conference of The Society for Applied Sociology, Chicago.

1988   <u>Women Who Sexually Abuse Children</u>, National Association of Social Workers, Michigan Chapter, Grand Rapids, MI.

1988   <u>A Follow-Up Study of Sexually Abused Children Identified by Protective Services</u>, National Association of Social Workers, Michigan Chapter, Grand Rapids, MI.

1987   <u>Sexual Abuse in Day Care</u>. Third National Family Violence Research Conference, Durham, N. H.

1987   <u>Women Who Sexually Abuse Children</u>. Third National Family Violence Research Conference, Durham, N.H.

1987   <u>Sexual Abuse Allegations in Divorce.</u> National Conference for the Prevention of Child Sexual Abuse, Ann Arbor, MI.

1987   <u>Sexual Abuse in Day Care.</u> National Conference for the Prevention of Child Sexual Abuse, Ann Arbor, MI.

1986   <u>Credibility of Child Witnesses in Sexual Abuse.</u> National Conference for the Prevention of Child Sexual Abuse, New Orleans, LA.

1985   <u>Decision-Making in Child Sexual Abuse Cases.</u> National Association of Social Workers Professional Symposium, Chicago.

1985   <u>Sexual Abuse by Paternal Caretakers</u>. National Conference on Child Abuse and Neglect, Chicago.

1985   <u>Indicators of Sexual Abuse</u>. Ohio School Psychologists Association, 42nd Annual Meeting, Columbus, OH.

1985   <u>Indicators of Physical Abuse</u>. Ohio School Psychologists Association, 42nd Annual Meeting, Columbus, OH.

1985   <u>Community Decision Points in Child Sexual Abuse</u>. Michigan Department of Social Services, Statewide Conference on Sexual Abuse, Lansing, MI.

1985   <u>Differential Diagnosis of Child Sexual Abuse.</u> Michigan Department of Social Services, Statewide Conference on Sexual Abuse, Lansing, MI.

1985   <u>Interviewing the Victim, Mother, and Perpetrator</u>. Michigan Department of Social Services, Statewide Conference on Sexual Abuse, Lansing, MI.

1985    Sexual Abuse Allegations in Disputed Custody Cases. Michigan Interprofessional Association Conference on Child Sexual Abuse, Birmingham, MI.

1985    Four Types of Intrafamilial Sexual Abuse. Down River Guidance Clinic Conference on Family Violence, Southgate, MI.

1985    Interviewing Sexually Abused Children. Down River Guidance Clinic Conference on Family Violence, Southgate, MI.

1984    Sexual Abuse by Caretakers. National Conference of Family Violence Researchers, Durham, NH.

1984    Play Therapy with Maltreated Children. Michigan Alliance of Children's Agencies, Troy, MI.

1984    Interdisciplinary Issues in Child Sexual Abuse. Kalamazoo County Child Abuse and Neglect Council, Annual Conference, Kalamazoo, MI.

1983    Issues in Evaluation of In-Home Family Based Treatment Services. National Conference on Child Abuse and Neglect, Baltimore, MD.

1983    The Impact of Reagan Budget Cuts on Services to Abused and Neglected Children. Bush Child Development Conference, University of Michigan, Ann Arbor, MI.

1982    Unanticipated Consequences of the American Child Protection System. International Congress on Child Abuse and Neglect, Paris, France.

1982    Interdisciplinary Management of Child Sexual Abuse. International Congress on Child Abuse and Neglect, Paris, France.

1982    Child Sexual Abuse. National Conference on Women and the Law, Detroit, MI.

1982    The Politics of Teenage Pregnancies, with others. National Conference on Women and the Law, Detroit, MI.

1982    Stress as a Factor in Child Abuse and Neglect. Infant Mental Health Conference, Ann Arbor, MI.

1982    Mental Health and Legal Collaboration in Permanency Planning, with Ellen Tickner, J.D. Mid-Regional Child Welfare League of America Conference, Detroit, MI.

1981    Interdisciplinary Management of Child Sexual Abuse. National Conference on Child Abuse and Neglect, Milwaukee, WI.

1981    Mock Trial: Expert Testimony in Child Abuse. National Conference on Child Abuse and Neglect, Milwaukee, WI.

1981    The Nuts and Bolts of Multidisciplinary Teams. Governor's Conference on Community Prevention of Child Abuse and Neglect, Dearborn, MI.

1981    Results from the Fifty-One Families Study. Annual Meeting of the Washtenaw County Coordinating Council of Children at Risk, Ann Arbor, MI.

1981-   Child Sexual Abuse: Diagnosis and Intervention, three sessions of three days,
1983    Top of Michigan Children's Agencies, Black Lake, Schuss Mountain, Presque Isle, MI.

1981    Child Sexual Abuse. Annual Meeting of the Jackson County Community Mental Health Association, Jackson, MI.

1981    Child Sexual Abuse. Annual Meeting of the St. Clair County Community Mental Health Association, Port Huron, MI.

1981    Child Abuse and Neglect: The State of Knowledge. Annual Meeting of Monroe County Council for Children at Risk, Monroe, MI.

1980    Child Sexual Abuse. Annual Meeting of the Michigan Chapter of the National Committee for the Prevention of Child Abuse, two workshops, Kalamazoo, MI.

1979    <u>Outreach Therapy with Abusive and Neglectful Families</u>; Seminar: <u>Social-Medical-Legal Collaboration in Family Treatment</u>, International Symposium of Family Therapy, Workshop Series, Zurich, Switzerland.

1979    <u>Interdisciplinary Collaboration in Child Abuse and Neglect</u>, Second Annual Conference of Consortium on Child Abuse and Neglect, Flint, MI.

1979    <u>Child Abuse and Neglect</u>, Annual Conference, Michigan NASW, Ann Arbor, MI.

1978    <u>Teaching Intervention Strategies in Child Abuse and Neglect</u>, Second International Congress on Child Abuse and Neglect, London, England.

1978    <u>Research in Progress: Family-Community Intervention: Child Abuse and Neglect</u>, Third National Conference on Child Abuse and Neglect, New York.

1977    <u>Role of School Counselors in Child Abuse and Neglect</u>, Michigan Personnel and Guidance Association Annual Meeting, Lansing, MI.

1976    <u>Family Policy and Child Abuse and Neglect</u>, Groves Conference on Marriage and the Family, Presentation with Professor Paul Glasser, Kansas City, MO.

1973    <u>Behavior Modification with Delinquent Youth</u>, International Workshop on Behavior Modification, Presentation with Professor Richard Stuart, Bangor, North Wales.


**LECTURE TOUR**

1980    Five week lecture tour in England sponsored by British-American Associates. The tour included the cities of London, Wolverhampton, Bristol, Birmingham, Sheffield, Canterbury, Durham, Newcastle, and Cleveland. Topics covered included Case Management and Treatment of Child Abuse and Neglect, the American Family and Inner City Social Problems. Audiences were social workers in practice, multidisciplinary groups, and academic audiences, including students and faculty at the London School of Economics and Political Science, University of Kent, Sheffield University, Newcastle University, Wolverhampton Polytechnic, and the Social Work Course run by the National Society for the Prevention of Cruelty to Children, and some more general audiences.


**CONSULTATION**

**2011—present        Consultation with National Resource Center for Permanency and Family Connections: A Service of the Children's Bureau**

2010—present  Advisory Board Member, National Children's Advocacy Center

1996-2007     Board member. Michigan Foster Care Review Board

2004-present  Steering Committee, Center for Excellence, The Guidance Center

2000-2007     Children's Center of Detroit

2000-2002     Ennis & Associates, Inc.

1995-1999     Office of the Children's Ombudsman, State of Michigan

1995-96       National Judicial Education Program (a project of NOW and the National Association of

              Women Judges)

1994-2000     Children's Home of Detroit, Grosse Pointe, MI.

1993-96       Girlstown, Belleville, MI.

1993-94       Wolverine Human Services, Detroit, MI.

1988-89       Families First, St. Clair Co., MI.

1985-86       Essex County Children's Aid Society, Windsor, Ontario, Canada.

1985-86       Team for Justice, Detroit, Michigan.

1984          Lutheran Children's Services, Detroit, Michigan.

| 1984 | Wayne County Office of Children and Youth Services, Detroit, Michigan. |
|------|-----|
| 1983-86 | Hamilton County Legal Services, Cincinnati, Ohio. |
| 1982 | Children's Defense Fund, Washington, D.C. |
| 1981-89 | Michigan Department of Social Services: Program Office, Neglect Services, Lansing, Michigan. |
| 1981-86 | Lucas County Children's Services Board, Toledo, Ohio. |
|  | Livingston County Department of Social Services, Howell, Michigan. |

**WORKSHOPS/TRAINING SESSIONS**

2015   Child Sexual Abuse: What Child Welfare Professionals Need To Know. Practicing Permanency: Advanced Certificate Course in Adoption and Foster Care Competency, Baton Rouge, LA.

2015   Grandparents in Distress, with Mary Ortega, LMSW. University of Michigan School of Social Work, Ann Arbor, MI

2013   NCWWI Annual Traineeship: Principal Investigator Interview Report, National Child Welfare Workforce Institute Annual Traineeship Meeting, Chicago

2013   Pre-conference Workshop for Guardians *ad litem*: Issues in Sexual Abuse of Children, with Frank Vandervort, J.D., Vincent Palusci, M.D.,& Mark Stone, D.O. Colloquium of the American Professional Society on the Abuse of Children, Las Vegas, NV.

2012   NCWWI Annual Traineeship: Principal Investigator Interview Report, National Child Welfare Workforce Institute Annual Traineeship Meeting, Chicago

2012   *Nd'nibwaakaami*--We Are Wise: Adapting Comprehensive Family Assessments to the Native American Community, with Abigail Eiler, Tina Louise, Mary Ortega, Robert Ortega, and Charla Sanders. American Indian Health and Family Services, Detroit. Two days

2012   Systems of Care webinar: Why Adapt Comprehensive Family Assessments, with Abigail Eiler, American Indian Health and Family Services and Michigan Intertribal Council

2012   Systems of Care webinar: Interviewing Children, with Abigail Eiler, American Indian Health and Family Services and Michigan Intertribal Council

2012   Working with parents with developmental disabilities, with Mary Ortega, University of Michigan School of Social Work. One half day.

2011   Finding a place for cultural humility in a culturally competent world with Mary Ortega, School of Social Work 90th Anniversary Alumni Association, Lansing, MI

2011   Cultural Humility in Child Welfare Management. Webinar for the National Child Welfare Workforce Institute Leadership Academy for Middle Managers, 2 hours. University of Michigan. With Robert Ortega.

2011   Cultural Humility in Child Welfare Management. Webinar for the National Child Welfare Workforce Institute Leadership Academy for Middle Managers, 2 hours. University of Michigan. With Robert Ortega.

2011   Grandparents in Distress. Webinar for the Midwest Children's Advocacy Center, 2 hours. University of Michigan with Mary Ortega

2011   Multidisciplinary Institute on Child Sexual Abuse. 4 days. University of Michigan with Robert Ortega, Ph.D., Bethany Mohr, M.D., Mary Ortega, A.C.S.W., Abigail Eiler, M.S.W., Frank Vandervort, J.D., Kimberly Thomas, J.D., & Samuel Holtz, J.D.

2011   Cultural Humility in Management. Webinar with Robert M. Ortega, for the National Child Welfare Workforce Institute.

2010   <u>Allegations of abuse in divorce & custody cases</u>. Webinar for the Midwest Region Children's Advocacy Center

2010   <u>The Child Welfare Challenge: Making better workers & making workers better</u>. With Mary Ortega. UM School of Social Work's 90th Anniversary.

2010   <u>Clinical Supervision in Child Sexual Abuse.</u> Louisiana Department of Social Services /Office of Community Services. 3 days Shreveport

2010   <u>Clinical Supervision in Child Sexual Abuse</u>. Louisiana Department of Social Services /Office of Community Services 4 days in Lafayette, LA

2010   <u>Clinical Supervision in Child Sexual Abuse</u>. Louisiana Department of Social Services /Office of Community Services. 4 days in New Orleans

2010   <u>Multidisciplinary Institute on Child Sexual Abuse</u>       With Mary Ortega, Robert Ortega, Bethany Mohr, James Henry, Frank Vandervort, Vivek Sankaran, & Samuel Holtz. 5 days.

2010   <u>Cultural Humility</u>, with Robert Ortega, ½ day UM Continuing Ed.

2010   <u>Cultural humility in child welfare.</u> Catholic Charities of West Michigan. 1 day presented with Robert Ortega, PhD.

2010   <u>Parents with Developmental Disabilities.</u> University of Michigan School of Social Work Continuing Education. 1/2 day. Co-presented with Mary Ortega, Ann Arbor, Michigan.

2009   <u>Visitation and Decision-making in Child Welfare.</u> Workshop for Michigan Department of Human Services. ½ day. Ann Arbor, Michigan.

2009   <u>Cultural humility in child welfare.</u> Child Welfare Consortium. University of Michigan, ½ day. With Prof. Robert Ortega.

2009   <u>Social work and legal ethics: When world views collide.</u> Child Welfare Consortium. University of Michigan, ½ day. With Prof. Frank Vandervort. Ann Arbor, Michigan.

2009   <u>Forensic interviewing in child sexual abuse.</u> Leftover Love Conference Center. 1 day. Seoul, S. Korea.

2008   <u>Cultural Humility for Child Welfare Workers</u>. 2 days With Robert Ortega, Ph.D. University of Southern Maine, Muskie School of Social Policy.

2008   <u>Cultural Humility for Child Welfare Workers: Train the trainers</u>. ½ day With Robert Ortega, Ph.D. University of Southern Maine, Muskie School of Social Policy.

2008   <u>Allegations of sexual abuse in divorce</u>. University of Wisconsin—Midwest Conference on Child Sexual Abuse, Madison, WI.

2008   <u>Disclosure of child sexual abuse</u>. University of Wisconsin—Midwest Conference on Child Sexual Abuse, Madison, WI.

2008   <u>Extended assessments in child sexual abuse</u>. Alaska Child Maltreatment Conference, Anchorage, AK.

2008   <u>Allegations of abuse in divorce and custody cases</u>. Alaska Child Maltreatment Conference, Anchorage, AK.

2008   <u>Cultural Humility</u>. With Robert Ortega, Ph.D. University of Michigan Recruitment and Retention of Child Welfare Staff Program. ½ day. The Guidance Center, Southgate, MI.

2008   <u>Allegations of sexual abuse in divorce: Research findings and case management strategies</u>. Youth and Children's Advocacy Center, 1 day. Lewisburg, WV.

2007   <u>Use of media in forensic interviews</u>. National Children's Advocacy Center Advanced Forensic Interview Training, Huntsville, AL.

2007   <u>Techniques for interviewing children who are reluctant to disclose abuse</u>. National Children's Advocacy Center Advanced Forensic Interview Training, Huntsville, AL.

2007   Identification of child abuse and reporting requirements identification of child abuse and reporting requirements. Mitchell School, Ann Arbor, MI.

2007   Cultural Humility. With Robert Ortega, Ph.D. University of Michigan Recruitment and Retention of Child Welfare Staff Program. The Guidance Center

2007   Disclosure of sexual abuse. National Children's Advocacy Center Advanced Forensic Interview Training:, Huntsville, AL

2007   Use of media in forensic interviewing of children. National Children's Advocacy Center. Advanced Forensic Interview Training. Huntsville, AL.

2007   Legal training in Cultural Humility. The Guidance Center, Southgate, MI .With Frank Vandervort, J.D.

2007   Asking questions about child abuse. Arizona Court Improvement Project, Flagstaff, AZ.

2006   Cultural Humility in Child Welfare. Children's Bureau Recruitment and Retention of Child Welfare Workers. 3 days, Ann Arbor MI & Detroit, With Robert Ortega, Ph.D.

2006   What Prevention Specialists Need to Know about Child Sexual Abuse. Children's Trust Fund of Michigan Annual Conference. Kalamazoo, MI.

2006   Peer-review of child abuse interviews. Child Maltreatment Conference, University of Toronto SCAN Program and Hospital for Sick Children. Panel presentation, Toronto.

2006   Roundtable on supervised visitation. U.S. Dept. of Justice, Office of Violence against Women. Consultant to participants—child abuse and Safe Havens, Atlanta.

2006   Research and practice on the disclosure process in child sexual abuse. New Mexico Network of Children's Saferooms &Community Against Violence, Taos, NM (1 day).

2005   University-based Multidisciplinary Teams. University of Wisconsin School of Social Work IV E presentation, Madison, WI..

2005   Allegations of abuse in divorce: What can the research tell us? Dane County Child Welfare, Madison, WI.

2005   Peer review of videotapes of forensic interviews. Colloquium of the American Professional Society on the Abuse of Children, New Orleans.

2005   Cultural humility. Governor's Task Force on Children's Justice, Marquette, MI (1 day).

2005   Peer review of videotapes of forensic interviews. Colloquium of the American Professional Society on the Abuse of Children, New Orleans (1.5 hrs.)

2005   Forensic interviewing. Ennis Center for Children Detroit, MI (1 day).

2005   Forensic Interview Clinic. APSAC and the Florida Department of Health, Orlando. (3 days).

2004   Forensic evaluation of Child sexual abuse Clinica de Salud Mental de la Communidad, Carlos Albizu University, San Juan, PR (2 days).

2004   Multidisciplinary training in child sexual abuse. Department of Child and Family Services. San Juan, PR (1 day).

2004   Issues in Child Abuse Cases. Administrative Office of the Illinois Courts, Bloomington, IL. (4 hours).

2004   APSAC Institute: Supervision and peer review of videotaped forensic interviews, American Professional Society on the Abuse of Children, San Diego, CA. (6 hours), with Deborah Davies, LICSW.

2004   Forensic Interviews in Child Sexual Abuse. University of Oklahoma Center on Child Abuse and Neglect & Oklahoma Department of Human Services, Norman, OK (16 hours).

2003.   Update on Allegations of Sexual Abuse in Divorce. Mercer County Multidisciplinary Team, Princeton, NJ.

2003   Workshop: Contested Issues in child sexual abuse, Trenton, NJ.

2003   Advanced forensic interview training; Use of media in forensic interviewing; Decision-making in child sexual abuse, & Videotape review      National Children's Advocacy Center, Huntsville, AL (1 day).

2003   American Professional Society on the Abuse of Children Institute on Forensic Interviewing Prevent Child Abuse Georgia, Atlanta, GA. (1 day- institute).

2003   Workshop: Cutting edge issues in forensic interviewing. Colloquium of the American Professional Society on the Abuse of Children, Orlando, FL (6 hours).

2003   Workshop: Critiquing forensic interviews, Colloquium of the American Professional Society on the Abuse of Children, Orlando, FL (1.5 hours).

2003   Advanced Forensic Interview Training, National Children's Advocacy Center, Huntsville, AL (1 day) hrs.

2003   Kids caught in the middle: Collaborative management of sexual abuse cases in the family, juvenile and criminal courts, Sexual Abuse Information Network and the Criminal Justice Institute, College of Lake County, IL (1 day).

2003   Multidisciplinary Assessment of Complex Child Welfare Cases. University Center for the Child and Family, Ann Arbor, MI (2 hours) with Mary Ortega, M.S.W.

2003   American Professional Society on the Abuse of Children, Forensic Interview Clinic. University of Michigan, Ann Arbor, MI. (40 hours) with Dennison Reed, Ph.D., Kee MacFarlane, M.S.W., Richard Cage, Hon Harry Elias, Steve Wilson, J.D., & Frank Vandervort, J.D.

2002   Child Safety and Parental Substance Abuse and Mental Health Problems. Roswell & Las Cruces, N.M., with Melnee McPherson. M.S.W., M.A. & Paula Bank, M.D., Ph.D. (2 two-day sessions).

2002   Co-morbidity: Parental Problems and Children's Welfare, Governors State University, University Park, Illinois, with Melnee McPherson & Dan Saunders (2 days).

2002   University of Michigan Child Welfare Supervisors' Training Program. Detroit, MI., with William Meezan, Ph.D., John Tropman, Ph.D., Frank Vandervort, J.D., Beverly Araujo, M.S.W., & Michelle Marie Mendez, J.D. (3 days).

2002   Contested Issues in Forensic Interviewing of Children; & Assessing Allegations of Abuse in Divorce and Custody Cases. Getting to the Truth without Taint: Gathering Information From and About Children, Dallas County Family and Juvenile Courts. Dallas, TX (1 day).

2002   Contested Issues in Forensic Interviewing of Children & Decision-making in Child Sexual Abuse. Family Advocacy Staff Training Advanced Forensic Interview Training Course, Heidelburg, Germany (1 day).

2002   Overview of Forensic Interview Issues & Lessons for Forensic Interviewing from Research. American Professional Society on the Abuse of Children, Forensic Interview Training for the Commonwealth of Kentucky (1 day).

2002   Training for Trainers, Overview of Forensic Interview Issues, & Lessons for Forensic Interviewing from Research. American Professional Society on the Abuse of Children, Forensic Interview Training for the Commonwealth of Kentucky (2 day).

2002   Child Safety and Parental Substance Abuse and Mental Health Problems. New Mexico State University, Albuquerque, N.M., with Melnee McPherson. M.S.W., M.A & Paula Bank, M.D., Ph.D. (2 two-day sessions).

2002   Child Abuse Response Team-Joint Interview Training. U.S. Army, Ludwigschafen, Germany, with Russell Strand, U.S. Army (5 days).

2002  University of Michigan Child Welfare Supervisors' Training Program. Lansing, MI., with William Meezan, Ph.D., John Tropman, Ph.D., Frank Vandervort, J.D., Beverly Araujo, M.S.W., & Michelle Marie Mendez, J.D. (3 days).

2002  Forensic Interviewing Protocols: A Critique. State of Kentucky Commonwealth Attorney's Office, Louisville, KY (1/2 day)

2002  Parental Substance Abuse and Child Welfare. University of Michigan 19th Annual Medstart Conference., Ann Arbor, MI.

2002  Testifying in Court: What Professionals Need to Know. University of Michigan School of Social Work Continuing Education. Ann Arbor, MI., with Frank Vandervort, J.D. (1 day).

2001  University of Michigan Child Welfare Supervisors' Training Program. Detroit, MI., with William Meezan, Ph.D., John Tropman, Ph.D., Frank Vandervort, J.D., Beverly Araujo, M.S.W., & Michelle Marie Mendez, J.D. (3 days).

2001  Allegations of Abuse in Divorce. Children's Justice Task Force Conference, Morgantown & Charleston, W.VA. (2 half days).

2001  Art & Science of Forensic Interviewing. Children's Justice Task Force Conference, Morgantown & Charleston, W.VA. (2 half days).

2001  Child Abuse Response Team-Joint Interview Training. U.S. Army, Heidelberg, Germany, with Russell Strand, U.S. Army. (5 days).

2001  Innovations in Social Welfare Services: Hasbro Early Assessment Project. Michigan Collaborative of Social Services Agencies, Ann Arbor, MI with Susan Smith, M.S.W.

2001  Forensic Interviewing of Children. Advanced Training Institute, American Professional Society on the Abuse of Children, Huntsville, AL with Anne Graffam-Walker. (1 day).

2001  A Critical Look at the Decision-making Process in Custody Evaluations Involving Allegations of Sexual Abuse. PACE Domestic Violence and Child Custody Evaluators' Seminar, San Diego, CA (2 hours).

2000  Parental Mental Health Problems and Child Maltreatment. National Resource Center on Child Maltreatment, Atlanta, GA (1/2 day).

2000  A Critical Analysis of Child Interview Protocols. Department of the Army, Academy of Health Sciences, Advanced Forensic Child Sexual Abuse, Fort Sam Houston, San Antonio, TX. (1/2 day).

2000  Art and Science of Forensic Interviewing. Ohio Department of Mental Health. Ashland, OH (1 day).

2000  Forensic Interviewing. American Professional Society on Abuse of Children Institute. With Kee MacFarlane, M.S.W., Katherine Eagleson, Det. Michael Johnson, Thomas Fallon, J.D. Battle, Creek, MI (3 days).

2000  Social Workers as Experts. Maple Clinic, Traverse City, MI (1 day).

2000  Expert testimony in court: A mental health perspective. (Jan.). Loyola University Chicago, School of Law, Chicago.

2000  A continuum of questions for children who may have been sexually abused: Integrating research and practice. Colloquium Series on Child Welfare, Rutgers University School of Social Work, Camden, N.J.

2000  The art and science of forensic interviewing of young children who may have been sexually abused. AVOISE & Talbert House, Cincinnati, OH (1 day).

2000  APSAC Intensive Interview Clinic, with Kee MacFarlane, M.S.W., Melissa Steinmetz, M.S.W., Paul Stern, J.D., Hon. Harry Elias, Katherine Eagleson, Ann Graffin Walker, Ph.D., & Donna Pence. U.S. Navy Training Series, Baltimore, MD (5 days).

1999    <u>Testifying in Court.</u> With Frank Vandervort, J.D. University of Michigan School of Social Work Continuing Education in Human Services, Ann Arbor, MI (1 day).

1999    <u>Interdisciplinary Management of Child Welfare Cases involving Domestic Violence, Substance Abuse, and Mental Health Issues</u>, with Daniel Saunders, Ph.D., Melnee D. McPherson, M.S.W., and Frank Vandervort, J.D. University of Michigan School of Social Work, Grand Rapids, MI (3 days).

1999    <u>Interdisciplinary Management of Child Welfare Cases involving Domestic Violence, Substance Abuse, and Mental Health Issues</u>, with Daniel Saunders, Ph.D., Melnee D. McPherson, M.S.W., and Frank Vandervort, J.D. University of Michigan School of Social Work, Ann Arbor, MI (3 days).

1999    <u>Interviewing Children who May Have Been Sexually Abused: What Can the Research Tell Us?</u> Colloquium Series on Child Welfare, State University of New Jersey at Rutgers, School of Social Work, Rutgers, NJ.

1999    <u>Forensic Interviewing of Young and Special Needs Children.</u> State of Louisiana Department of Child and Family Services, New Orleans (3 days).

1999    <u>Interdisciplinary Management of Child Welfare Cases involving Domestic Violence, Substance Abuse, and Mental Health Issues</u>, with Daniel Saunders, Ph.D., Melnee D. McPherson, M.S.W., and Frank Vandervort, J.D. University of Michigan School of Social Work, Bloomington, IL (3 days).

1999    <u>Multidisciplinary Child Protection Team Training; Train the Trainers.</u> University of South Florida Department of Child and Family Studies and the State of Florida, Tampa, FL (2 days).

1999    <u>Interdisciplinary Management of Child Welfare Cases involving Domestic Violence, Substance Abuse, and Mental Health Issues</u>, with Daniel Saunders, Ph.D., Melnee D. McPherson, M.S.W., Cheryll D. Bellamy, M.S.W., and Frank Vandervort, J.D. University of Michigan School of Social Work, Fort Wayne, IN (3 days).

1999    <u>APSAC Intensive Interview Clinic</u>, with Kee MacFarlane, M.S.W., Melissa Steinmetz, M.S.W., Deborah Davies, LCSW, Charles Wilson, MSSW, Ann Graffin Walker, Ph.D., & Donna Pence. (5 1/2 days), National Symposium on Child Sexual Abuse, Huntsville, AL.

1998    <u>The role of social workers in multidisciplinary teams</u> (panel with others), Western Regional Conference, National Children's Advocacy Center, Anchorage, AL (half day).

1998    <u>Allegations of Sexual Abuse in Divorce</u>, University of Michigan School of Social Work, Muskegon, MI (1 day).

1998    <u>Forensic interviewing.</u> Louisiana Department of Human Resources, Lafayette, LA (half day).

1998    <u>The relationship between Domestic Violence and Child Maltreatment,</u> State of Michigan Office of the Children's Ombudsman, Ann Arbor, MI (half day).

1998    <u>APSAC Intensive Interview Clinic</u>, with Kee MacFarlane, M.S.W., Melissa Steinmetz, M.S.W., Harry Elias, J.D., Deborah Davies, L.C.S.W. (5 1/2 days), University of Dundee, Scotland.

1998    <u>Forensic Interviewing.</u> Taos (NM) Community Against Violence. (1/2 day).

1998    <u>Structured versus Unstructured Forensic Interviews.</u> New Mexico Network of Saferooms. (1 day).

1998    <u>Child Sexual Abuse, Domestic Violence, and Substance Abuse.</u> Looking Behind the Veil, Michigan Public Health Institute, Lansing, MI (1/2 day).

1998    <u>Assessing Children for Sexual Abuse</u> (one day), Downriver Guidance Clinic, Southgate, MI.

1998    <u>Forensic Interviewing Children who May Have Been Sexually Abused: Art and Science</u> (two days), U.S. Military Forces, Kadena Air Force Base, Okinawa, Japan.

1998    <u>Allegations of Child Abuse in Divorce,</u> Maricopia County Bar Association, Phoenix, AZ.

1998   APSAC Intensive Interview Clinic, with Kee MacFarlane, M.S.W., Melissa Steinmetz, M.S.W.,
       Harry Elias, J.D., John Stirling, M.D., Charles Wilson, MSSW, Ann Graffin Walker, Ph.D., & Donna
       Pence. (5 1/2 days), Huntsville, AL.
1998   A Mental Health Perspective on Expert Testimony. Trial Practice Course, Loyola University,
       Chicago School of Law, Chicago.
1997   The Intersection and Prevention of Child Abuse, Substance Abuse, and Domestic Violence
       (one day), Kent County Council for Children at Risk, Grand Rapids, MI.
1997   Developing a Sexual Abuse Treatment Program for Boy Victims (3 half days), Children's Home
       of Detroit, Grosse Pointe, MI.
1997   Treatment of Sexually Abused Girls (5 half days), Vista Maria Residential Treatment Center,
       Detroit.
1997   Teleconference: Children's Memory and Suggestibility. Medical College of Ohio, Toledo, OH.
1997   Understanding Ritual Abuse Allegations, Office of the Children's Ombudsman, State of
       Michigan. Lansing, MI.
1997   The Art and Science of Forensic Interviewing of Young Children who May have Been Abused,
       University of Michigan Continuing Professional Education Program, Ann Arbor, MI (Also a
       distance learning training program).
1997   Treating Abused Children, Center for Child Protection and Children's Rights, Bangkok,
       Thailand. (1 day).
1997   APSAC Intensive Interview Clinic, with Kee MacFarlane, M.S.W., Melissa Steinmetz, M.S.W.,
       David Corwin, M.D., Mark Everson, Ph.D., Harry Elias, J.D., Karen Saywitz, Ph.D., John Stirling,
       M.D., & Donna Pence. (5 1/2 days), Ann Arbor, MI.
1997   Social Work Evaluation of Maltreated Children, workshop at the Annual Conference of
       Michigan Foster Care Review Board, Grand Rapids, MI.
1997   Interviewing children who may have been sexually abused (4 hours), University of Arkansas
       School of Social Work, Fayetteville, AR.
1997   Treatment of abused and neglected children (2 hours), Korean Association for the Protection
       of Children, Seoul, S. Korea.
1997   Child Welfare in the United States (2 hours), Tokai (Japan) University Social Work students,
       Ann Arbor, MI.
1997   Developing a sexual abuse treatment program for boy victims (3 half days), Children's Home
       of Detroit, Grosse Pointe, MI.
1997   Allegations of child abuse in divorce (4 hours), San Diego Conference on Responding to Child
       Maltreatment, San Diego, CA.
1997   The intersection and prevention of child abuse, substance abuse, and domestic violence (one
       day), Kent County Council for Children at Risk, Grand Rapids, MI.
1997   A Mental Health Perspective on Expert Testimony. Trial Practice Course, Loyola University,
       Chicago School of Law, Chicago.
1997   A Mental Health Perspective on Expert Testimony. Trial Practice Course, Loyola University,
       Chicago School of Law, Chicago.
1996   Forensic interviewing of children who may have been sexually abused (one day), St.
       Tammany Children's Advocacy Center, New Orleans, LA.
1996   Treatment of sexually abused girls (two half days), Vista Maria Residential Treatment Center,
       Detroit
1996   Forensic evaluation of children who may have been sexually abused, (two days), Navy Family
       Advocacy Program, Annapolis Naval Academy.

1996   <u>Teleconference: Children's Memory and Suggestibility.</u> Medical College of Ohio, Toledo, OH.

1996   <u>A Mental Health Perspective on Expert Testimony.</u> Trial Practice Course, Loyola University, Chicago School of Law, Chicago.

1996   <u>Treatment of the Sexually Abused Child.</u> Monroe County Intermediate School District, Monroe, MI.

1996   <u>Resiliency in Sexually Abused Children</u>. University of Michigan Flint and Mott Children's Health Center, Flint, MI.

1996   <u>Child Sexual Abuse.</u> Muskegon County Family Independence Agency & Catholic Social Services, Muskegon, MI.

1996   <u>Survivors of Child Sexual Abuse: Preparing Adolescents for Independence</u>, Region 5 Family Independence Agency, Saginaw, MI.

1995   <u>An overview of Child Sexual Abuse</u>, Civitas ChildLaw Center, Loyola University, Chicago.

1995   <u>The Art and Science of Forensic Interviewing</u>, Direct Practice with the Sexually Abused Child, University of Michigan, Ann Arbor, MI.

1995   <u>Interviewing Children who May Have Been Sexually Abused,</u> Children's Advocacy Center and Department of Child and Family Services, Philadelphia

1995   <u>Assessing Allegations of Sexual Abuse.</u> Foothills Child Abuse Council, Pasadena, CA.

1995   <u>Allegations of Sexual Abuse in Divorce.</u> Giarretto Institute and Children's Institute International, Los Angeles, CA.

1995   <u>Working with Non-abusive Parents.</u> Ausbildungsinstitut fur systemische Therapie und Beratung, Zurich, Switzerland.

1995   <u>Paedophilia: Assessment and Intervention.</u> Ausbildungsinstitut fur systemische Therapie und Beratung, Zurich,Switzerland.

1995   <u>Case consultation.</u> Ausbildungsinstitut fur systemische Therapie und Beratung, Zurich.

1995   <u>Sexual Abuse and Teen Mothers.</u> Empowering Teen Parents: Dependency to Self-sufficiency, MDSS, E. Lansing, MI.

1995   <u>Interviewing sexually abused children.</u> Tennessee Chapter of the American Professional Society on the Abuse of Children.(1 day) Nashville, TN.

1995   <u>Assessment: Interviewing children about possible sexual abuse</u>. National Resource Center on Child Sexual Abuse. (2 days) Huntsville, AL.

1994   <u>Interviews mit Kindern bei Verdacht auf sexuelle Ubergriffe</u>. Ausbildungsinstitut fur systemische therapie und beratung. (2 days) Zurich, Switzerland.

1994   <u>Ritual abuse: Research findings, controversies, and case management strategies</u>. Children's Advocacy Center. (1 day) Chattanooga.

1994   <u>Age appropriate interviewing of child victims</u>. National Resource Center on Child Sexual Abuse. (1 day), Traverse City, MI.

1994   <u>Allegations of Sexual Abuse in Divorce</u>. Coalition for Accuracy in Abuse. Ann Arbor, MI.

1994   <u>Diagnosis and Treatment of Sexually Abused Children</u>. Monroe County Intermediate School District: Tenth Annual In Service. (1/2 day) Monroe, MI.

1994   <u>Extrafamilial sexual abuse</u>; <u>Sexual Abuse and Divorce</u>. University of Michigan School of Social Work Spring-Summer Symposium. (2 days) Ann Arbor, MI.

1994   <u>Treating Child Sexual Abuse.</u> Community Care Services. (1 day) Romulus, MI.

1994   <u>The Backlash and its Relevance: Child Sexual abuse: Recent research and state of the art practice</u>. Illinois Coalition against Sexual Assault. (1 day) Chicago.

1994   <u>Comprehensive Child Sexual Abuse Intervention: Advanced Training in the Multidisciplinary Approach</u>. National Resource Center on Child Sexual Abuse. (2 days) Huntsville, AL.

1994    Diagnosis and Treatment of Child Sexual Abuse. Monroe County Intermediate School District. (1/2 day) Monroe, MI.

1994    Assessment of allegations of sexual abuse. St. Joseph Mercy Hospital, Pontiac, MI.

1994    Sexual Abuse of Children and Adults, with Diane Shoemaker, A.C.S.W. Sexual Assault Prevention and Awareness Center, University of Michigan, Ann Arbor, MI.

1994    Assessment and Intervention of Sexually Abused Children in the School System, (1 day). Michigan Association of School Psychologists and Michigan Association of School Social Workers. Grayling, MI.

1994    Sexual abuse allegations in divorce, (1 day). University of Michigan School of Social Work Continuing Education, Ann Arbor, MI.

1994    Treating child sexual abuse: The use of play therapy techniques, (1 day). Community Care Services, Romulus, MI.

1993    Child physical and sexual abuse, (3 days). United States Navy Family Advocacy Program. Keflavik, Iceland.

1993    Assessing child sexual abuse cases. Charter North Hospitals. Anchorage, AL.

1993    Child sexual abuse assessment and treatment, (2 days). American Prosecutors Research Institute. Morgantown, W. VA.

1993    Indicators of child sexual abuse. University of Iowa Hospitals, Division of Developmental Disabilities. Iowa City.

1993    Sexual abuse in religious settings. United Methodist Church. Lansing, MI.

1993    Indicators of child sexual abuse. United Methodist Church. Lansing, MI.

1993    Use of anatomical dolls and other media in assessing children suspected of being sexually abused, (one half day). Jackson County Department of Social Services. Jackson, MI.

1993    Ritual abuse, (1 day). Kent County YWCA Sexual Abuse Treatment Program. Grand Rapids, MI.

1993    Sexual abuse: Prevalence and Indicators. St. John's Hospital. Detroit.

1993    Assessment of Child Sexual abuse. (1 day) Essex County Children's Aid Society. Windsor, Ont., Canada.

1993    Physical and sexual abuse of children. (3 days) United States Navy Family Advocacy Program. Garmisch, Germany.

1993    Treatment of child sexual abuse in a forensic context. Jackson County Catholic Social Services. Jackson, MI.

1993    Assessment of Sexually Abused Children, (half day). Michigan Chapter of the NASW Annual Conference. Traverse City, MI.

1992    Treatment of the sexually abused child. (2 days) Sarnia-Lampton Child Abuse Council. Sarnia, Ont., Canada

1992    Assessment and treatment of child sexual abuse. (2 days)Top of Michigan Children's Agencies. Shanty Creek, MI.

1992    Identification, Assessment, and Treatment of Maltreated Children. (4 days) LaPeer County Community Mental Health. LaPeer, MI.

1992    Identification and Intervention with the Sexually Abused Child. (1 day) Kinderspital, Department of Psychiatry. Zurich, Switzerland.

1992    The Sexual Offender: Assessment and Treatment. (2 days) Institut fur Ehe und Familie. Zurich, Switzerland.

1992    Interviewing Children Alleged to have been Sexually Abused. (1 day) American Professional Society on the Abuse of Children (Michigan Chapter). Lansing, MI.

1991   New Developments in Child Abuse and Neglect Assessment. (1 day) Marquette County Child Abuse and Neglect, Marquette, MI.

1991   Child Sexual Abuse. (1.5 days) Tennessee Network for Child Advocacy, Nashville, TN.

1991   Permanency Planning for the Sexually Abused Child. (1 day) Michigan Association of Court Appointed Special Advocates. Kalamazoo, MI.

1991   Diagnosis and Treatment of Child Sexual Abuse. (2 days) Sarnia-Lampton Child Abuse Council. Sarnia, Ont. Canada.

1991   Assessing Children Alleged to Have Been Sexually Abused. (1 day) Alpena County Prosecutor's Office, Alpena, MI.

1991   Evaluating Children for Sexual Abuse. Wayne County Clinic for Child Study, Detroit, MI.

1990   Providing Expert Testimony in Court. Children's Center of Michigan, Detroit, MI.

1990   False Allegations of Sexual Abuse. Children's Center of Michigan, Detroit, MI.

1990   Ritual Abuse of Children. Children's Center of Michigan, Detroit, MI.

1990   New Knowledge About Child Sexual Abuse. Essex County Child Abuse Council, Windsor, Ont, Canada.

1990   Treatment of Child Sexual Abuse. Livingston County Community Mental Health, Brighton, MI.

1990   Child Maltreatment: Physical and Sexual Abuse. Michigan Psychological Association, Novi, MI.

1990   Treatment of Sexually Abused Children. Sarah Fisher Home, Detroit, MI.

1990   Emotional Maltreatment of Children. Washtenaw County Council for Children, Ann Arbor, MI.

1990   Female Perpetrators of Sexual Abuse. Children's Center of Michigan, Detroit.

1990   Allegations of Child Abuse in Divorce. University of Michigan Continuing Education in the Human Services, Detroit.

1990   Treatment of Sexually Abused Children. Livingston County Community Mental Health, Howell, MI.

1990   Adolescents and Child Sexual Abuse. Michigan Runaway Network, Lansing, MI.

1990   The Diagnosis and Treatment of Adolescent Sex Offenders. Windsor-Essex O.A.P.S.W. and the Roman Catholic Children's Aid Society, Windsor, Ont., Canada.

1990   Ritual Abuse of Children. Eastwood Community Clinic, Detroit.

1989   Child Sexual Abuse. Shiawassee County Department of Social Services, Shiawassee, MI.

1989   Critical Issues in Child Sexual Abuse. Interdisciplinary Project on Child Abuse and Neglect, Detroit.

1989   Interviewing Victims of Child Sexual Abuse. Child Abuse and Neglect Council of Oakland County, Pontiac, MI.

1989   Child Sexual Abuse: Diagnosing True and False Allegations. Ottawa County Child and Family Services, Holland, MI.

1989   Child Sexual Abuse: An Overview. Washtenaw County Council for Children, Ann Arbor, MI.

1989   A Generic Model of Child Welfare Service Delivery. University of Michigan Continuing Education in the Human Services, Ann Arbor, MI.

1989   Child Sexual Abuse, (2 days) with Don Duquette, J.D., Northwest Region Council on Child Abuse and Neglect, Petoskey, MI.

1989   Community Approach to Child Sexual Abuse, with others, (2 three day sessions), Interdisciplinary Project on Child Abuse and Neglect, Escanaba, MI, and Ann Arbor, MI.

1988   Emotional Maltreatment of Children. Michigan State Department of Social Services, Grand Rapids, MI.

1988   SAID Syndrome, Fact or Fallacy. Kent County Council for the Prevention of Child Abuse and Neglect and Grand Valley State College, Grand Rapids, MI.

1988    <u>Female Perpetrators of Sexual Abuse</u>. Ypsilanti Regional Psychiatric Hospital, Ypsilanti, MI.

1988    <u>Community Approach to Child Sexual Abuse</u>, two sessions of three days, University of Michigan Interdisciplinary Project on Child Abuse and Neglect, Ann Arbor, MI.

1988    <u>Adolescent Sex Offenders and Prevention of Sexual Abuse</u>. National Council on Child Abuse and Neglect Workshop for Challenge Grantees, Washington, DC.

1988    <u>Sexual Abuse of Children: A Victim-Centered Approach</u>, with Lisa D'Aunno, JD, (three days) University of Michigan Continuing Education in Human Services, Ann Arbor, MI.

1988    <u>Organizing Intervention for Sexually Abused Children</u>. Wexford County Child Abuse Council, Cadillac, MI.

1988    <u>Child Neglect</u>. Lucas County Child Abuse Council, Toledo, OH.

1988    <u>Emotional Abuse and Neglect</u>. Michigan Child Abuse Council, Battle Creek, MI.

1988    <u>Treatment of Sexually Abused Children</u>. Huron Valley Child Guidance Clinic, Ann Arbor, MI.

1988    <u>False Allegations of Sexual Abuse</u>. Macomb County Child Abuse Council, Mt. Clemens, MI.

1987    <u>Child Abuse and Neglect</u>. St. Joseph Hospital SCAN Team, Flint, MI.

1987    <u>Emotional Abuse and Neglect</u>. State of Michigan Foster Care Review Boards, Grand Rapids, MI.

1987    <u>False Allegations of Sexual Abuse</u>. University of Michigan Child Protection Team, Ann Arbor, MI.

1987    <u>Follow-Up Training for Community Based Child Sexual Abuse Teams</u>. University of Michigan, Interdisciplinary Project on Child Abuse and Neglect, Ann Arbor, MI.

1987    <u>Adolescent Maltreatment</u>. Michigan Committee for the Prevention of Child Abuse, Lansing, MI.

1987    <u>Community Approach to Child Sexual Abuse</u>. (three sessions of three days), University of Michigan, Interdisciplinary Project on Child Abuse and Neglect, Ann Arbor, MI.

1987    <u>Interviewing Sexually Abused Children</u> Jackson County Department of Social Services, Jackson, MI.

1987    <u>Validating Cases of Sexual Abuse</u>. Essex County Child Abuse Council, Windsor, Ont., Canada.

1986    <u>The Family of the Sexually Abused Child</u>. Cleveland Public Schools, Cleveland, OH.

1986    <u>The Effects of Sexual Abuse Through the Life Cycle</u>. Cleveland Public Schools, Cleveland, OH.

1986    <u>Child Sexual Abuse</u>. (one day), Lorain County Community College, Lorain, OH.

1986    <u>Child Sexual Abuse</u>. (one day) Williams County Children's Services Board, Williams County, OH.

1986    <u>Outreach Treatment in Child Sexual Abuse</u>. Down River Guidance Center, Wayne County, MI.

1986    <u>Psychological Evaluations in Child Abuse and Neglect</u>. Lucas County Child Abuse Prevention Center, Toledo, OH.

1986    <u>Community Approach to Child Sexual Abuse</u>, (two sessions of three days, with others). University of Michigan, Interdisciplinary Project on Child Abuse and Neglect, Ann Arbor, MI.

1985    <u>Indicators of Child Sexual Abuse</u>. Beacon Day Treatment Center, Wayne County, MI.

1985    <u>Investigating Cases of Sexual Abuse.</u> (one-half day) Lucas County Children's Services Board, Toledo, OH.

1985    <u>Investigating Cases of Physical Abuse</u>. (one-half day) Lucas County Children's Services Board, Toledo, OH.

1985    <u>Psychological Evaluations in Child Protection Cases</u>. (one-half day) Lucas County Children's Services Board, Toledo, OH.

1985    <u>Sexual Abuse Allegations in Child Custody Cases</u>, with others (one-half day) Ann Arbor Center for the Family, Ann Arbor, MI.

1985   <u>Assessment of Child Sexual Abuse</u>. Children's Psychiatric Hospital, University of Michigan, Ann Arbor, MI.

1985   <u>Developing Multidisciplinary Child Abuse and Neglect Teams</u>. (one day) University of Michigan, Interdisciplinary Project on Child Abuse and Neglect, Grayling, MI.

1985   <u>Follow-Up Training Session for Multidisciplinary Teams</u>, with Interdisciplinary Project on Child Abuse and Neglect faculty (two sessions of two days) University of Michigan, Interdisciplinary Project on Child Abuse and Neglect, Ann Arbor, MI.

1985   <u>The Effects of Child Sexual Abuse</u>. Ypsilanti Regional Psychiatric Hospital, Ypsilanti, MI.

1984   <u>Child Sexual Abuse</u>. Mercywood Hospital, Ann Arbor, MI.

1984   <u>Child Sexual Abuse</u>, (one day). Monroe County Child Abuse and Neglect Council, Monroe, MI.

1984   <u>Use of Anatomically Explicit Dolls in Sexual Abuse Diagnosis</u>. Livingston County Child Abuse and Neglect Council, Howell, MI.

1984   <u>Intake Management in Child Welfare</u>. Lucas County Children's Services Board, Toledo, OH.

1984   <u>Multidisciplinary Approaches to Foster Care</u>. Michigan Department of Social Services, Lansing, MI.

1984   <u>Assessment and Treatment of Child Sexual Abuse</u>, (two half days) Community Mental Health, Lincoln Park, MI.

1984   <u>Assessment and Treatment of High Risk Infants and Toddlers</u>, with Vivian Shapiro, MSW, (two days) University of Michigan Continuing Education in Human Services, University of Michigan, Ann Arbor, MI.

1984   <u>Recent Research in Child Maltreatment</u>. University of Michigan Science Research Club, University of Michigan, Ann Arbor, MI.

1984   <u>Diagnosis and Treatment of Child Sexual Abuse</u>. (one day) Jefferson County Children's Services Board, Jefferson County, OH.

1984   <u>Long-term Treatment Issues in Child Sexual Abuse</u>. (one day) Family Outreach Center Annual Workshop, Grand Rapids, MI.

1984   <u>Interdisciplinary Management of Child Abuse and Neglect</u>, with Interdisciplinary Project on Child Abuse and Neglect faculty. (two sessions of three days) University of Michigan, Interdisciplinary Project on Child Abuse and Neglect, Ann Arbor, MI.

1984   <u>Sexual Abuse in Institutions</u>. Michigan Department of Social Services, Bureau of Licensing, Lansing, MI.

1983   <u>Diagnosis and Case Management in Child Sexual Abuse</u>. (three days) University of Michigan Continuing Education in Human Services, Ann Arbor, MI.

1983   <u>Diagnosis of Child Sexual Abuse</u>. Jackson County Child Abuse and Neglect Prevention Council, Jackson, MI.

1983   <u>Child Sexual Abuse.</u> Lenawee County Child Abuse and Neglect Council, Adrian, MI.

1983   <u>Differential Diagnosis of Child Sexual Abuse</u>. Livingston County SCAN Team, Howell, MI.

1983   <u>Differential Diagnosis in Child Abuse and Neglect</u>, (three sessions of one-half day) Lucas County Children's Services Board, Toledo, OH.

1983   <u>Protocol for Evaluating Allegations of Physical Abuse</u>. (two sessions of one-half day) Lucas County Children's Services Board, Toledo, OH.

1983   <u>Protocol for Evaluating Allegations of Sexual Abuse</u>. (one day) Lucas County Children's Services Board, Toledo, OH.

1983   <u>Child Sexual Abuse</u> (three days) Niagara Region Child and Family Services, Niagara, Canada.

1983   <u>Child Sexual Abuse</u>. University of Michigan Continuing Medical Education, Ann Arbor, MI.

1983   <u>Child Sexual Abuse</u>. (two sessions of two hours) York Woods, Ypsilanti, MI.

1983   <u>Diagnosis of Child Sexual Abuse</u>. Woodcreek Counseling Service, Farmington, MI.

1982   <u>Treatment and Child Sexual Abuse</u>. (one day) Alpena County Council for Children at Risk, Alpena, MI.

1982   <u>In-Service on Child Sexual Abuse</u>. Ann Arbor Schools, Ann Arbor, MI.

1982   <u>Child Sexual Abuse</u>. (two days) Hamilton County Department of Public Welfare, Cincinnati, OH.

1982   <u>Social Work Intervention with Involuntary Clients</u>. (two days) University of Michigan Continuing Education in the Human Services, Ann Arbor, MI.

1982   <u>Workshop on Child Sexual Abuse</u>. Washtenaw County Coordinating Council for Child at Risk, Ann Arbor, MI.

1981   <u>Emotional Abuse and Neglect: Interdisciplinary Collaboration in Child Abuse and Neglect</u>. (one day) Lucas County Children's Services Board, Toledo, OH.

1981   <u>Emotional Abuse and Neglect</u>. (one day) Michigan Department of Social Services, Traverse City, MI.

1981   <u>Interdisciplinary Approaches to Permanency Planning for Children</u>, with Donald Duquette, JD, (four sessions of one day workshops) Michigan Department of Social Services, Detroit, Lansing, Saginaw, Traverse City, MI.

1981   <u>Multidisciplinary Management of Child Abuse and Neglect</u>, with Interdisciplinary Project on Child Abuse and Neglect faculty. (two training sessions of three days) Michigan Department of Social Services, Detroit, Gaylord, MI.

1981   <u>Interdisciplinary Management of Child Sexual Abuse</u>, with Ellen Tickner, JD. (three day symposium) University of Michigan Continuing Education in the Human Services, Ann Arbor, MI.

1980   <u>Child Sexual Abuse</u>. (one day) Crawford County Consortium, Grayling, MI.

1980   <u>Child Sexual Abuse: Assessment and Treatment</u>. (one-half day) Michigan Department of Social Services, Detroit, MI.

1980   <u>Multidisciplinary Management of Child Abuse and Neglect</u>, with Interdisciplinary Project on Child Abuse and Neglect faculty. (three sessions of two days) Michigan Department of Social Services, Ann Arbor, Lansing, Grand Rapids, MI.

1980   <u>Treatment of Child Sexual Abuse</u>. (one-half day) Michigan Department of Social Services, Marquette, MI.

1980   <u>Treatment of Child Sexual Abuse</u>. (one-half day) Michigan Department of Social Services, Kalamazoo, MI.

1980   <u>Interdisciplinary Management of Child Sexual Abuse</u>, with Donald N. Duquette, JD. (three day symposium) University of Michigan Continuing Education in the Human Services, Ann Arbor, MI.

1980-   <u>Multidisciplinary Management of Child Abuse and Neglect</u>. (Ten sessions of three day
1984   workshops on for professionals from forty Michigan counties) University of Michigan Interdisciplinary Project on Child Abuse and Neglect.

1979   <u>Expert Witnessing in Cases of Child Abuse and Neglect</u>. (two sessions), Beth Mosher Clinic, Jackson, MI.

1979   <u>Child Abuse and Neglect</u>, with others. (two day workshop) Eastern Michigan University and Washtenaw Community College Continuing Education Programs, Ypsilanti, MI.

1978   <u>Intervention Strategies in Child Abuse and Neglect</u> with M. L. Bowden, ACSW. (one day workshop), Child Abuse Prevention Center, Toledo, OH.

1978    <u>Child Abuse and Neglect for Mental Health Professionals</u>. (one day workshop)        Institut fur Ehe und Familie, Zurich, Switzerland.

1978    <u>Professional Roles in Child Abuse and Neglect</u> with Donald Duquette, J.D. (two day workshop) Northwest Detroit Interagency Council, Detroit, MI.

1978    <u>Child Abuse and Neglect.</u> University of Michigan Continuing Education for Physicians; Family Practice Seminars, Ann Arbor, MI.

1978    <u>Child Abuse and Neglect.</u> Emergency Room Physicians' Seminars, Ann Arbor, MI.

1978    <u>The Use of Network Therapy with Abusive and Neglectful Families.</u> University of Michigan Hospital, Ann Arbor, MI.

1978    <u>The Use of Network Therapy with Abusive and Neglectful Families.</u> Washtenaw County Catholic Social Services, Ann Arbor, MI.

1977    Monthly one-half day training sessions for Washtenaw County Protective Services and
1980    Child Welfare Workers, Ann Arbor, MI.

1977    Monthly day-long training sessions for Wayne County Protective Services Workers,
1980    Detroit, MI.

1977    <u>Case simulation</u> with Interdisciplinary Project on Child Abuse and Neglect. Michigan Department of Social Services, Governor's Conference on Community Networks for Child Abuse and Neglect, Lansing, MI.

1977    <u>Workshop on Child Abuse and Neglect</u>, with Paul Glasser, Ph.D., Donald Duquette, J.D., University of Michigan Mental Health Skills Lab, Detroit.

1971    <u>In-Service Teacher Training in Behavior Modification in Classroom Management</u>, with Sally Iman, M.S.W., Jackson County Elementary Schools, Jackson, MI.

**LICENSURE/CERTIFICATIONS**

Academy of Certified Social Workers, National Association of Social Workers (NASW); I.D. # 881396606

Licensed Clinical and Macro Social Worker--State of Michigan; I.D. # 6801061768; L880104

Diplomate in Clinical Social Work, National Association of Social Workers (NASW)

National Register of Clinical Social Workers, National Association of Social Workers (NASW)

**MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS**

National Association of Social Workers

American Professional Society on the Abuse of Children (APSAC)
    Board of Directors 1991-1997; Executive Committee 1992-1997
x    Advisory Board 1998-2008
    Co-chair, Guidelines Task Forces 1994-2000
    Board of Directors, Michigan Chapter of APSAC 1997-2001
    Board of Directors, 2013-2015
    Executive Committee 2014-2015
    Chair, Guidelines Task Forces 2013-2015

Society on Social Work and Research

International Society for the Prevention of Child Abuse and Neglect

National Organization of Forensic Social Work

American Association of Orthopsychiatry

Council on Social Work Education

July, 2015.

**Elizabeth Ann Toplyn, Ph.D., L.P.**
**4955 Hickory Pointe Blvd**
**Ypsilanti, MI 48197**
**734-434-3024**

**EDUCATION:**

Ph.D. in Clinical Psychology, 1997, New School for Social Research, 65
Fifth Avenue, New York, New York 10001, 1997.
B.A. in Psychology, University of Michigan, Ann Arbor, Michigan, 1985.

**LICENSES**

Michigan License as Full Psychologist, 2006.
New York License, 1998.

**PROFESSIONAL EXPERIENCE**:

Family Assessment Clinic at Catholic Social Services, Ann Arbor, MI, April 2014 to present.
Provide psychological evaluations for select cases

Center for Forensic Psychiatry, Saline Michigan, April 2009 to present.
Conduct supervised court ordered criminal responsibility and competency
evaluations
Provide inpatient group treatment.
Provide psychological assessment of inpatients as needed.

Private Practice, Ann Arbor, MI, October 2008 to present.
Provide individual and family therapy to adults and children.

Catholic Social Services, Ann Arbor, MI, Psychologist February 2007-April 2009.
Saw adults and children for individual therapy.
Diagnoses include substance abuse, anxiety problems, depression, work and
relationship problems.

Daily Life Center, 5038 Miller Rd. Flint, MI, September 2006-February 2007.
Provided psychotherapy for individuals, children and couples.

Private Practice, New York, NY, May 2000-June 2006.
Provided play therapy and psychotherapy to children and adults.
Specialized in anxiety disorders and depression with adults.
Practice also focused on children with adoption issues and learning disabilities.
Worked with clients referred by EAP programs for difficulties on their job.

Che Senior Psychological Services, Brooklyn, NY October 2004-June 2006.

Provided assessment and psychotherapy to residents of nursing homes and rehabilitation facilities.
Included work with significant number of chronically mentally ill.

New York Foundling Hospital, Bronx, NY, October 1999-October 2005.
Provided psychological assessment and psychotherapy for children in foster care.
Children ranged in age from 0 through 21.
Provided screening batteries to assess developmental delays.
Participated in and led clinical team meetings.
Developed extern program and supervised pre doctoral candidates.

Metropolitan Center for Mental Health, New York, NY, July 1994-May2000.
Provided psychotherapy and intakes in outpatient mental health clinic.
Provided suicidality assessments at time of intakes. Serviced both children and adults.
Provided therapy to clients residing in therapeutic community treating drug addiction.

Catholic Charities, Thea Bowman Center, Brooklyn, NY, June 1998-September 1999.
Participated in and administered grant funded program aimed at providing foster care children with mental health services in their primary care setting.
Collaborated care with family practitioner and nurse practitioner.
Provided psychological assessment to assess developmental and speech delays.
Provided psychotherapy to children.
Responsible for administrative duties in program.
Supervised part time clinician on grant.

Lakeside Family and Children's Services, Brooklyn, NY, October 1993-September 1995.
Provided psychological assessment to children in foster care.
Provided crisis intervention and short term psychotherapy to select group of children.
Collaborated with caseworkers and provided direction in regards to mental health needs of children on their caseloads.

Renaissance Health Care Network/Sydenham, New York, NY, October 1993-June 1998.
Provided psychological assessment in developmental evaluation unit.
Assessed children ages 0-21 for developmental delays, speech delays, emotional issues and learning disabilities.
Did individual and group psychotherapy with select group of children.
Provided group therapy supervision to M.A. level extern. Provided talented and gifted assessments as well.

Creedmoor Psychiatric Center, Queens Village, NY, APA approved internship September 1992 -August 1993.
Provided psychotherapy and assessment to patients on Creedmoor's transitional community preparation unit.
Provided weekly psychotherapy to outpatient chronically mentally ill population.

**TEACHING EXPERIENCE**:

Adjunct Faculty, College of New Rochelle, New York, NY, September 1999-September 2000.
Taught Introductory Psychology course to undergraduates.
Students included diverse student body and adult students.


Manhattan Borough of Community College, New York, NY, 1996
Taught Developmental psychology to nursing students in joint program with Harlem Hospital.


Berkeley College, New York, NY, 1989-1992.
Taught introductory psychology, psychopathology, group dynamic, social psychology to community college students.

**REFERENCES AVAILABLE UPON REQUEST**

**MARY B. ORTEGA, M.S.W., L.M.S.W., A.C.S.W.**
O: (734) 998-9703 – (734) 926-4650
FAX: (734) 998-9710 - (734) 971-2730

**EDUCATION:**
1986 M.S.W. University of Michigan, Ann Arbor, MI
Major: Interpersonal Practice with Families and Groups
Minor: Community Organization
1977 B.A. Psychology, University of Michigan, Ann Arbor, MI

**EMPLOYMENT:**
**Administrative/Clinical:**
2013-Present Clinic Administrator/Clinical Social Worker
Family Assessment Clinic
Catholic Social Services Washtenaw County
2013-Present Clinic Administrator
Family Assessment Learning Laboratory for Education and Research
2011-Present Child Welfare Learning Community Coordinator
School of Social Work, University of Michigan
2002-2013 Clinic Administrator/Clinical Social Worker
Family Assessment Clinic
School of Social Work, University of Michigan
2000-2008 Clinical Administrator/Clinical Social Worker II
1992-1999 University Center for the Child and the Family
Rackham/IHA, University of Michigan

**Teaching/Instruction:**
2014-Present Part-time Lecturer
School of Social Work, Eastern Michigan University
2012-Present LEO II Faculty
School of Social Work, University of Michigan
2004-2005 Teaching Fellow, Field Project in Alaska
Global Intercultural Experience for Undergraduates (GIEU)
University of Michigan
2001-2005 Adjunct Faculty
School of Social Work, University of Michigan
1999-2000 Visiting Faculty

School of Social Work, New Mexico Highlands University
(February, 2009-Consulted on BSW/MSW Field Placement Outcome Measure)



  

**Family Assessment Clinic** | 4925 Packard Road, Ann Arbor, MI 48108 | Direct: 734.926.4650 | Main: 734.971.9781 | F: 734.971.2730 | www.csswashtenaw.org

Date: March 17, 2017

Case name: M_____/P_____ family

Contractual arrangement: The Family Assessment Clinic through Co-Director, Kathleen Coulborn Faller, Ph.D., was contacted by James R. Marsh of the Marsh Law Firm on February 3, 2015 to undertake a document review and family member assessments related to the exploitation of the M_____ children in pornography. The contract specifies a fee of $295 an hour for work on this case (document review, interviews, testing, report writing, deposition, and court testimony) paid to Catholic Social Services of Washtenaw County. No personal compensation is received for this review. The Clinic's administrative support and internal consultation are not billed.

Brief biographical sketch: KATHLEEN COULBORN FALLER, Ph.D., A.C.S.W., D.C.S.W., is Marion Elizabeth Blue Professor Emerita at the University of Michigan. She is also Co-Director of the Family Assessment Clinic at Catholic Social Services of Washtenaw County.

Dr. Faller is involved in research, clinical work, teaching, training, and writing in the area of child welfare, child sexual abuse, and the child welfare workforce. She conducts case record reviews where the issues related to child sexual abuse, other types of child maltreatment, and child welfare and social work best practice. She has conducted over 300 juried conference presentations at state, national, and international conferences and over 250 workshops.

She is the author, editor or co-editor of 10 books, including *Social Work with Abused and Neglected Children* (The Free Press, 1981), *Child Sexual Abuse: An Interdisciplinary Manual for Diagnosis, Case Management, and Treatment* (Columbia, 1988), *Understanding Child Sexual Maltreatment* (Sage, 1990), *Child Sexual Abuse: Intervention and Treatment* (Department of Health and Human Services, 1993), the American Professional Society on the Abuse of Children Study Guide: *Interviewing Children Suspected of Having Been Sexually Abused* (Sage, 1996), *Maltreatment in Early Childhood: Tools for Research-based Intervention* (Haworth Press, 2000), *Understanding and Assessing Child Sexual Maltreatment, Second Edition* (Sage, 2003), *Interviewing Children about Sexual Abuse: Controversies and Best Practice* (Oxford, 2007), *Seeking Justice in Child Sexual Abuse: Shifting Burdens and Sharing*

*Responsibilities* (Columbia, 2010) and *Contested Issues in Child Sexual Abuse Evaluation* (2014), as well as approximately 100 research and clinical articles.

<u>Reason for referral:</u> Members of the M____/P____ family were evaluated on February 24, 2015, a little over two years ago. The interviews described in this report were conducted as a follow-up to assess the ongoing and current impact of the pornographic images of the M____ children on the victims and the family. The producers of the pornography were R_____ M____, the children's biological father, and J____ B____, a General Motors executive. Both men are currently incarcerated, but they distributed the pornography on the internet. These images of sexual abuse of the M____ girls are still available on the internet and involve scores of additional offenders who have accessed, traded, shared, and utilized the M____ children's sexual abuse images.

<u>Process of evaluation:</u> The children's mother, A____ P____, and Fiona[1] were interviewed on Mar. 17, 2017. Erin was supposed to be interviewed, but was in an auto accident and had no means of transportation. Altogether, interviews with Mrs. P____ and Fiona lasted approximately 2.5 hours, an hour and a half of which was spent with Mrs. P____, with an additional three-quarters of an hour spent with Fiona. Mrs. P____ signed releases for the interviews to be videotaped and for reports to be sent to their attorney, James Marsh. I was assisted by Caitlyn Hayes and Jason Lam; graduate student interns at the University of Michigan School of Social Work. The interns also took notes.

### **Interview with A____ P____, mother of the victims**

Mrs. P____ was asked about the current family situation, her functioning, the functioning of each of her children, her marriage, and the current impact of the downloading, sharing, and trading of sexual abuse images of her children.

<u>Current living situation:</u> Mrs. P____, Fiona, 15, her husband, A____, and their daughter, C____, now 8, now live in _____, Indiana. When interviewed 2 years ago, Mrs. P____ expressed a wish to leave the state of Michigan. This was because of the publicity related to the sexual abuse, the presence of pornographic images of her daughters on the internet, and the fact that identifying information about her girls was also shared. Mrs. P____ was fearful that one of the people who downloaded the images might kidnap her girls.

The move to _____ was prompted by a job offer in 2015 to do essentially the same work she had done in Michigan: human resources work in a health setting, but at higher pay. Mrs. P____ did not want to disrupt Erin's senior year of high school by moving, so the health system allowed her to complete some of her work from home. Mrs. P____ spent a few days a week in _____ to complete the remainder of her work; the rest of the family remained in Michigan. This arrangement ended in August, 2016 when the family, with the exception of Erin, moved permanently to _____.

---

1

Pseudonyms are used for the girls. Fiona is now 15 and her sister, Erin, is 18.

<u>Current functioning</u>: Mrs. P⬚⬚ was quite traumatized when interviewed in 2015 and is predisposed to anxiety. She was asked in the follow-up interview if she was doing well or not doing so well. She stated that in some ways things were better, but in some ways worse. She said that the knowledge of the continuing access by pedophiles to images of her daughters is a source of ongoing trauma. It has also affected her memory, especially in terms of the sequencing of events. She stated she has to compartmentalize in order to cope.

In 2015, when interviewed, Mrs. P⬚⬚ stated that one of the most traumatic aspects of the discovery of the pornography involving her girls in 2010 was the assumption that she was complicit, even though she was divorced from Mr. M⬚⬚, the children's father. After the discovery of the child pornography, she was the subject of an open child protective services case for three months, which was characterized by frequent and intrusive visits from multiple child protective workers. During this time, she was very frightened that her children would be removed. In 2015, Erin was engaging in a range of self-destructive behaviors: skipping school, having unprotected sex, and using drugs. Erin also was suffering from depression. Erin, when interviewed, had the insight to understand that these behaviors and her affect were directly related to her sexual exploitation, which included both the betrayal by her father and the knowledge that the images were being downloaded and shared.

Mrs. P⬚⬚ was fearful that Erin's behavior would result in another report to child protective services, and the past CPS involvement would be used against her. During 2016, her fear came true: there were two reports made to protective services. Erin and Fiona were sneaking out of the house at night to meet with boys, who sexually exploited them, and to use drugs. During this time, Fiona had sex with a boy who was 18 while she was underage.

Mrs. P⬚⬚ said when the first CPS case was opened, she and her husband made a safety plan which involved putting an alarm system on the windows so they would be alerted if the girls tried to go out the window. The girls outsmarted the alarm system and went out the window at least one additional time. In the morning the parents discovered that the girls were gone and called the police. When the girls came home, the police gave them a lecture which was directed especially at Erin, who was older. Erin, however, was defiant. A second CPS investigation ensued. Mrs. P⬚⬚ said she and her husband were called "perps" and she felt like a criminal. She was told she needed to take a parenting class; she observed that parenting classes don't teach how to raise children who have been sexually exploited and who are aware that pedophiles are downloading their pornographic images. She was also afraid that she would not be able to move to Indiana as the family was planning. After a follow-up visit in August, 2016, she heard nothing more from CPS.

<u>Fiona</u>: At the time of the second report, Fiona confided in her brother that she was suicidal, which he revealed to the parents. Fiona was then hospitalized in Havenwyck for about a week. Mrs. P⬚⬚ stated the hospitalization was good for Fiona. She received good care

there and was put on medication that stabilized her mood, though it made her tired. She had been suffering from depression.

The move to ▮▮▮▮▮ has also been good for Fiona. She likes her school: she is doing well academically and has decent friends. Mrs. P▮▮▮ stated that she has a boyfriend who treats her well. He lost his mother to cancer and they have a bond based upon the loss of a parent (Mr. M▮▮▮ received a sentence of 45 years for sexually exploiting his daughters).

That said, Mrs. P▮▮▮ is still worried about Fiona. She states that Fiona believes that because of her sexual exploitation, especially the fact that pedophiles are accessing the images on the internet, she is predestined to be promiscuous. She states that Fiona "hangs her value" on boys due to her father's actions and absence, as well as due to knowing how her images are being used online. Mrs. P▮▮▮ reports conversations with her daughter in which Fiona has basically told her that she doesn't know how to say no. She also is concerned that Fiona has poor boundaries with peers with regards to how much she shares about her sexual exploitation. Fiona told her about an incident from 8th grade in which a peer made a post on social media asking 'Who's f'ed Fiona?' Someone responded with 'her dad.' Mrs. P▮▮▮ said she feels "crushed" hearing about it, but she is glad her daughter can tell her these things.

Erin: Although Mrs. P▮▮▮ perceives Erin as doing better, she still has many challenges because of the sexual exploitation and the presence of her images on the internet. Before the family's move to Indiana, Erin's behavior was clearly out of control. She did not complete high school. She was destructive of property, breaking windows in the home, and assaultive. She lunged at her sister, K▮▮▮, jumping on top of her, an experience that still is a source of trauma for K▮▮▮. She would defiantly smoke pot on the family's front porch and would leave when told to stop. She broke a window in an attempt to let her friends into the house. The parents had to resort to calling the police on Erin, but Erin was "sassy to the police". On one occasion, Erin was arrested at the home and was found to be in possession of drugs. She was placed in the back of the police car where she kicked at the car window. When law enforcement told her to stop, she said she wanted to kill herself. They then took her to hospital. Mrs. P▮▮▮ was hoping the psychiatric facility would keep her and she would get help. However, she was let out after 24 hours and her behavior did not change.

Erin had one friend in particular who was arguably more self-destructive than herself. Erin had a strong desire to "rescue" this friend. Her mother advised against this relationship, but Erin felt that she had to support her because no one else was there for her. When the rest of the family moved to ▮▮▮▮▮, Erin remained in Michigan. She and her friend moved into an apartment together.

Erin's friend had a boyfriend, who had his own "unsavory friends". This group would come over and take advantage of Erin and her friend. On one occasion, Erin tried to make these people leave and they physically assaulted her. She told her landlord, who helped her file a police report. The landlord evicted Erin's friend. Now Erin lives alone in the apartment, though her boyfriend spends a lot of time there. She works long hours at ▮▮▮▮▮ in

order to pay rent. Ms. P⬛⬛ said Erin is diagnosed with bi-polar disorder and is on her medication.

One thing that has helped Erin is that she had a very good counselor, but presently she is not seeing the counselor. She also liked to draw, but she had stopped doing so. Recently, however, she gave Mrs. P⬛⬛ artwork for her birthday.

<u>Christina</u>: Christina, now 8, was 1 year old when the pornography was discovered. Mrs. P⬛⬛ reports she is doing well. She does not cope with change easily, and so Mrs. P⬛⬛ has to be sure that she has routines.

<u>D⬛  (formerly S⬛⬛</u>): D⬛ is transgender and is one of twins. He has been affected by what has happened to his family. (Mrs. P⬛⬛ did not differentiate between the effect of his younger sisters' risk-seeking behaviors, the effect of having a father who made pornography using his children, and the effect of the constant downloading of the pornography from the internet.) He was identified by Mrs. P⬛⬛ as often being a resource for his siblings. Dan is a student at ⬛⬛⬛⬛ University, majoring in criminal justice, and will graduate in May.

<u>K⬛⬛</u>: K⬛⬛ is the other twin. She suffers from anxiety. She completed an internship with Disney in Florida and currently is staying with Mrs. P⬛⬛'s parents. She was supposed to move into Erin's apartment, but did not because they don't get along. Her anxiety was exacerbated by the child pornography.

<u>Marriage:</u> We spent some time on the topic of the P⬛⬛s' marriage. Mrs. P⬛⬛ stated that she is not the person she was when she and her husband got married. The sexual abuse of her daughters and the presence of their pornographic images on the internet have changed her dramatically and have had a profound impact on their relationship. She believes that A⬛⬛ would rather not be married to the person she is today. She added that they do not have a lot of fun together. This makes her sad.

<u>Impact of the availability of sexual images of her daughters on the internet</u>: Mrs. P⬛⬛ perceives that the circle of people downloading images of her daughters is getting bigger. She continues to receive notices of new cases and progress on old cases, which she forwards to her attorney, James Marsh. She estimates she receives about 15 a day, with higher volume around the holidays. She stated she used to get a sense of control by following the cases, but now doing so primarily makes her feel overwhelmed. As a mother, she wants to write a letter to every perpetrator so that he (or she) can see there is a real person who is affected. She wishes she could attend every sentencing and read her victim impact statement, as she did during the prosecutions of Mr. M⬛⬛ and Mr. B⬛⬛. She wants to put a face on the victim so the perpetrators see there is a human being involved. She said she "feels there is no way to heal." The case (actually cases) never ends. She says sometimes she sees information about cases in the news. She is drawn toward them and feels she should be doing something, but she does not know what to do.

She does not believe her children would ever have gotten into drugs, breaking windows, or other problem behaviors had it not been for the making of pornography and its availability on the internet. She is angry over the fact her daughter, Fiona, can't say "no" to boys. "There is no way that Fiona can get over this," she said. "Just because she doesn't look like the girl in the picture anymore, it doesn't mean she not affected by this anymore. All the moments in her life will be affected by that moment." She added, "There's no way to fix or solve it." Mrs. P████ said she is convinced Fiona will seek out the wrong people. At this point, she was crying.

Mrs. P████ wants some form of justice, but she doesn't know if she believes in justice anymore. She has lost hope. She is upset that people are still passing the images around, and she has an acute awareness of the way those images are used as currency and to groom new victims. She is affected by the knowledge that these images contribute to the victimization of other children.

She was asked if she still has fears about predators tracking down her children. She said she feels safer in Indiana, but she knows that her children would be pretty easy to track. She tries to tell herself that the predators are interested in young children, so her teenage and adult children are no longer targets. This is only moderately reassuring, however, and she still feels a surge of anxiety at anything unexpected. For example, if she gets a call from an unknown number on her cellphone, she assumes it is related to the pornography. She is traumatized by white vans, which is what the children's father drove.

### Interview with Fiona P████, the primary victim

Fiona was interviewed for about 45 minutes. She was told that she would be asked a lot of questions, but she did not have to answer a question if she did not want to. She was asked about the move to ████████, her school, her friends, what she remembered about her abuse, her relationships with her siblings, and the future. Fiona was soft-spoken and somewhat reticent, but cooperative. She has matured markedly over the last two years.

Current living situation: Fiona and her family moved to ████████ in August of 2016. She described the move to ████████ in positive terms, although later she said that she had not wanted to move beforehand. She is happier there. She said the people in ████████ are nicer and described her friends in Michigan as mean and not nice to her. People in ████████ care about her more. Her family consists of her mother, her stepfather, and her half-sister, C██████.

It does not seem that they do a lot together as a family. They watch TV and sometimes go to the mall. Her mother cooks and cleans. Fiona has some chores, cleaning her room and her bathroom, sometimes helping her mother with cooking, and putting dishes in the dishwasher.

School: Fiona said her school is one of the top 100 high schools in the country. She is a freshman and the school has a center for freshman, which has made the transition to high school easier. She has made lots of friends at school. When asked about what courses she is taking, she said algebra, geography, biology, gym, and Spanish. This is her first year of Spanish. She said that she gets lots of A's and does well in everything except algebra. She passed algebra, but will retake it because she does not want a low grade to impede her ability to go to college.

Friends: When asked about friends and dating partners, Fiona said she has a few friends and a boyfriend. She does not hang out with her friends that much outside of school. When she does, they go to each other's houses, talk to each other, and go to the mall. She has no best friend yet. She said she has had a boyfriend since she first moved to ▮▮▮▮▮▮▮▮. He is different from the boys in Michigan: they were exploitive, but he cares more about her. She said that her new friends do not use drugs, so she has also stopped using drugs. She said she does not miss it. Fiona reports that she uses social media to a moderate extent, but that she does not post much and that her usual means of communicating with her friends is via texting, rather than online.

In general, Fiona described her peers in Indiana as being nicer than peers in Michigan. Peers in Michigan "hated" her. As an example, Fiona described an incident from 8th grade. She was dating a boy with whom she had a sexual relationship. He had sex with another girl who was very popular. Fiona broke up with him and he began dating the popular girl. Fiona had sex with him again toward the end of the school year, and the girl found out. This spurred a fight which Fiona's sister Erin also became involved in. The girl sent two cars of people to Fiona's house. Fiona finished the account by saying, "Then it got bad."

Relationship with Erin: Fiona was asked a little about the trouble she got into with Erin. The two have a strong bond; out of all her siblings, she is closest with Erin. She said in Michigan they did a lot of drugs and "crazy stuff." They got into a lot of fights. They had sex with boys. Fiona reported that Erin did drugs she had never heard of, and though she herself did not use drugs to the same extent, she still did use them a lot. She described arriving at school while high on Xanax, which resulted in her being sent to see the school counselor. The counselor called child protective services. Fiona states the counselor also told her peers' parents that they should not be friends with her.

During this time, Fiona was experiencing severe depression related to her history of sexual exploitation. In summer, she ended up in the hospital after disclosing to her brother, who disclosed to her parents, that she was suicidal. Fiona said the people were really nice there and helped her. She got on medication which made her depression better. She is still on medication.

When asked if Erin ever comes to ▮▮▮▮▮▮▮, she said no. Fiona comes to Michigan on weekends to see Erin. She stays at her apartment. There is no furniture so she sleeps on the floor. They hang out and watch movies. She does not do drugs when she visits. Erin works a lot at ▮▮▮▮▮▮▮.

Fiona talked a little about Erin's auto accident. She said Erin was racing and hit a patch of ice and went off the road, totaling her car. Erin was not hurt. Now her mother has to buy Erin a new car. Her mother is stressed because she still has a house in Michigan, bought a house in ██████████, and now has to buy Erin a new car.

C██████: Fiona has a less than positive view of C██████. She described her as "snobby," and with an attitude toward her parents. She stated she never would have acted that way at 8. Her stepdad allows it and babies C██████, but mom tries to stop her. Sometimes C██████ hits her parents. When asked about a specific instance, Fiona described an incident when C██████ was kicking Fiona, her mother took away C████████'s iPad, and C██████ had "a complete fit." She added that when C██████ is told to go to her room, she says, "No," and she gets mad really easily.

The sexual exploitation: Fiona was asked what she remembered about the sexual exploitation. She reported more recollections than she did two years ago. She said that much of her memory was vague, but she remembered one incident. She said she was at her dad's house for the weekend, and none of her siblings were there. She remembered J██ because he had come over before. Her dad had bought her a Lego set because she liked Legos. The three of them were sitting on the floor making things with Legos, and she told her father her back hurt. Her dad rubbed her back but then gave her medication for her back. She fell asleep. She remembers waking up and she had thrown up all over herself. Her dad gave her more medication and she fell asleep again. She remembers waking up again and being naked with J██ on top of her. J██ left the room and said, "C███ (her father's nickname), she's up." Fiona said she felt confused and didn't think about it.

When asked about pictures, she remembered a time when she was wearing a bathing suit because there was a pool at her dad's house. She was asleep and the flash from the camera woke her up. She asked why her dad was taking a picture of her. She now understands they were making child pornography. She also said she knows they took pictures and sold them on the internet.

Fiona said that knowing her images are available on the internet meant she could have gone one of two ways in terms of development: becoming very socially anxious and withdrawn, or becoming very sexual. She ended up being sexual, although she also has social anxiety. She feels the better path was becoming sexual because she does not want to be like her sister, K██████. K██████ has social anxiety because of the sexual exploitation, and Fiona notes that K██████ has never had a boyfriend.

With regards to the availability of the images, Fiona said, "It bothers me. I hate it," but she doesn't sit there and feel bad about it. She said, "It was really bad at first," but she is doing better.

She does not consider her dad as a dad anymore. A██████ is a stepdad and cannot replace her dad.

<u>Future</u>: We asked Fiona again about college. She said she would like to go to ▓▓▓▓▓▓▓ but is concerned that her grades won't be good enough. She expects she will go to community college for two years and then transfer. As to what she might want to study, she said she was considering cosmetology or becoming a detective like her brother.

Fiona is not currently in counseling. She has difficulty trusting counselors due to the incident when her school counselor called child protective services, as well as an additional incident when her private counselor called child protective services after she disclosed having sex with an 18 year-old boy. In spite of this, Fiona expressed a desire for counseling. She stated that she knew that Erin had a good counselor and, and she would like to find someone like that.

## Impressions

On the one hand, Mrs. P▓▓▓▓ is still functioning and trying to make the best decisions she can for her children: both for Erin, who has been enormously damaged by her and her siblings' initial sexual exploitation and the continuing exploitation through the sharing of images online, and for Fiona, who emulated her sister but has been helped by hospitalization and relocation.

On the other, Mrs. P▓▓▓▓, by her own communications and insights as well as our observations, is chronically suffering, presently because of the knowledge that images of the sexual exploitation of her children are regularly be accessed, downloaded, shared, traded, and used for sexual gratification. She knows persons who access this material also use the images to entice other victims into sexual exploitation. She is affected by how these images are used.

Moreover, she is traumatized by knowledge that there are new and continuing cases against these pedophiles and that the problem of her children's exposure to more perpetrators expands the scope of their exploitation. Despite the fact her children are getting older and out of the range of desire of the pedophiles who are downloading their images, she worries that some deranged pedophile will be able to track her children and do them harm.

Erin's self-destructive behavior and compromised capacity to have a decent life speak to the catastrophic harm she has experienced not only because of her father's betrayal, but also because of the knowledge that she and her sisters are subject to repeated downloading of their images which are used for the sexual gratification of sexual predators against children. The likelihood of her ever having a normal life is minimal.

Fiona, although the primary object of the pornography, was drugged during most of the sexual assaults. Thus, her memory of the sexual assaults is attenuated. Nevertheless, she has an appreciation of how she was victimized. Her description about how she has responded to her victimizations by becoming sexual indicates that both the experiences of the sexual victimization and the knowledge that people are regularly downloading images of her sexual victimization have resulted in high risk-taking behavior. Her close

relationship with Erin has caused her to follow in her sister's footsteps in expressing her trauma by engaging in promiscuous and risky sexual behavior, substance abuse, and aggressive behavior. Presently, because of hospitalization, medication, and relocation, Fiona is doing much better. But she remains fragile and quite vulnerable to exploitation because of her abuse and her knowledge of how the images of sexual abuse are currently being used.

Respectively submitted,

Kathleen Coulborn Faller, Ph.D., A.C.S.W.
Marion Elizabeth Blue Professor Emerita of Children and Families
School of Social Work, University of Michigan
Co-Director, Family Assessment Clinic
Catholic Social Services of Washtenaw County
kcfaller@umich.edu